UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x

KEITH DAVIS,

Petitioner,

-against- CV 08-4659 (DLI)

JAMES W. WALSH, Superintendent,
Sullivan Correctional Facility,

Respondent.

---------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ MAR 17 2009 ★
BROOKLYN OFFICE

RESPONDENT'S EXHIBITS A, B, C, D AND E

ORIGINAL COPY

CHARLES J. HYNES
DISTRICT ATTORNEY KINGS COUNTY
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

LEONARD JOBLOVE
HOWARD B. GOODMAN
Assistant District Attorneys
of Counsel

March 2009

Davis v. Walsh

CV 08-4659 (DLI)

RESPONDENT'S EXHIBIT A

Hearing Transcript

ORIGINAL COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS : Part 23:CRIMINAL TERM

--------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK, : Indictment

-against- : 9148/2001

KEITH DAVIS : Hearing

Defendant. :

--------------------------------------x

120 Schermerhorn Street
Brooklyn, New York 11201

December 4, 2002

B E F O R E:

HONORABLE MICHAEL BRENNAN
SUPREME COURT JUSTICE

A P P E A R A N C E S:

CHARLES J. HYNES
District Attorney - Kings County
By: DVORA GOLOWA
Assistant District Attorney

AL DORFMAN
26 Court Street
Brooklyn, New York 11201
Counsel to Mr. Davis

TANYA MILO
SENIOR COURT REPORTER

stop stop stop

THE CLERK: Number three on the calendar, 9148 of 2001, Keith Davis. Defendant is present before the Court.

Appearances.

MR. DORFMAN: Al Dorfman for the defendant.

MS. GOLOWA: Dvora Golowa, G-O-L-O-W-A, D-V-O-R-A, first name.

THE COURT: It was sent here for a hearing, Dunaway, Huntley, Wade. I believe I have an application from the surety in this case concerning bail.

THE CLERK: Who put up the bail?

BAIL BONDSMAN: Empire Bail Bonds.

THE CLERK: The gentleman who paid the --

BAIL BONDSMAN: We have Keith -- Kasie Jeffer (ph).

THE COURT: I understand the surety has indicated that he or she wishes to vacate the bond. That's all well and good but I need the surety before me under oath to tell me that.

BAIL BONDSMAN: Your Honor, can I show you this document?

THE COURT: No.

BAIL BONDSMAN: Notarized by the surety.

THE COURT: Sorry, I have to have the surety here. You have the surety here tomorrow at 10:00 a.m. I'm going to revoke the defendant's bail until then.

BAIL BONDSMAN: I am one of the assigned surety --

THE COURT: I'm sorry, did you put up the money for the bond?

BAIL BONDSMAN: No.

THE COURT: Bail bondsman wrote the policy for the bond. Someone put up a guarantee for the bond and paid a fee. I want that person in front of me ten o'clock tomorrow morning.

MR. DORFMAN: Judge --

THE COURT: Since I've had an indication that the surety has indicated that he or she wishes the bond vacated, I am vacating the defendant's bail and setting new bail in the amount of 5,000 over 5,000. If the surety doesn't appear tomorrow, I will reinstate the bond.

MR. DORFMAN: Judge, can I request that at this time the defendant be ROR. The trial is eminent at this time, Judge. I have to prepare

the defendant for trial. I think -- I think he's -- it's greatly unfair to the defendant to have to be incarcerated at this time.

THE COURT: $5,000 bail is more than reasonable. That's the bail. It's on for tomorrow. Surety doesn't -- I have an -- I haven't exonerated bond. What I've done is established new bail for the defendant. If the surety doesn't appear tomorrow, I'll reinstate the bond. That's my ruling.

MR. DORFMAN: May I make one additional comment?

THE COURT: Go ahead.

MR. DORFMAN: The defendant has always appeared in court during the duration of this case. Every single time, probably amounts to 15, maybe 20 times and he's been checking into the bail bondsman's office every week. This is the only bail bondsman I understand requires the defendant to check in personally. He's been doing it every single week.

Your Honor, I ask in light of his attendance at trial -- for the pendency of this case, I ask that he be ROR until tomorrow.

THE COURT: That's denied.

Let's do the hearing. Both sides ready to proceed with the hearing?

MS. GOLOWA: Yes, Your Honor. I would move before I call my witness, I don't think that there is any reason for there to be a problem or any issues of suggestivity in the identification procedures. I am going to move to bifurcate the hearing.

THE COURT: I don't bifurcate. You do what you think is necessary to prove your case.

MS. GOLOWA: Okay.

THE COURT: Call your first witness.

MS. GOLOWA: People call Detective Delahunt.

D E T E C T I V E E D W A R D D E L A H U N T, called as a witness on behalf of the People, after being duly sworn testified as follows:

THE CLERK: Have a seat. In a loud, clear voice state your name shield and command.

THE WITNESS: Edward Delahunt. Shield 4776, Brooklyn Transit Robbery Squad.

THE COURT: You may inquire, counsel.

BY MS. GOLOWA:

MS. GOLOWA: Thank you, Your Honor.

Detective, what is your assignment?

A I'm assigned to the Brooklyn Transit Robbery Squad to do investigations on robberies.

Q And how long have you been employed by the New York City Police Department?

A Twenty-one years.

Q And of those years how many of those have been as a detective?

A Eighteen.

Q Now, were you employed by the New York City Police Department on November 29th, 2001?

A Yes, I was.

Q And were you working on that day?

A Yes, I was.

Q Now, directing your attention to that day, did you become involved in an investigation on that day?

A Yes.

Q And what kind of investigation was it?

A It was robbery one.

Q When you say robbery one, do you mean Robbery in the First Degree?

A Yes.

Q What was the location of the incident that you investigated?

A That was at Hoyt and Schermerhorn on the A

line.

Q That's the A subway station?

A Subway station, yes.

Q What was the date and time of the incident you were investigating?

A That was -- it was at 16:05 was the time and the date -- if I can refresh my memory.

THE COURT: You may.

THE WITNESS: Eleven/29/01, 2001.

THE COURT: You may refresh your recollection. Tell us what you're using to refresh your recollection.

THE WITNESS: The front of my folder, jacket.

Q And what county is that location in, Hoyt and Schermerhorn station of the A line subway?

A That's in Kings County.

Q How did you become involved in the investigation?

A I received a call from District 30 stating that there was an arrest for a robbery. One was arrested and there were two outstanding perpetrators.

Q And what did you do after you received that call?

A I responded over to District 30 to --

Q Go ahead.
A -- to investigate the incident.
Q Where is District 30 located?
A It's at Hoyt and Schermerhorn on the A line.
Q And do you know approximately what time you got there?
A It was between seven and 7:30, probably.
THE COURT: P.M.?
THE WITNESS: P.M., correct.
Q And when you got there, who did you speak with?
A I spoke with the arresting officer, I also spoke to the complainants involved in the incident.
Q What was the name of the police officer that you spoke with?
A At this time --
THE COURT: You may refresh your recollection.
(Brief pause.)
Do you have anything that would refresh his recollection?
Q Yes. Detective I'm going to ask that you be handed a voucher from this case if that will help refresh your recollection?
A It says P.O. Schule (ph).

Q And what were the names of the complainants that you spoke with?

A I spoke with a Keith Davis, Andrew Glover and -- excuse me I spoke with Joseph Davis, Thomas Norwood and a Dennis Fitzgerald.

Q And what was the substance of your conversations with these individuals, briefly; what did you learn about the incident?

A I learned that they were on a train and they were seated on a train and across from them there was three other --

MR. DORFMAN: Excuse me, Judge. I'd like to know specifically what each person said. He's -- what he's testifying to is his conclusions as to what they said, not to what they said.

THE COURT: Overruled.

THE WITNESS: What I learned was that they were riding on the train, heading Manhattan bound. There were three other gentleman seated across from them. One of the gentleman said something to the effect there is -- I have to refresh my memory to the name that they had called him. Is that all right, Your Honor?

THE COURT: Yes.

THE WITNESS: Romeo. They said there is

Romeo and one of the complainants is in rap videos and his name is Romeo, stage name is Romeo and at that point one of the gentleman across from him got up, walked over and displayed a weapon and when --

THE COURT: Indicate which one.

THE WITNESS: He indicated Muldrew (ph), the one arrested at the scene had a weapon -- had a gun. When one of his friends came up to try and help him, the other two got up and one displayed a knife and pushed Mr. Davis' friend away towards the back of the train, away from what was going on right there.

Q Detective, I'm going to interrupt you to try to clarify because you mentioned friends and I don't think it's clear as to whose friends you're talking about and if you could refer to Mr. Davis with their first name as well since we have Joseph Davis as the complainant and Keith Davis as the defendant.

A Joseph Davis, one of his friends came up to try and help.

Q Was that one of the other individuals that you had spoken with?

A Right. And at that point a knife was displayed by Muldrew's friends which turned out to be

Keith Davis and Andrew Glover.

Q Just to clarify, you stated that Muldrew was under arrest at the time you were having a conversation with the complainants?

A Yes, that's correct.

Q At the time you were having the conversation with the complainants, were you aware of the identity of either Keith Davis or Andre Glover at that time?

A No, I wasn't.

Q So it was the other two individuals?

A Right, the other two individuals came up and intervened when Mr. Joseph Davis' friends tried to stop the incident or help him and the knife was displayed. They were pushed away to the back end of the train. The robbery then occurred. Property was taken and when the train pulled into Hoyt and Schermerhorn, the complainant as the train was pulling into Hoyt and Schermerhorn, Joseph Davis, Thomas Norwood and Dennis Fitzgerald were put between the cars and made to stay there and the other three that were involved in the robbery ran.

Q Now during your conversation with the complainants did you learn whether -- withdraw that.

Did you receive a description of the two individuals that had not been apprehended at that

time?

A Yes.

Q What were the descriptions that you got?

A One was that one was shorter with a scar on his face. The other was much taller and I have other descriptions but I don't recall them right at this point. I'd have to refresh my memory.

Q What would you use to refresh your memory?

A One of my DD-Fives.

MS. GOLOWA: With the Court's permission.

THE COURT: Go ahead.

(Brief pause.)

THE WITNESS: I have one. It would be male black, 23, six-three. Light -- black jacket doo rag and the second -- third would be male black 23, five-five, scar on the face, black leather jacket and brown jeans.

MR. DORFMAN: What was the last thing he said, Judge?

THE COURT: What was the last thing you said?

THE WITNESS: Brown jeans.

Q Now, detective, you said that a knife had been displayed. Did Joseph Davis tell you who

displayed a knife?

A He said the man with the scar displayed a knife.

Q And you stated that you had learned that an individual by the name of Jeremiah Muldrew had been arrested that night?

A That's correct.

Q And did you learn whether a weapon had been recovered?

A Yes.

Q And what weapon was recovered?

A A gun.

Q And on that date, on November 29th, 2001, besides Jeremiah Muldrew, was anyone arrested with regard to this case?

A No, there wasn't.

Q And were you able to ascertain the identity of the individual with the scar on November 29th, 2001?

A No, I didn't.

Q Did there come a time that you learned the identity of the individual with the scar?

A Yes.

Q And when was that and how did that come about?

A I have to refresh my memory on the date, Your

X Is this consistent knife

Honor.

THE COURT: You may.

(Brief pause.)

THE WITNESS: That was on December one I received a call from Joseph Davis and at that point --

THE COURT: December 1,2001?

THE WITNESS: 2001, that's correct, Your Honor.

THE COURT: Go ahead.

THE WITNESS: And he stated that he knows a few people in the Rockaways and he spoke to some people and he described the male with the scar and they told him that it was Keith Davis and he lived at 4020 41st Street in the Rockaways, Queens.

Q And as a result of that conversation with Joseph Davis, what did you do next?

A I then went into my computer and I did a check on the name and I found that there was a Joseph Davis that lived at 4020 Beach Channel Drive.

Q Detective, I'm sorry, you said you were looking for Joseph Davis or Keith Davis?

A Keith Davis. Keith Davis and I found that there was a Keith Davis that lived on 20 -- 4020 Beach

Channel Drive and he was on parole until the 2005.

THE COURT: What was the name of the street?

THE WITNESS: Beach Channel Drive.

Q So it wasn't the same street that had been given to you by Joseph Davis?

A No, but they cross each other from what I can gather with the addresses. 4020 is right at Beach Channel Drive. Well, no -- it's close by. It's not that far off.

Q And after discovering this information during your check, what did you do next?

A I went into my computers and -- I found a photograph of Keith Davis and I made an array up, a photo array up.

Q How did you prepare that photo array?

A Well, what I did was I put in -- I went into a certain area called the array area. I put in the NYSID number that I had for Keith Davis and his photo came up and then what happens is it does a search for other people within the same height, weight and range and it will give me three, 400 other photos to choose through to make an array.

Q How many photos did you actually select for the array?

A Five.
Q It's five plus Keith Davis?
A Right.
Q And what did you do with that photo array?
A I took that to the Joseph Davis' house.
Q And did you speak with Joseph Davis before you brought that photo array over?
A I called him to make sure he was home to let him know I was going to come over and let him look at photos.
Q And approximately what time did you get to his house?
A Approximately 8:30 p.m.
Q And what did you say to him when you got there?
A Told him I was going to show him six photos to see if he recognized anyone.
Q And where did this take place?
A At his residence.
Q And was anyone else present at the time besides yourself and Joseph Davis?
A One other detective.
Q And what happened?
A I showed him the array and he immediately picked out Keith Davis' photograph out of the array.

Q And did he say where he recognized Keith Davis from?

A Excuse me?

Q Did he say where he recognized Keith Davis from?

A Oh yes. He said that was the guy who had the knife the night he was robbed.

THE COURT: I'm sorry?

THE WITNESS: That was the person that had the knife the night he was robbed.

Q And after Joseph Davis picked out Keith Davis' picture in the photo array, did you have Joseph Davis do anything else?

A Not at that point but later on --

Q Did he do anything with regard to the photo array?

A Okay, I'm sorry. I didn't -- he signed the photo array, he dated it. He put down what position the person he recognized from the robbery was in and he initialed it also.

Q And what position was it that Keith Davis was in?

A He was in position number one.

Q Now, detective, do you have that photo array with you today?

A Yes, I do.

Q And from the day that you showed it to Joseph Davis until today where has that photo array been?

A It's been in my file either at my office or the District Attorney's Office.

MS. GOLOWA: And I'm going to ask at this time that the photo array be marked People's one.

THE COURT: It's deemed People's one for purposes of identification.

(So deemed.)

Q Detective, looking at --

MR. DORFMAN: May I see it.

THE COURT: Show it to counsel.

(Brief pause.)

MS. GOLOWA: Judge, just for the record, Mr. Dorfman was just asking me with regard to what I had turned over previously and a copy of a -- a photocopy of the photo array exactly as it's appearing in what's deemed People's one --

THE COURT: Color copy?

MS. GOLOWA: Not a color copy. It's a black and white copy was turned over.

THE COURT: Go ahead.

Q Detective, looking at what's been deemed

People's one for identification, does that -- is that in the same or substantially the same condition as it was when you showed that photo array to Joseph Davis on December 1st, 2001?

A Yes.

Q And is there anything different about it from when you showed it to him?

A No -- well accept for the signature and the initials and date he put on after I showed it to him. It's the exact same.

MS. GOLOWA: I would now ask that what's been deemed People's one for identification be moved into evidence as People's number one.

THE COURT: Any objection, counsel?

MR. DORFMAN: May I have a short voir dire?

THE COURT: Go ahead.

MR. DORFMAN: People's exhibit one does not have the NYSID, arrest date or arrest number on it, does it?

THE WITNESS: No it doesn't.

MR. DORFMAN: When you showed the photographs that are shown in People's exhibit one to Mr. Davis, did the NYSID arrest date and arrest notice have it on it?

THE WITNESS: Were they on -- no they weren't.

MR. DORFMAN: They were not?

THE WITNESS: No.

MR. DORFMAN: And this identification -- the rest is really -- one minute.

I'll save the rest for cross-examination. One second. Let me take a quick look at it.

I'll save it for cross-examination.

THE COURT: Received in evidence as People's one.

May I see it.

(So marked.)

Q Detective, did you say anything to Mr. Joseph Davis after you finished with the photo array that day?

A I just told him that in the future I'd be needing him to view a line up.

Q And what happened next with regard to the case against Keith Davis?

A On the third, December 3rd, 2001, I called the parole office and I spoke to Senior Parole Officer Lever or Leifer (ph), I don't know how you pronounce it exactly, but I told him that I was looking for Keith Davis and he said to me that next day he had an appointment to come to the parole office between six

and eight p.m -- six a.m. and eight p.m. There was no set time but he was supposed to be in the next day and he told me that when he arrives he's going to call me and hold him for me.

Q And when you said the next day, that's referring to December 4th, 2001?

A That's correct.

Q And did you ask Parole Officer Leifer to do anything for you with regard to the defendant?

A I asked him to hold him when he got him. If he did come in, hold him for me.

Q I'm directing your attention, detective, to December 4th, 2001, were you working that day?

A Yes, I was.

Q Did you receive any communications from the parole office?

A Yes.

Q Who did you speak with?

A I'll have to refresh my memory to the name.

THE COURT: You may.

THE WITNESS: Thank you, Your Honor. Parole Officer Marcus called me up about 9:45 in the morning and told me that Keith Davis was in his office and he was holding him for me.

Q And what did you do after that conversation?

A I responded over to the parole offices over at Merrick Boulevard in Queens.

Q And what happened when you got there?

A I took Mr. Keith Davis into custody and brought him -- put him in our car and brought him back to District 32.

Q Now, approximately what time on December 4th, 2001, did you take Keith Davis into custody?

THE WITNESS: I'll refresh my memory one more time here, Your Honor.

THE COURT: You may.

THE WITNESS: Approximately 11:00 o'clock in the morning, a.m.

Q Now, detective, looking around the courtroom here today, do you see the person that you took into custody that you knew as Keith Davis in the courtroom today?

A Yes.

Q Can you point him out and identify him by an article of clothing?

A He's wearing the gray pullover shirt.

THE COURT: The Detective has identified the defendant for the record.

Q Thank you, Your Honor. And you stated that you took the defendant in your car to go to District

32, what's at District 32, detective?

A That's our office. Our offices over at District 32.

Q And, did you say anything to the defendant when you took him into custody?

A I basically told him that we were taking him back to my office to place him in a line up because of an incident that happened on 11/29 -- I mean October -- November 29th, 2001 at the train station at Hoyt and Schermerhorn.

Q And did anything happen in the car?

A At that point he said to me that he knew what I was talking about and he wanted to tell me all about it and I told him wait until we get back my office and we'll sit down and we'll discuss it there. I said you know we've got to read you your rights. He said I know might rights. He said listen I'm telling you right now I wasn't involved in it. I met two --

MR. DORFMAN: I was or wasn't?

THE WITNESS: I wasn't. He says he met two friends. They got involved with a rapper. One of them got involved with a rapper and I got up and went the other way when the incident started. I again told him listen, wait until we get to my office and we'll discuss it then.

Q And approximately what time did you get back to the office?

A Probably between 12, 12:15.

Q And what happened --

THE COURT: Is that midnight?

THE WITNESS: No that's p.m., afternoon.

THE COURT: Okay.

Q What happened when you got there?

A I brought him in front of the front desk. We have to search all prisoners and I brought him -- after the initial search I brought him to the back into the cell area and I put him in the right cell, the furthest cell from the -- the furthest cell you could put him in. I always put prisoners I'm going to put in a line up in that cell just because if the door is open and complainants walking down the hallway, they can see into the cell area so I put them all the way over where you can't see that cell just looking straight down the hallway and I put him in there and I told him that, you know, I'd be back to talk to him in a little while.

Q So the cell that you put the defendant in, just to clarify, you could not see that cell if you were walking down the hallway?

A Right. If the door was open, you could only see the cell directly in front of you.

Q That's not the cell he was in?
A That's not the cell he was in.
Q Do you know if the defendant was given anything to eat or drink?
A I believe I bought him a sandwich and soda.
Q Was he given an opportunity to go to the bathroom?
A Oh yeah, sure.
Q Did there come a time that you spoke with the defendant further about the case?
A Yes.
Q And what time was that?
A I spoke to him about -- approximately 2:00 p.m. 14:00 hours.
Q Where did that conversation take place?
A That took place in a small room we used for line ups and interviews. That's within the cell area.
Q And who was present at the time?
A It was me and him and I really don't recall if there was another detective with me. There could have been. I just don't recall.
Q Besides possibly another detective, were there any other civilians or anybody else there?
A No.
Q At the time you were speaking with the

defendant was he cuffed or uncuffed?

A Uncuffed.

Q Was he sitting or standing?

A He was seated.

Q And were you sitting or standing?

A I was seated.

Q Did you have your gun on you at the time that you were speaking with the defendant?

A No. Guns aren't allowed into that area.

Q And were any threats or promises made prior to speaking with the defendant?

A No.

Q Did you do anything before you actually spoke to the defendant about the case?

A Yes.

Q What did you do?

A I read him his Miranda rights.

Q Did you use anything to help you?

A Yes, I used a sheet that we -- a statement sheet that we always read the rights off of.

Q And when you say you used a statement sheet, is there something else on that sheet besides the Miranda warnings?

A There is a space for location of interview, name of interviewer, name of subject, starting time,

stopping time and date.

Q Okay, what about the actual statement, where would that go?

A The statement would go in the middle, right below the Miranda warnings.

Q On that same piece of paper?

A Yes.

Q And detective, I see you're actually holding a piece of paper. Do you have with you today the statement sheet you used to assist you in reading the defendant his Miranda warning on that date, on December 4th, 2001?

A Yes.

MS. GOLOWA: At this time I would ask that this be deem marked People's two for identification.

THE COURT: So ordered.

(So deemed.)

Q And detective, what exactly is on People's two for identification?

A I have like I said the Miranda warnings. If you want me to read them.

Q First if you could tell us what's on it.

A What's on it is Miranda warning and then a written statement and it also has times and date of the

interview; what time it started, what time it stopped.

Q Whose written statement is that?

A This is Keith Davis'.

Q And that sheet, People's two for identification that you're holding, is that in the same or substantially the same condition that it was when you used it to assist you in giving the defendant his Miranda warnings on December 4th, 2001?

A Yes.

Q And does that contain the entire written statement of Keith Davis as it was written before you on December 4th, 2001?

A Yes.

MS. GOLOWA: At this time I would ask that what's been deemed People's two for identification be moved into evidence as People's exhibit two.

THE COURT: Show it to counsel.

MR. DORFMAN: No objection.

THE COURT: Proceeded into evidence as People's number three and will be so marked.

(So marked.)

Q Detective, using People's two in evidence to assist you, can you please demonstrate for the Court how it was that you advised the defendant of his

Miranda warnings on December 4th, 2001?

A 2001 we got in the room. I told him I was going to read him his rights and what I normally do is read them straight through and let him take it and sign -- put his answer --

THE COURT: Tell us what you did in this case.

THE WITNESS: That's exactly what I did. I read him his rights.

"You have the right to remain silent and to refuse to answer questions. Do you understand?" And he said yes.

"Anything you do say may be used against you in a court of law, do you understand?" And he said yes.

Q Detective I'm going interrupt you for a moment. Was any -- were any notations made at the time that the defendant answered yes to your first question?

A No.

Q Okay. Go ahead.

A "You have the right to consult an attorney before speaking to the police and to have an attorney present during any questioning now or in the future, do you understand?" He said yes.

"If you can not afford an attorney, one

will be provided for you without cost, do you understand?" And he answered yes.

"If you do not have an attorney available, you have the right to remain silent until you've had an opportunity to consult with one, do you understand?" He said yes.

"Now that I've advised you of your rights, are you willing to answer questions?" He said yes. I then asked him to take it back, put his answers, reread it if he wanted and put his answers down and his initials next to each question, which he did. And --

Q What were the answers that the defendant put down next to each question?

A It was yes, yes, yes, yes.

Q And did he place his initials there?

A Yes, he did.

Q Then what happened?

A Then I asked him if he understood all his rights and he said yes and I asked him to sign the top line which he did and then I signed the line below him.

Q Okay and after the -- you finished with the Miranda rights, did the defendant still agree to speak with you?

A Yes, he did.

Q And what happened?

A Basically what happened was that I asked him to tell me his side of the story, what happened and he stated that he was on the train, he had met a couple of friends and an incident occurred and he went the other way because he was on parole and he didn't want to be involved in the incident. He said everybody was running and I ran.

Q During the time that the defendant was telling you this, what were you doing?

A I just listening to what he had to say.

Q Were you writing anything down at that time?

A No.

Q And after he told you what he had to say, the statement that you just said, what happened next?

A I asked him to write out the best he could the statement he just gave me.

Q And did he do that?

A Yes.

Q Where did he write it?

A Right below my signature.

Q On People's two for identification?

A Yes, that's correct.

THE COURT: People's two in evidence.

MS. GOLOWA: I'm sorry People's two in

evidence. Thank you.
Looking at People's two, can you please, detective, read for the Court --
THE COURT: It speaks for itself. I read it. He doesn't have to read it out loud.
MS. GOLOWA: Thank you.
After the defendant wrote out his statement on People's two in evidence, did he make any further markings on People's two?
A I asked him to sign his name right next to where he finished his statement.
Q What's the purpose of that?
A So no one could add anything to the statement.
Q And did he sign it any place else?
A Yes I also had him sign it at the very bottom.
Q And did you add any notations?
A I signed my name below his.
Q Now, was anything further done that day with regard to Keith Davis?
A Yes a line up was conducted or two line ups.
Q And --
MR. DORFMAN: Two what?
THE WITNESS: Two line ups.

Q Who viewed those line ups?
A Joseph Davis and Thomas Norwood or Norwood Thomas.
THE COURT: Sorry, the second name?
THE WITNESS: It's Norwood Thomas, I believe.
THE COURT: Norwood Thomas.
THE WITNESS: Right.
Q Now, how did you go about contacting Joseph David and Norwood Thomas?
A I called them by phone.
Q And what did you tell Joseph Davis when you called him?
A I just told him I needed him to come into my office to view a line up.
Q And what about Norwood Thomas?
A Same exact thing.
Q Now, you had -- you said that you had spoken with a third individual named Dennis Fitzgerald on the day of the incident, November 29th?
A That's correct.
Q And did he view a line up of Keith Davis?
A No, he didn't.
Q Why not?
A I couldn't get in touch with him. Phone

numbers I had for him were either not working on just rang.

Q And how did Joseph Davis and Norwood Thomas get to Transit District 32?

A They got there from what I remember under their own accord, either by train or by car. I really -- I know they came on their own.

Q So, no police officers were sent to pick them up?

A From what I remember, no.

Q And approximately what time did they get to your office?

A The exact time I really don't recall. Even reading my paperwork I don't remember exactly. I don't think that I --

Q Let's try to narrow it down. Detective it was before or after you had the conversation with the defendant where he wrote out the statement?

A After.

Q What time were the actual line ups conducted?

A The line ups were conducted at approximately 5:42 to 5:44.

Q It was sometime between 2:30 and 5:45 that the witnesses came down to the precinct?

A That's correct.

Q And after you finished speaking with Keith Davis or the defendant, where was he taken?

A He was put back into the cell.

Q Was he put back into the same cell you mentioned originally?

A That's correct.

Q And when the witnesses came into the command, where were they taken?

A They were taken, we made sure the back door was closed and they were taken into my office.

Q When you say the back door, which back door?

A The back door leading into the cell area.

Q So from the time that they came into the command until they came into your office would they have had an opportunity to see Keith Davis?

A No.

Q And who else was in the line up besides --

MR. DORFMAN: Excuse me, Judge, I move to --

THE COURT: I'm sorry?

MR. DORFMAN: I'm sorry, Judge, I move to strike the question -- I object to the question, did they have any opportunity. I don't know if that's within his knowledge.

THE COURT: Don't lead. Sustained.

Q Detective, who else was in the line up besides Keith Davis?

A There were five what they call fillers.

Q And where were the -- where did the fillers come from?

A These fillers came from the shelter on Atlantic Avenue and Bedford Avenue.

Det. got fillers so who's watching c/w's

Q Who got the fillers?

A I did.

Q How did you choose the fillers?

A I chose them on size. I tried to get approximately the same height and approximately the same weight and skin tones.

Q And what time did you bring the fillers to the command?

A That was just before the line up was ready to go.

Q Who was at the command first, were the witnesses at the command or fillers?

A The witnesses were.

Q And where were the fillers taken when they -- when you brought them back?

A Well, what we do is when we come back --

Q What did you do in this case?

A I'm telling you what we do, when we come back

I make sure that the doors are locked and any window shades are down so the fillers can't be viewed prematurely by the complainants or the witnesses and we make sure that the doors are secure and we bring them down the hallway past my office and into the line up room.

Q Where were the witnesses on December 4th, 2001?

A They were secured in my office.

Q And where was Keith Davis at that time?

A He was in the cell, in the right hand cell in the back.

Q And are witnesses ever allowed to go into the cell area?

A No.

Q Once you got the fillers in the line up room, what did you do next?

A I got the names, addresses from all fillers, I took photographs to memorialize the line up. I brought Keith Davis out and let him choose his spot where he wanted to sit.

Q What number did he chose?

A He chose position three if I'm not mistaken. Yes, position three.

Q And at the time that you brought Keith Davis

from the cell to the line up room, where were the witnesses at that time?

A They were secured in my office.

Q From your office can you see the path that was taken by the defendant to the line up room?

A No.

Q You said that -- withdrawn.

How was the line up arranged?

A There were people, five fillers sitting on benches and like I said Keith Davis, I asked him what position he wanted to sit in and he sat in position three and I gave everybody a number to hold. I also put band aids, big band aids over everybody's face and had Keith Davis cover his scar and everybody put on a band aid on the same exact spot or close as they could match to that spot on the face.

Q What's the reason for that?

A Because I didn't have people with scars on their face. He was the only one with a scar in the line up.

Q Did you have anything else in arranging the line up?

A I gave everybody hats because there were different hairdos and we wanted to make it fair and, you know, have everybody look the same.

Q Did everyone receive the same hat or different hats?

A Same hat.

Q You stated, detective, that you memorialized the line up with photographs?

A Yes, did I.

Q What kind of photographs did you take?

A Polaroids.

MS. GOLOWA: And at this time I'm going to ask that the detective be handed what I'm going to ask be deem marked People's 3A, B and C for identification.

THE COURT: Deem People's 3A, B and C for purposes of identification.

(So deemed.)

Q Detective, looking at People's A, B and C for identification, do you recognize them?

A Yes.

Q What do you recognize them to be?

A I recognize them to be the photos I took that day.

Q And what are those photos of?

A Of the line up.

Q And do those photographs fairly and accurately represent the line up as conducted on

December 4th, 2001 with respect to defendant Keith Davis?
A Yes.
Q Do those photographs fairly and accurately represent the line up as it was when it was viewed by Mr. Thomas?
A Yes.
Q Does it fairly and accurately represent the line up as it appeared when it was viewed by Joseph Davis?
A Yes.
MS. GOLOWA: At this time I'm going to ask that People's 3A, B and C be moved into evidence as People's 3A, B and C.
THE COURT: Counsel?
MR. DORFMAN: No objection.
THE COURT: I'm sorry?
MR. DORFMAN: No objection.
THE COURT: Received in evidence as People's 3A, B and C and will be so marked.
May I see them.
(So marked.)
Q Detective, after the line up was prepared, what did you do next?
A I then brought -- I actually, what I did was

separated the two witnesses, the complainants and Mr. Norwood Thomas and Mr. Joseph Davis. I separated them. One in one office -- one stayed in my office and another one to a different office.

Q At what point had you separated them?

A Just prior to the line up.

Q Then what happened?

A What happened then was Mr. Norwood Thomas viewed the line up first at approximately 5:42.

Q And where did he view the line up from?

A In my office we have a back room which doubles -- it's an office plus it doubles as a viewing room for the line up. We brought him in there and just prior to the line up, I told him that I'd be asking him three questions one being do you recognize anything. The second, what number do you recognize. What number is that person holding and number three, where do you recognize that person from.

Q And when you say that it's a viewing room, what -- what do I look through?

A You look through a one-way mirror. The room is dark. We have to close the lights and shut the door and we lift up a paper that we have over a window, you know, one way mirror.

Q So, at the time that you brought Norwood

Thomas to the viewing area, where was Joseph Davis?

A He was in a separate office across the hall.

Q And is there a door to the viewing area room?

A Yes.

Q Was it open or closed?

A Closed.

Q What happened when Norwood Thomas viewed the line up?

A He lifted up the -- a piece of paper or cardboard and he immediately told me that he recognized number three.

Q And did he say where he recognized him from?

A Yes he said he was the guy holding the knife in his pocket that day on the train, on the A line.

Q And then what happened?

A We concluded the line up. I took him and put him in a third room, a separate room. My boss' office so I could conduct the second line up and there wouldn't be any way that Joseph Davis or Norwood Thomas could talk to each other in between the two line ups.

I put him in a separate office, closed the door and then took Joseph Davis in to view the line up.

Q Was anything between the line up changed between the time Norwood Thomas viewed it and Joseph

Thomas viewed it?

A No.

Q What happened when Joseph Davis came into the area?

A I told him the exact same thing. I had asked him three questions, one do you recognize anyone, two, what number do you recognize or what number is that person holding and three where do you recognize him from.

Q And what happened when Joseph Davis viewed the line up?

A He identified the defendant in position three. He indicated number three Keith Davis was one of the ones that robbed him. He's one of the three guys on the A train and -- robbed me and my friend?

MR. DORFMAN: I didn't hear that last part of his answer.

THE WITNESS: He said he was one of the three guys that robbed his friend and him.

Q And what happened after the witnesses viewed the line up with regard to Keith Davis?

A I placed him under arrest.

MS. GOLOWA: I have no further questions.

THE COURT: Cross-examination.

BY MR. DORFMAN:

Q Officer, when Mr. Thomas and Mr. Davis came -- withdrawn.

What do you call it, 32 District?

A District 32.

Q District 32. What is the nature of District 32?

A It's a police -- a transit police district or precinct.

Q It's a what?

A Transit police precinct or district. They call them districts instead of precincts.

Q I see. Where is it located?

A It's located at 960 Carroll Street.

Q That's between what?

A At the corner of Franklin Avenue.

Q Is this above ground, I assume?

A Yes, sir.

Q It's not in any subway station, is it?

A No, sir.

Q Now when Mr. Thomas and Mr. Davis, Joseph Davis and Norwood Thomas came in, did you get any statement from them as to what happened?

MS. GOLOWA: Objection, which day?

THE COURT: I'm sorry. Who are you

talking about, the victims?

MR. DORFMAN: Yes.

THE COURT: Did you take statements from the victims?

THE WITNESS: Which day?

Q December 4th that's the day of the identification?

A That's the line up, correct.

Q Did you take any statement?

A The only statement I took from them that day were what they had said at the line up.

Q And can I see the statement that they -- that you took from them?

A The very bottom they wrote in their own handwriting.

Q Now, did you have were any previous statements given by these defendants --

THE COURT: Defendants or complainants?

MR. DORFMAN: You're right Judge. I'm sorry.

Were any previous statements given by these complainants, talking about Joseph Davis and Anthony -- and Thomas Norwood or Norwood Thomas to the police prior to this date?

A Yes.

Q You have them with you?

A I have one statement that was -- that I had typed up when I interviewed Joseph Davis.

Q When was that interview?

A That was on 11/29/01.

Q Do you have that with you?

A Yes, I do.

Q May I see it please?

A This DD-Five right here.

Q Could you take it out and give it to me?

THE COURT: Were you provided copies?

MR. DORFMAN: No.

MS. GOLOWA: Mr. Dorfman was provided copies, hand delivered copies of the Rosario which included the line up report, every piece of paper that's been referred to in this hearing today was provided to Mr. Dorfman on 11/29.

MR. DORFMAN: May I have that. I may be mistaken. I withdraw that until I overlook my papers. I'm sorry I said that, Judge.

MS. GOLOWA: Judge, all the copies of materials provided to Mr. Dorfman were redacted as to take out any personal information of the complainant. I'm going to ask that the defendant not be able to view any original paperwork from

the detective.

THE COURT: That's correct.

MS. GOLOWA: If Mr. Dorfman needs to borrow any redacted copies, I'll give it to him.

THE COURT: Don't leave it there. Give it back to the detective and use the redacted copy.

MR. DORFMAN: Incidentally, Judge, there was nothing redacted.

MS. GOLOWA: I don't know what's on each piece of paper.

MR. DORFMAN: On the thing we just talked about.

THE COURT: Next question, please.

Q Now, did Joseph Davis say that the defendant Keith Davis, took out a knife during the course of this robbery?

A Yes.

Q And did he -- where did he say that -- when did he say that?

A He said -- he told me that on 11 --

Q When did he say that; on what date --

THE COURT: He's just answering your question.

THE WITNESS: On 11/29/01, 2001.

Q Where did you get that statement from him; where were you located when you got that statement from him?

A That was at District 30.

Q Thirty, not 32?

A Yes.

Q Where is District 30 located?

A At Hoyt and Schermerhorn.

Q Did you make a written statement -- did you get a written statement from Mr. Davis that Keith Davis took out a knife?

MS. GOLOWA: Objection, Your Honor. This is beyond the scope of the hearing.

THE COURT: Did you get a written statement from Mr. Davis on that date?

THE WITNESS: No.

Q Did you write it out that he told you that?

A What he told me was that the man with the scar, the shorter guy with the scar, he had -- he took out a knife.

Q And did you write that down in your notes?

A I wrote it out in my -- I typed it out in my DD-Five.

Q Can I see that, please?

THE COURT: Don't you have a copy of it

counsel?

MR. DORFMAN: I probably do --

MS. GOLOWA: It's the same copy I just handed you.

Q Are you telling the Court that when you spoke to Joseph Davis you said that someone pushed him between -- from the car he was in originally into the next car?

A Between the two cars, not into the next car. It was between the car he was originally in and the car -- the next car.

Q What car was -- when you say he was, you mean the victims, right?

A Yes.

Q The victims were in which car originally?

MS. GOLOWA: Judge, this is beyond the scope of the hearing.

THE COURT: Sustained.

Q And did Joseph Davis say that he was pushed into the next car from the one he was originally in?

MS. GOLOWA: Objection.

THE COURT: Overruled, you may answer.

THE WITNESS: No he said he was pushed between cars.

Q What did he mean when he said between cars?

MS. GOLOWA: Objection.

THE COURT: Sustained it requires that witness to know the mind of the victim.

MR. DORFMAN: Very well.

Q Did you ask the defendant -- the victim what he meant by between two cars?

THE COURT: Sustained.

Q Did the victim tell you what he meant when he said he was pushed between two cars?

THE COURT: Sustained.

Q Did he say who pushed him between two cars?

MS. GOLOWA: Objection.

THE COURT: Overruled.

You may answer.

THE WITNESS: I'm thinking back to what he said, Your Honor.

From what I remember he said that all three perpetrators made them go between cars. They were forced to go between cars by all three. They were told get between the cars.

Q Let me ask you this, did the doors to these cars open?

MS. GOLOWA: Objection.

THE COURT: Sustained.

Q Did the doors between the different cars

open?

THE COURT: Sustained.

Q Did you prepare a felony complaint in this case?

A Did I prepare, no the District Attorney did.

Q Where did the District Attorney prepare the felony complaint?

THE COURT: Sustained.

Q Did you speak to Norwood Thomas on November 29th?

A Yes, I did.

Q And did he give you his description of the incident?

A His description was basically the same thing as Joseph Davis'.

Q And his description was that the defendant, Glover, displayed and pointed a knife at him, isn't that correct?

MS. GOLOWA: Judge, I'm going to object to this whole line of questioning. The issue is whether or not there is enough probable cause that this defendant participated in a robbery the specifics are issue for trial.

THE COURT: Sustained.

MR. DORFMAN: Judge, on that issue the

defendant denies that he was involved in this robbery.

THE COURT: I understand that.

MR. DORFMAN: And I have -- what -- the question I'm asking now --

THE COURT: There has been evidence that two people stated that he used a knife. So you can restrict yourself to that, not what somebody else did.

Q Did you speak to the defendant, Norwood Thomas, yes or no?

MS. GOLOWA: He is the complainant.

THE COURT: He is the victim, not the defendant.

Q The victim, Norwood Thomas?

A Yes.

Q And did he give you a description as to what happened?

A Yes, sir.

Q And he did not say that the defendant, Keith Davis, had a knife, did he?

MS. GOLOWA: Objection.

THE COURT: Overruled. You may answer.

THE WITNESS: He said that the male with the scar had his hand in the pocket like he had a

knife.

Q And he also said that the defendant, Glover, displayed a knife, isn't that correct?

MS. GOLOWA: Objection.

THE COURT: Overruled. Did he say that?

THE WITNESS: I don't recall him saying that, Your Honor.

THE COURT: Next question.

Q I'd like to refresh your recollection.

THE COURT: He has a recollection. He says he didn't recall him saying that.

Q Did you take down a statement from Norwood Thomas?

MS. GOLOWA: Objection.

THE COURT: Overruled. Did you?

THE WITNESS: I didn't type one but I did listen to what -- he basically like I said, he basically said exactly what Joseph Davis said with the exception of him saying that the man with the scar put his hand in his pocket like he had a weapon.

Q Did you ask him what he meant by put his hand in his pocket?

THE COURT: Sustained.

Q Did you ask Norwood Thomas if the defendant

Glover had a weapon?

MS. GOLOWA: Objection.

THE COURT: Sustained.

Q Do you have -- you took down information about the fillers and the subject of the line up, isn't that correct? You took down information such as height, weight, age?

A That's correct.

Q Hair, did you not?

A Yes, sir.

Q You have that information with you?

THE COURT: Did you provide him with a copy of that?

MS. GOLOWA: Yes.

THE COURT: Look through your file, counsel.

Q Do you know how tall the defendant was?

A Excuse me?

Q Do you know how tall the defendant was?

A Was or is?

Q Was.

THE COURT: Did you take pedigree from him?

THE WITNESS: Yes.

THE COURT: He told you how tall he was?

THE WITNESS: No I stood next to him and I judged from my height. I have him as about five-eight.

Q And do you know what his weight was?

A Approximately 165, 160.

Q Now when you called up Davis and Norwood before the line up was held, is that correct?

A That's correct.

Q You called him up on December 3rd, the day before the line up?

A No.

Q The same day as the line up?

A Yes, sir.

Q And what time did you call them up?

A I began trying once I got back to my office somewhere around 11:30, 12:00 o'clock.

Q And did you tell Mr. Davis -- who did you speak to first?

A Mr. Joseph Davis, I believe, I got in touch with first.

Q And did you tell him you had a suspect in your office?

A All I told him was that I wanted him to come view a line up.

THE COURT: Did you tell him you had a

suspect in your office?

THE WITNESS: No I told him I needed him to come and view a line up.

Q Did he ask you if you caught somebody?

A Not that I can recall.

Q Did he say anything in response to the fact that you told him you wanted him to view a line up?

MS. GOLOWA: Objection.

THE COURT: Sustained.

Q Did he say anything after you told him you wanted him to view a line up?

MR. DORFMAN: Objection.

THE COURT: You may answer.

THE WITNESS: He said he'd be in as soon as he could.

Q Did you tell him where to come?

THE COURT: Sustained. It's irrelevant for purposes of this hearing.

Q When he got to the office, to the District 32 office, who was the first one who spoke to him from the district?

A Probably the desk officer.

Q And do you know what the desk officer said to him?

A No.

Q And do you know what he did after he spoke to the desk officer?

A I imagine --

Q No not what I imagine.

THE COURT: You know.

A The desk officer had him sit down and wait for me to come out.

Q When you came out, where was he?

A He was seated at -- we have a small cut out where there is seats for complainants or witnesses or anybody to sit in and the desk officer had him seated in that spot.

Q Was he sitting there alone or with someone else?

MS. GOLOWA: Objection.

THE COURT: If you know.

A I believe that both Thomas Norwood and Joseph Davis came to the office together I believe if my memory serves me right.

Q So when you came outside and you saw Thomas -- Mr. -- Joseph Davis, you also saw Thomas Norwood, is that correct; is that your testimony?

A That's correct.

Q Did you tell them both that you had a suspect you wanted them to view?

A I brought them into my office and told them they were going to view the line up.

THE COURT: Answer his question. Did you tell him?

THE WITNESS: No I didn't.

Q How much time elapsed from the time they arrived until the time you saw them?

MS. GOLOWA: Objection.

THE COURT: Sustained.

Q Do you know what time they arrived at the 32 District Office?

A Exactly, no.

Q Did the desk sergeant tell you that they arrived?

A Yes, he did.

Q And you don't know what time that was?

A I didn't write it down, I don't have it written down.

Q Well how much time elapsed from the time the desk officer told you they arrived until the time you went out to greet them?

A Moments. I went straight out there.

Q And what room did you bring them to?

A I brought them into my office, detective office.

Q Was anybody else in your office at the time?
A Other detectives, yes.
Q Did you tell them that you had someone who fit the description that they had pointed out during the photo array?
MS. GOLOWA: Objection.
THE COURT: Overruled.
THE WITNESS: No.
Q Now when -- what day did Joseph Davis view the photo array?
A What day did Joseph Davis view the photo array?
Q Yes.
A I can check my records but I believe it was December 1st.
THE COURT: 2001.
THE WITNESS: 2001, correct, Your Honor.
Q Where was that at the 32 District Office or was that --
A That was at his residence.
Q His residence?
Anyone else home at that time?
A No, sir.
Q When you went to his house, did you tell him that -- did you ask him to look at the photo array see

if he saw the suspect in the photo array?

A I showed him the photo array and asked him to see if he could identify anybody.

Q And how long did it take him before he said he could identify someone; how long did he look at it?

A It was a second.

MS. GOLOWA: Objection.

THE COURT: Overruled. You may answer.

THE WITNESS: It was a second or two.

Q You showed the photo array to Thomas Norwood also, is that correct?

A No.

Q You did not?

A No, sir.

No Thomas never sees array

Q Did you show it to anyone else other than Joseph Davis?

THE COURT: Sustained. It's irrelevant for purposes of this hearing.

Q When Joseph Davis called you on December 1st, 2001 and he said he knows the defendant from what he heard from the neighbors, what did he say that he heard from the neighbors?

A He said that he knows people in the Rockaways because of his rap music, he knows other people that are in the rap industry that live in the Rockaways and

he described the male with the scar on his face to them and they told him that the guy's name was Keith Davis and he was on parole.

Q Did he tell you who he spoke to, who these neighbors were?

MS. GOLOWA: Objection.

THE COURT: Sustained.

Q Did you ever get Mr. Fitzgerald to look at a photo array?

MS. GOLOWA: Objection.

THE COURT: There's been no evidence concerning Mr. Fitzgerald.

Sustained.

Q So Mr. Davis said that neighbors from Rockaway said that the guy with the scar was the defendant, Keith Davis, is that correct?

MS. GOLOWA: Objection.

THE COURT: Sustained. It's been asked and answered.

Q Did Mr. Joseph Davis say that he gave any other description to his neighbors about the perpetrator other than he had a scar?

MS. GOLOWA: Objection.

THE COURT: Overruled. Any other identifying features?

THE WITNESS: I don't know what you mean neighbors. He never spoke of neighbors. He spoke of people in the rap industry that lived in the Rockaways and I don't -- all I know is that he gave the description of a man with a scar living in the Rockaways. Obviously he must have given height and wait.

MR. DORFMAN: Move to strike out height and wait.

THE COURT: Sustained. We've been through this.

Next question, please.

Q So the only thing that Mr. Joseph Davis told you was that he ascertained from his neighbors that the person --

MS. GOLOWA: Objection to the word neighbors.

THE COURT: Sustained.

MR. DORFMAN: That's all.

THE COURT: Any redirect?

MS. GOLOWA: No, Your Honor.

THE COURT: Detective, you're excused with the thanks of the Court.

THE WITNESS: You're welcome.

THE COURT: People, is that your case at

the hearing?

MS. GOLOWA: Yes, Your Honor.

THE COURT: Counsel does defense choose to put on a case at the hearing?

MR. DORFMAN: No.

THE COURT: Both sides have rested. The court reserves decision. There is a bail matter to be determined tomorrow at ten. I have a case scheduled for trial tomorrow. If that doesn't go this will be my next trial.

MR. DORFMAN: Thank you very much, Your Honor.

THE CLERK: Bail is 5,000 over $5,000.

THE COURT: That's correct.

CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPTION OF MY STENOGRAPHIC NOTES.

Tanya Milo

TANYA MILO

SENIOR COURT REPORTER

Davis v. Walsh

CV 08-4659 (DLI)

RESPONDENT'S EXHIBIT B

Transcript of Calendar Call of December 11, 2002

ORIGINAL COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS :Part 23:CRIMINAL TERM

--------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK, : Indictment

-against- : 9148/2001

:

KEITH DAVIS, : Calendar Call

Defendant. :

--------------------------------------x

120 Schermerhorn Street
Brooklyn, New York 11201

December 11, 2002

B E F O R E:

HONORABLE MICHAEL BRENNAN
Justice

A P P E A R A N C E S:

CHARLES J. HYNES
District Attorney - Kings County
By: DVORA GOLOWA
Assistant District Attorney

AL DORFMAN
26 Court Street
Brooklyn, New York 11201
Counsel to Mr. Davis

TANYA MILO
SENIOR COURT REPORTER

THE CLERK: Calling from the trial calendar indictment 9148 of 2001, Keith Davis. Defendant incarcerated, produced not present before the Court. Counsel appearance.

MR. DORFMAN: Al Dorfman for the defendant.

THE COURT: Good morning, counsel. I'm sorry you had to come in --

MR. DORFMAN: It's all right. I was down the hall.

THE COURT: My law assistant left a message on the machine indicating that the other trial folded and that we were going to go forward with this matter tomorrow morning. So it's adjourned for tomorrow at ten o'clock.

MR. DORFMAN: Okay. Thanks, Judge.

THE COURT: Okay.

CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPTION OF MY STENOGRAPHIC NOTES.

Tanya Milo

TANYA MILO
SENIOR COURT REPORTER

Davis v. Walsh

CV 08-4659 (DLI)

RESPONDENT'S EXHIBIT C

Transcript of Calendar Call of December 12, 2002

ORIGINAL COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS : Part 23:CRIMINAL TERM

---------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK, : Indictment
-against- : 9148/2001
:
KEITH DAVIS, : Calendar Call
Defendant. :

---------------------------------------x

120 Schermerhorn Street
Brooklyn, New York 11201

December 12, 2002

B E F O R E:

HONORABLE MICHAEL BRENNAN
Justice

A P P E A R A N C E S:

CHARLES J. HYNES
District Attorney - Kings County
By: DVORA GOLOWA
Assistant District Attorney

AL DORFMAN
26 Court Street
Brooklyn, New York 11201
Counsel to Mr. Davis

TANYA MILO
SENIOR COURT REPORTER

THE CLERK: From the trial calendar indictment 9148 of 2001, Keith Davis. Defendant incarcerated and present.

Counsel appearances.

MR. DORFMAN: Al Dorfman for the defendant.

MS. GOLOWA: Dvora Golowa, Assistant District Attorney.

THE COURT: I'm going to hand to each of you a copy of written decision on the Motion to Suppress. The Motion to Suppress was denied, exception on the record for the defendant.

Case was scheduled for trial today. It has come to my attention that the co-defendant in this matter, I believe his name is Wade Caldera (ph).

MS. GOLOWA: Your Honor, it would be Jeremiah Muldrow.

THE COURT: Excuse me, had been found -- sent for CPL 730 as to fitness to stand trial and it was communicated to me by the Assistant District Attorney that he has been found fit to proceed and is at an Upstate facility, is that correct counselor?

MS. GOLOWA: Except for the --

Mr. Muldrow's whereabouts I'm not sure he's still in an Upstate facility. If we can make a call we can make a determination whether he's been sent back down.

THE COURT: He's not here.

MS. GOLOWA: No, that's correct.

THE COURT: And he is part of this case and it's come to my attention that you're going to make a motion to sever these cases.

MS. GOLOWA: Yes, after having conversation was Mr. Nelson Schmuckler who is the attorney representing Mr. Muldrow and based on my previous conversations with Mr. Dorfman as to what I understand his defense to be, it's my understanding the defenses would be antagonistic and when I spoke with Mr. Schmuckler he had no opposition to any severance by this Court and I think additionally that Mr. Schmuckler may -- I don't want to represent everything for him, but it's my understanding that he would like to talk to us about some dispositions relating to Mr. Muldrow's mental capacity and I don't think he would be prepared to proceed to trial whereas I don't think that there should be any further delay as far as to Mr. Davis.

The People are making a motion to sever these two cases.

THE COURT: I'll have to entertain that motion in writing with time for the defense to respond to it.

It's also been indicated to me that Mr. Davis intends to call the co-defendant as a witness.

MR. DORFMAN: Yes, Your Honor, we do, Your Honor.

THE COURT: That's going to be another issue I'll have to address once he is produced in court and is represented by his attorney.

MR. DORFMAN: Can I add that the defense are not antagonistic.

MS. GOLOWA: Are you familiar with what Mr. Muldrow's defense is?

MR. DORFMAN: I'm familiar with the case.

MS. GOLOWA: He's claiming your client put him under duress to commit the actions.

THE COURT: Counsel, I have to resolve these issues one at a time. I need a date for the motion to consolidate and to produce the co-defendant.

MR. DORFMAN: You mean to sever.

THE COURT: Motion to sever, excuse me. I need a date for you to serve the motion and for the defendant's response. Also you're going to have to give me a subpoena and find the location of the co-defendant and I'll sign a subpoena to bring him here.

MS. GOLOWA: Mr. Muldrow has an appearance in Part 32. I believe it's on January 3rd. So we can ask at that time for his case to be adjourned into this part if we have a date after that if that will make things easier.

THE COURT: What date will he be in -- what part, 30?

MS. GOLOWA: Thirty-two.

THE COURT: On the third. What date is convenient to you, counsel?

MR. DORFMAN: I'd like a little later than that because I have a trial on the fourth -- I have a case set down for retrial on January 6th.

THE COURT: How about the 13th.

MR. DORFMAN: Okay, make it the 13th.

THE COURT: By the defense. Matter is adjourned to January 13th. Same bail conditions. Please serve your papers on defense before

January 3rd and you'll have a subpoena for me to bring. Since he's in the system we can probably get him in for the 13th if he's going to be in Part 32 on January 3rd.

MS. GOLOWA: Judge, would you like me to ask Judge -- I believe it will be Judge Firetog by that date to have the case adjourned into this part?

THE COURT: Are you handling his case as well?

MS. GOLOWA: Yes.

THE COURT: I would be happy to accept the case for January 13th.

MR. DORFMAN: January 13th this part.

THE COURT: Co-defendant's case is going to be adjourned here. I'd appreciate having your response to the People's motions, motion to sever by at least the sixth so I can decide it.

MR. DORFMAN: Okay.

THE COURT: People why don't you serve by December 30th and that will give time to respond to the sixth and I'll have time to decide by the 13th.

CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPTION OF MY STENOGRAPHIC NOTES. Tanya Milo
TANYA MILO-SENIOR COURT REPORTER

Davis v. Walsh

CV 08-4659 (DLI)

RESPONDENT'S EXHIBIT D

Transcript of Proceedings of January 20, 2004

ORIGINAL COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - CRIMINAL TERM - PART: 23
-------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

-against-

KEITH DAVIS,

Defendant.
-------------------------------------------X

Indict. No. 9148/2001
Trial

120 Schermerhorn Street
Brooklyn, New York
January 20, 2004

B E F O R E:

HONORABLE MICHAEL BRENNAN, Justice

A P P E A R A N C E S:

OFFICE OF CHARLES J. HYNES, ESQ.
DISTRICT ATTORNEY, KINGS COUNTY
Attorney for the People
BY: DVORA GOLOWA, ESQ.
Assistant District Attorney

AL DORFMAN, ESQ.
Attorney for the Defendant

ANGELA PUNTORNO
SENIOR COURT REPORTER

THE CLERK: From the trial calendar, number seven, indictment 9148 of 2001, Keith Davis. The defendant is present.

Counsel appearances.

MS. GOLOWA: Dvora Golowa for the office of district attorney.

MR. DORFMAN: Al Dorfman for the defendant.

THE COURT: Good morning, counsel. I think we are ready to go. We have a couple of preliminary matters to do first. Sandoval, obviously, and the Parker Warnings and Antommarchi warnings which you could discuss with your client.

MR. DORFMAN: Judge, I haven't got a copy of his rap sheet.

THE COURT: I will give you the file. You can go over it.

(Pause in the record).

THE COURT: Let me know when you are ready, counsel.

MR. DORFMAN: Okay.

THE COURT: Have you discussed the waiver with your client?

MR. DORFMAN: Not yet. Before I do that the defendant has instructed me to make a -- to sever these two motions. The first motion is to dismiss the

indictment under 30.30.

THE COURT: That's denied.

MR. DORFMAN: Secondly -- defendant takes exception.

The second motion is that I be replaced by another attorney on this case.

THE COURT: That's also denied.

People, if the defendant chooses to testify on his own behalf what prior convictions or bad act would you elicit from him on cross examination?

MS. GOLOWA: If the defendant does choose to testify on his own behalf the People would seek to cross examine the defendant on the following convictions and the underlying facts. And I would preface this by saying that although the defendant's convictions seem to be somewhat old, in preparing a predicate felony sheet my office did calculate the time that the defendant has been incarcerated as a result of his convictions and his convictions as far back as May 10, 1989 -- actually the sentence date is within the ten-year period.

And just so the Court has some sense of the time that we are talking about, the first case that we would seek to cross examine the defendant about would be his conviction for Attempted Robbery in the Second Degree

on May 10, 1989. And the facts of that case is that the defendant, along with other individuals, approached the complainant in the case and as a group, tripped him and then stole money and property from him on the street and the defendant was apprehended immediately thereafter.

The People would also seek to cross examine the defendant on his conviction of September 22, 1988 for Petit Larceny, as well as his conviction on August 6, 1991, for Robbery in the First Degree. The reason that I bring those both up together is that they actually all relate to incidents that happened on June 9th of 1988.

In the first incident the defendant was involved with a group of people on the A train and he surrounded the complainant and the complainant was hit with a hammer, a ratchet, and property was taken from the complainant. Another complainant was then surrounded and property was taken from him as well on the subway system.

A few moments later on the same date, the defendant was again part of a group of people who surrounded a complainant on the subway and assaulted him and took his property and his money.

The People would also seek to cross examine the

defendant on his conviction of July 16, 1991, for Criminal Possession of Narcotics in the Fourth Degree and the underlying facts, specifically that the defendant was in possession of a stolen vehicle at 11:30 in the vehicle on May 2, 1990, in which a quantity of crack cocaine was recovered. The People would also seek to cross examine the defendant on his conviction.

I think that's actually it, Judge.

THE COURT: Anything else?

MS. GOLOWA: I am just checking because I gave over my sheets to defense counsel and I want to make sure I didn't miss anything.

No, Judge, that's it.

THE COURT: I will hear you, Mr. Dorfman.

MR. DORFMAN: Regarding the first conviction on May 18, 1989, I would ask to have that excluded completely on the grounds that the conviction was 14 years ago, more than ten years ago. And the defendant informs me that he only served one year on that case. In fact, he informs me that he was only sentenced to one year on this case.

THE COURT: Little louder please.

MR. DORFMAN: We are alleging there is a mistake in the rap sheet, your Honor. Nevertheless, even one to three years there is no showing that he served

more than one year in this case and that would bring it more than ten years from the present time. The present date which is January 20, 2004. So the -- between May 18, 1989, and January 20, 2004, is approximately fifteen years, your Honor. I think that should be excluded because of the time.

MS. GOLOWA: Judge, I am going to hand over to the Court a copy of our predicate sheet with our calculated amount of time that the defendant spent incarcerated since that time.

MR. DORFMAN: Secondly, on that same conviction, your Honor, I would submit that the conviction should be excluded because he pled guilty to Attempted Robbery in the Second Degree which is the same crime -- one of the crimes he is charged with on this case. He is charged with Robbery in the First Second and Third Degree in this case and to let the jury hear that he was convicted of a similar crime would allow the jury to hear that he has a propensity to commit crimes and that propensity to commit the same crime would outweigh any probative value.

So, because of the similarity of the crimes, I ask the Court to not allow the D.A. to offer the convictions regarding the conviction of September 22, 1988, Petit Larceny for which he was

sentenced -- convicted of Petit Larceny and convicted of ninety days. This was September 22, 1988. I submit that this is more than 10 years from the present date and therefore it should be excluded.

Secondly, the nature of the crime is -- I believe he is charged with larceny in this case. I am not positive judge. Charged with the exact same charge in this case, the count of petit larceny in this case, the exact same crime which he pled guilty. That would allow the jury to conclude that he has a propensity to commit a crime and this would outweigh any probative benefit the jury might get in evaluating his credibility.

The conviction of September 22, 1988, when he pled guilty to Attempted Criminal Possession of a Stolen Property in the Fifth Degree this, too, your Honor, is more than -- he received a conditional discharge. This was a B misdemeanor; this too it's fifteen years on the present date and I would submit that the length of time for which he was convicted of this very minor crime which he received conditional discharge, as I previously said, would only cause the Jury to show that he has the propensity to commit the crimes rather than be significant in allowing it to evaluate his credibility.

Regarding the conviction of August 6, 1991, he pled guilty to Robbery in the First Degree, and was sentenced to five and a half to fifteen years in that case.

Once again, your Honor, this conviction is of a crime which is identical with the crime with which he is charged in this case, Robbery in the First Degree. And if the jury hears he was convicted for the same crime there is a very strong likelihood that the jury would not decide this case on the merits of this case but would decide the case rather on the -- on their conclusion that he has a criminal propensity to commit crimes and, therefore, his prior conviction would be used as evidence of the commission of this crime or the likelihood that it would be used as evidence of his guilt in the instant case would outweigh any likelihood -- any probability of it being used to attack his credibility.

THE COURT: Anything else?

MR. DORFMAN: Yes, last -- on the last conviction, July 16, 1991. Well, that was a verdict of Criminal Possession of a Narcotic Drug in the Fourth Degree. I would submit that this does not show any lack of credibility on his part and it would only show that he has a propensity to commit crimes. I think the conviction of a narcotic drug does not indicate that the

defendant is not a credible person and may very well be used, as I said, to show that he has a propensity to commit a crime and therefore the jury may believe the facts of those cases and not this case.

MS. GOLOWA: Judge, just briefly I would like to point out two things that are important to the Court's consideration of the issue here in being that the case is about the same act that the Court has to decide, whether the prejudice to the defendant here would outweigh the probative value.

I would like to point out that I turned over to Mr. Dorfman a list of People who I plan to have testify on this case. Joseph Davis and Norman Thomas. Joseph Thomas has a lengthy criminal history involving I think around five states and certainly the jury will have some opportunity to hear about his acts. So, in the balance act of, you know, for defendant to then get the stand and appear to have no conviction, that would really prejudice the People and it would have probative value for the defendant's past criminal history.

Although most of the defendant's convictions are, in fact, for robbery and the underlying facts are similar, I did specifically ask the Court to let me cross examine him. By law, if the defendant chooses this to make his prime choice he should not be shielded to have

him answer for those things. It was to the June 10, 1988, case the defendant upon his arrest told the Plaintiff I saw a fight and I wasn't involved and the police locked up my friend who was on the train and is similar to this case.

So, I submit that the defendant seems to make this kind of robbery his crime of choice and should not be shielded from being cross-examined about it.

MR. DORFMAN: May I respond, Judge?

THE COURT: Go ahead.

MR. DORFMAN: Judge, the prosecution seems to indicate --

THE COURT: I am not going to let her go into the underlying facts, counsel. Here is my Sandoval decision which is in effect --

MR. DORFMAN: May I make one more remark?

THE COURT: Go ahead.

MR. DORFMAN: Very briefly.

The prosecution's argument that one of the complainants in this case has an extensive criminal history. It would most likely go into his criminal history. Therefore, the prosecution being allowed to go into the admissability of the defendant is an in opposition argument, Judge. The credibility of a witness goes to the defendant in this case and Sandoval

is to the defense of the defendant so the jury will not convict the defendant --

THE COURT: The issue of credible is for all witnesses not just defendant.

MR. DORFMAN: You're right. Sandoval hearings --

THE COURT: Yes, it's a balancing test.

I am about to give you my decision which is if the defendant chooses to testify on his own behalf in this case he would have to truthfully admit that he has three prior felony convictions. If he does that I will not let the People go into any underlying circumstances of those convictions.

You have an exception for the record.

Discuss the Antommarchi and the Parker.

MR. DORFMAN: Yes, Judge.

THE COURT: The jurors are on their way up.

MS. GOLOWA: Judge, I do have a few minor issues that I need to address before the jury comes in.

THE COURT: Let's do first things first.

THE SERGEANT: Judge, defendant refuses to sign. You want me to write that on the sheet?

THE COURT: Counsel, you want to come up for a second.

(Whereupon, there was a discussion at the

bench.)

THE DEFENDANT: You say if I don't sign this you are going to remand me, Judge, your Honor?

THE COURT: Have your lawyer talk for you.

MR. DORFMAN: Judge, the defendant wishes to know --

THE COURT: I can't hear you, sir.

MR. DORFMAN: I am sorry, your Honor.

The defendant wishes to know if he doesn't sign the Parker Warnings will he be remanded?

THE COURT: Yes.

MR. DORFMAN: I object, your Honor.

THE COURT: You have your objection. The defendant it now on the remand status, he doesn't have to sign the warning.

MR. DORFMAN: He signed it, Judge.

THE COURT: Okay.

MR. DORFMAN: For the record I object to my two previous motions which I made; one to dismiss the case on the 30.30. Two, to be relieved on behalf of the defendant.

THE COURT: Denied.

MR. DORFMAN: Thank you.

Judge, the defendant is no longer -- Judge, is the defendant no longer on the remand status?

THE COURT: He is returned to the status he was before. Bail is reinstated.

MR. DORFMAN: Am I supposed to sign --

THE COURT: Let me state this on the record. The defendant has not signed the Antommarchi waiver. As long as he knows that when he approaches the bench which he has a right to do with you when we have conferences up here, especially when we examine the jurors, the officers are going to accompany him up here. That might very well create the impression with this jury that he's incarcerated but I am not going to allow him to approach the bench without the officers being present. As long as he understands that he has a right to be up here. If he doesn't want to waive that right he will be accompanied by officers.

He also must understand if he absents himself from this trial without legal cause, the trial will continue in his absence. That's what the Parker Warnings are.

I am going to indicate to this jury that the likelihood is that this trial will last until the beginning of next week.

You had some other issues to put on the record before the jurors come in.

MS. GOLOWA: Yes, Judge.

First of all, the detective who actually examined the firearm in this case was Detective Treese. Due to some unavoidable delays in us starting the trial he expected that he would be able to testify before he went on vacation. He is now on vacation. My intention is to introduce his examination report in this trial as a business record with Detective Sandano or possibly some other firearms detective who is familiar with all the procedures and who can put that into evidence and provide the foundation instead so we don't have any delays and we don't delay this trial until Detective Treese comes back from vacation. I just want to inform Court and counsel of that.

I want to place on the record although Rosario materials were turned over to counsel November 20, 2002, I did provide a few additional materials to counsel. I dropped them off in his office this past Thursday, I believe that was January 15, 2004, especially photocopies of memo book entries of Officer Rutherford which was three pages; of Officer Rodriguez which is five pages. Some handwritten notes I had taken. One page with regards to an interview of one of the witnesses in this case, copies of the B.C.I. photo of the defendant as well as Andre Glover (phonetic spelling) and then some copies of photos that may be introduced into

evidence in this case, specifically three pages including copies of the photographs of the watch and keys of Joseph Davis, three pages of photographs of the subway station at Hoyt/Schermerhorn Street, three pages of a subway car that is similar to the one that is involved in the incident, one page of photos of the gun, one page of Polaroid photos of Keith Davis, Jermemiah Muldrow and a copy of a diagram of the subway car that was prepared by our graphic's department. I want to put that on the record.

A few small motions in limine with regards to evidence that will be introduced in this case.

The defendant in this case was -- his photo was placed into a photo array after the complainant had some conversations with people that he knew and called up the detective to let him know that he had spoken to people and given a description and he found out that the person involved was the defendant Keith Davis.

I don't -- I am not seeking to introduce that evidence, I think that that definitely would be hearsay, but I just want to let Court and counsel know that that's something we are going to have to address in terms of the defendant -- the detective could speak about an investigation. My proposal is he speak about an

investigation and apprehended the defendant. Part of that also is that the defendant was apprehended at his parole officer's office.

THE COURT: I won't allow you to elicit that.

MS. GOLOWA: I am sorry.

THE COURT: I won't allow to you elicit that.

MS. GOLOWA: I am not asking you to elicit that.

THE COURT: Why are you asking me that? I don't give advance rulings. You are telling me what the problems might be, I appreciate that. I am not going to give you rulings now of things that might occur during the trial before they occur. You approach the bench and I will give you a ruling.

MS. GOLOWA: That's fine. I don't have anything else.

THE COURT: Just let me know when we have all the jurors.

THE CLERK: Does the defendant have a copy of the Parker warnings, Sergeant?

THE SERGEANT: Not yet.

THE CLERK: Antommarchi is not waived.

Bring in the jury.

THE COURT OFFICER: Jury panel entering the courtroom.

(Whereupon, the jury panel enters the courtroom.)

(Whereupon, the remainder of the proceeding was not transcribed.)

* * * *

It is hereby certified that the foregoing is a true and accurate transcript of the proceedings.

Angela Puntorno

ANGELA PUNTORNO

SENIOR COURT REPORTER

Davis v. Walsh

CV 08-4659 (DLI)

RESPONDENT'S EXHIBIT E

Transcript of Mistrial Declaration of January 26, 2004

ORIGINAL COPY

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS - CRIMINAL TERM - PART: 23

-------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

KEITH DAVIS,

Defendant.

-------------------------------------------------X

Indict. No. 9148/2001

120 Schermerhorn Street
Brooklyn, New York
January 26, 2004

Declaration of mistrial

B E F O R E:

HONORABLE MICHAEL BRENNAN, Justice

(Appearances same as previously noted.)

ANGELA PUNTORNO
SENIOR COURT REPORTER

THE CLERK: Calling the case on trial, 9148 of 2001. Keith Davis. Defendant present.

Counsel appearances.

MR. DORFMAN: Counsel for the defendant Al Dorfman.

MS. GOLOWA: Dvora Golowa for the office of the

district attorney.

THE COURT: Last Thursday we recessed early because Mr. Dorfman had indicated that he was having arterial fibrillation, a heart condition, and I believe he went to a cardiologist last Thursday and we adjourned this matter for Friday morning.

On Friday morning we received a telephone message from Mr. Dorfman indicating that he could not come into court on that date and the trial was put over to 2:00 today.

Mr. Dorfman is here before the Court, I believe you're experiencing the same condition that you had on Thursday.

MR. DORFMAN: Yes, your Honor.

THE COURT: And you made arrangements to go immediately to a cardiologist?

MR. DORFMAN: I made an appointment for 5:30 this evening.

THE COURT: It's the opinion of the Court that you will not be able to proceed to the conclusion of this trial which will be at least to the end of this week and with your consent I will declare a mistrial.

MR. DORFMAN: Consent.

THE COURT: What I will do is adjourn this matter for about three or four weeks to see if you are

able to continue with the trial physically, if not the Court will assign a new attorney or consider whatever applications might be made at that time.

The both of you agree on a potential date.

MR. DORFMAN: Judge, for the record the defendant wishes me to inform you that he wishes to go pro se.

THE COURT: I will entertain that application on the new trial date. I might suggest February 17, it's a Tuesday.

MR. DORFMAN: Judge, I can do the 18th. I am going to be out of town until late on the 16 and if I am delayed I won't make it back. So the 18th is good for me -- how about the 20th?

THE COURT: The 20th, that's a Friday, how about the 23rd.

MR. DORFMAN: Okay. Okay, Judge.

MS. GOLOWA: That's fine.

THE COURT: Mistrial is declared by the Court.

MS. GOLOWA: That's a control date the 23rd?

THE COURT: That's a control date for trial -- for retrial in this instance.

MS. GOLOWA: I am sorry, just to clarify, we are going to at that point determine whether we are going to go forward or is it possible we will go forward on

that date.

THE COURT: It will be a control date.

Mr. Dorfman, if you can indicate one way or the other what your condition is because the Court is interested down the road whether you are able to proceed with this case on that date.

It's adjourned to February 23, the defendant's bail is continued.

Mr. Dorfman, you are free to leave and so is Mr. Davis. He has to return to this Court 9:30 on the morning of February 23.

I will discharge the jury. Ms. Golowa you can remain if you wish or you are free to go also. Don't forget you have to take custody of the exhibits.

THE COURT OFFICER: Do you have the officer here to take the gun?

MS. GOLOWA: Yes, he is here.

(Pause in the record.)

(Whereupon, Mr. Dorfman and the defendant exit the courtroom.)

THE COURT OFFICER: Ready for the jury?

THE COURT: Bring the jury in.

THE COURT OFFICER: Jury entering.

(Whereupon the jury enters the courtroom. )

THE COURT: Ladies and gentlemen of the jury,

even though one of you is missing, I brought you in here because I declared a mistrial in this case. Mr. Dorfman was here with his client earlier ready to proceed with the trial but unfortunately he had another bout of arterial fibrillation. He called his cardiologist from here and he is on his way. We wish him well but it is apparent he will be unable to continue in this trial and it would be unfair to the defendant and the district attorney to substitute. I have scheduled this trial for February to see if Mr. Dorfman can continue then.

Your work in this case is finished. These things happen, we are all human beings. I appreciate your patience but you are going to be discharged from this case.

Let me say this, I want to thank you for your willingness to serve. It's the only way our system of justice can function, it is your willingness to serve.

The admonition not to talk about this case is removed. Of course, you have not heard too much in evidence in this case. If the attorneys are still around the building and they are interested in talking to you, you can talk to them, however, you are under no legal obligation to discuss the case. Your jury service is finished.

Please know that the state and the community

appreciates your willingness to serve and you are now discharged with my personal thanks. I hope my staff and I have made this not an unpleasant experience for you. Thank you.

(Whereupon, the jury exits the courtroom.)

THE COURT: For the record, juror number 12 who is about fifty-five minutes late for this court session is also discharged. You can inform her. You can inform her when she arrives.

THE CLERK: I just got a call from her and told her to return straight to the jury room.

THE COURT: She has been told telephonically to report to the jury room and she will be informed at that time that I have declared a mistrial and she is discharged from this case

* * * *

It is hereby certified that the foregoing is a true and accurate transcript of the proceedings.

[signature]

ANGELA PUNTORNO

SENIOR COURT REPORTER.