the rest of them in. I believe there are 16 left. We will put them all up here. If we have to split on Monday, we would have exhausted --

THE COURT: Please fill the box.

THE CLERK: Jannette, J-A-N-N-E-T-T-E, Perez, P-E-R-E-Z, seat one.

Joyce, J-O-Y-C-E. A. Molinaroi, M-O-L-I-N-A-R-O-I. Seat two.

Desiree, D-E-S-I-R-E-E, Wilson, W-I-L-S-O-N, seat three.

Stacey, S-T-A-C-E-Y, A. Brown, B-R-O-W-N-E, seat four.

Sergey, S-E-R-G-E-Y, Trotsky, T-R-O-T-S-K-Y, seat five.

David, D-A-V-I-D, Dookwa, D-O-O-K-W-A, seat six.

Stanley, S-T-A-N-L-E-Y. Montes, M-O-N-T-E-S, seat seven.

Winston, W-I-N-S-T-O-N, P. Chambers, C-H-A-M-B-E-R-S, seat eight.

Doris, D-O-R-I-S, Adams. A-D-A-M-S, seat nine.

Lilly, L-I-L-L-Y Rodriguez, R-O-D-R-I-G-U-E-Z, seat 10.

Carl, C-A-R-L H. Lahens, L-A-H-E-N-S, seat 11.

Kwameo, K-W-A-M-E-O. Stewart, S-T-E-W-A-R-T,

seat 12.

Inez, I-N-E-Z, Rivera R-I-V-E-R-A, seat 13.

Mikhail, M-I-K-H-A-I-L, Kane, K-A-N-E, seat 14.

Jonathan, J-O-N-A-T-H-A-N, G. Lininger, L-I-N-I-N-G-E-R, seat 15.

THE COURT: Guess who is next.

THE CLERK: Colleen, C-O-L-L-E-E-N, Williams, W-I-L-L-I-A-M-S, seat number 16.

THE COURT: Good afternoon, to all of you. You'll find this round goes even faster than the last round, and we will have you out of here before 5:00.

Any of you know anything about the case, anything about the incident, read anything, heard anything, know anything, any way, shape or form about this case?

Any of you have any difficulty participating in a process, bringing to this jury panel your common sense, human experience, weighing and evaluating the evidence, judging the credibility of witnesses, affording the defendant the right of presumption of innocence. The fact that the burden of proof rests with the People never passes to the Defense, and that the People are obligated to prove him guilty beyond a reasonable doubt?

Any of you have any difficulty following those instructions or participating in the deliberative

process?

Collective negative response from all.

Any of you have any particular experience with the police, either positive or negative that would not enable you to judge police testimony just like that of any other witness?

Collective negative response.

Anyone with prior jury experience, please indicate by raising your hands.

First row, first Miss Perez, the type of case?

PROSPECTIVE JUROR: Drugs, criminal.

THE COURT: And about how long ago was it?

PROSPECTIVE JUROR: Five years ago.

THE COURT: Did the jury reach a verdict?

PROSPECTIVE JUROR: No, I think.

THE COURT: The law has changed. Obviously anything about that experience that would not enable you to follow the law as I give it to you in this case and to be a fair and impartial juror?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Miss Molinaroi, type of case?

PROSPECTIVE JUROR: Criminal case.

THE COURT: What was the charge?

PROSPECTIVE JUROR: I believe it was robbery

but it was settled outside.

THE COURT: Anything about that -- how long ago was it?

PROSPECTIVE JUROR: Mid `90s.

THE COURT: Anything about that experience that would not enable you to follow the law as I give it to you and to be fair to both sides?

PROSPECTIVE JUROR: No.

THE COURT: Continuing along the first row, prior jury experience. Going to the back row.

Miss Adams, type of case? I'll get to you, sir, in a second.

PROSPECTIVE JUROR: Criminal case.

THE COURT: Do you remember what the charge was?

PROSPECTIVE JUROR: It was somebody got stabbed.

THE COURT: A stabbing?

PROSPECTIVE JUROR: Yeah.

THE COURT: About how long ago was it?

PROSPECTIVE JUROR: `94.

THE COURT: Did the jury reach a verdict?

PROSPECTIVE JUROR: Yes.

THE COURT: Anything about that experience that would not enable you to serve as a fair and impartial

juror in this case?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, ma'am. Going back to you, sir, Mr. Chambers. The type of case you sat on?

PROSPECTIVE JUROR: Civil.

THE COURT: How long ago?

PROSPECTIVE JUROR: Four years ago.

THE COURT: Did the jury deliberate or settled?

PROSPECTIVE JUROR: Deliberated.

THE COURT: I'll go right back to you. This is criminal law, can you follow the law the way I give it to you in this matter?

PROSPECTIVE JUROR: Definitely.

THE COURT: Thank you, sir. Yes, Miss Adams?

PROSPECTIVE JUROR: I also served on a civil case as well.

THE COURT: How long ago?

PROSPECTIVE JUROR: That was in `86.

THE COURT: The jury reach a verdict or settled?

PROSPECTIVE JUROR: It was settled.

THE COURT: Could you follow the criminal law?

PROSPECTIVE JUROR: Yes.

THE COURT: Prior jury experience, Miss Rodriguez, what type of case?

PROSPECTIVE JUROR: Civil against the gas company and it was settled.

THE COURT: How long ago did you sit?

PROSPECTIVE JUROR: About four, five years ago.

THE COURT: Can you follow the law as I give it to you here, if you are selected?

PROSPECTIVE JUROR: Yeah.

THE COURT: Thank you.

Going down to Miss Rivera, the type of case you sat on?

PROSPECTIVE JUROR: Civil.

THE COURT: How long ago?

PROSPECTIVE JUROR: Mid `90s.

THE COURT: Settled or.

PROSPECTIVE JUROR: Settled.

THE COURT: Can you set aside whatever law you heard and follow the law the way I give it to you here?

PROSPECTIVE JUROR: Yes.

THE COURT: Anyone either your or close friends or relatives been the victim of a crime, any type of a crime? Put your hands up again. Mr. Trotsky, yourself or somebody close to you?

PROSPECTIVE JUROR: Both.

THE COURT: Let's deal with you first. What was the crime?

PROSPECTIVE JUROR: Car theft.

THE COURT: Report it to the police?

PROSPECTIVE JUROR: Yes.

THE COURT: Car recovered?

PROSPECTIVE JUROR: Twice.

THE COURT: Was the car recovered each time?

PROSPECTIVE JUROR: Yes, recovered twice but not in piece.

THE COURT: Anyone arrested?

PROSPECTIVE JUROR: No.

THE COURT: Satisfied the police did what they could do?

PROSPECTIVE JUROR: No.

THE COURT: Going to hold it against the district attorney here?

PROSPECTIVE JUROR: No.

THE COURT: I can't ask you to forget about the experience, I'll ask you to judge the case on its own merit. Can you do that?

PROSPECTIVE JUROR: Sure.

THE COURT: Continuing along. Mr. Dookwa, yourself or somebody close to you?

PROSPECTIVE JUROR: Myself.

THE COURT: And what was the crime?

PROSPECTIVE JUROR: Robbery.

THE COURT: This is a robbery case, was there a weapon used in your case?

PROSPECTIVE JUROR: No.

THE COURT: Anyone arrested?

PROSPECTIVE JUROR: No.

THE COURT: Report it to the police?

PROSPECTIVE JUROR: Yes.

THE COURT: Satisfied the police did what they could do?

PROSPECTIVE JUROR: Yes.

THE COURT: Anything about that experience that would not enable you to give both sides a fair trial here?

PROSPECTIVE JUROR: No.

THE COURT: Mr. Trotsky, I believe you mentioned somebody close was the victim of a crime?

PROSPECTIVE JUROR: Yes, my mother.

THE COURT: What was the crime?

PROSPECTIVE JUROR: Robbery.

THE COURT: Was a weapon used?

PROSPECTIVE JUROR: I'm not sure. She was knocked down to the ground.

THE COURT: Property was taken?

PROSPECTIVE JUROR: She let go of the sale and robber ran away.

THE COURT: Anybody arrested?

PROSPECTIVE JUROR: No.

THE COURT: Satisfied the police did what they could do in that case? You're not sure?

PROSPECTIVE JUROR: I'm not sure on the details, so I can't specify.

THE COURT: It's a horrendous experience to have your mother robbed. That is a robbery case. Did you set aside your feelings and base the case based on the merits?

PROSPECTIVE JUROR: Sure, I can.

THE COURT: Continuing along. Mr. Kane, yourself or someone close to you?

PROSPECTIVE JUROR: Myself.

THE COURT: What was the crime?

PROSPECTIVE JUROR: Identify theft.

THE COURT: How long ago?

PROSPECTIVE JUROR: Around one year ago.

THE COURT: Report it to the police?

PROSPECTIVE JUROR: Yes, I did.

THE COURT: Anybody arrested?

PROSPECTIVE JUROR: No.

THE COURT: Are you satisfied the authorities did what they could do?

PROSPECTIVE JUROR: No.

THE COURT: Are you going to hold it against the prosecution here?

PROSPECTIVE JUROR: No.

THE COURT: Is it going to affect the way you judge this case or it will not affect you?

PROSPECTIVE JUROR: Not affect.

THE COURT: Miss Williams, you had your hand up, yourself or someone close to you?

PROSPECTIVE JUROR: Myself.

THE COURT: And what was the crime?

PROSPECTIVE JUROR: Robbery.

THE COURT: Was a weapon used?

PROSPECTIVE JUROR: No.

THE COURT: How long ago was it?

PROSPECTIVE JUROR: About six years ago.

THE COURT: Report it to the police?

PROSPECTIVE JUROR: Yes.

THE COURT: Anyone arrested?

PROSPECTIVE JUROR: No.

THE COURT: Satisfied the police did what they could do?

PROSPECTIVE JUROR: Yeah.

THE COURT: Anything about that experience that would not, cause you not to give Mr. Davis or the people a fair trial?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, ma'am. I'm going to the second row. Victim of a crime. I'm sorry, let me go back to the first row. To Miss Wilson, yourself or someone close to you?

PROSPECTIVE JUROR: I was robbed.

THE COURT: Was a weapon used?

PROSPECTIVE JUROR: No.

THE COURT: Was it reported to the police?

PROSPECTIVE JUROR: Yes.

THE COURT: Anyone arrested?

PROSPECTIVE JUROR: Yes.

THE COURT: Prosecuted?

PROSPECTIVE JUROR: No.

THE COURT: Did it happen in Brooklyn?

PROSPECTIVE JUROR: Yes, in the subway.

THE COURT: You said that the authorities did what they could do?

PROSPECTIVE JUROR: Yes.

THE COURT: How long ago was it?

PROSPECTIVE JUROR: About four years ago.

THE COURT: Will it affect the way you judge this case?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Going to the second row now. Miss Adams, yourself or somebody close to you?

PROSPECTIVE JUROR: Both.

THE COURT: Let's deal with you first. What was -- what crime were you a victim of?

PROSPECTIVE JUROR: Robbery and burglary.

THE COURT: Was a weapon used in the robbery?

PROSPECTIVE JUROR: No.

THE COURT: How long ago was that?

PROSPECTIVE JUROR: In `86.

THE COURT: Reported to the police?

PROSPECTIVE JUROR: Yes.

THE COURT: Anyone arrested?

PROSPECTIVE JUROR: No.

THE COURT: You satisfied that the police did what they could do?

PROSPECTIVE JUROR: Yeah.

THE COURT: How about the burglary, how long ago was that?

PROSPECTIVE JUROR: That was in `86 too.

THE COURT: Anyone arrested for that?

PROSPECTIVE JUROR: Yes.

THE COURT: Prosecuted?

PROSPECTIVE JUROR: Yes.

THE COURT: Did it happen in Brooklyn?

PROSPECTIVE JUROR: Yes.

THE COURT: You satisfied that the authorities did the proper thing in the case?

PROSPECTIVE JUROR: Yes.

THE COURT: Is there anything about either experience that would not enable you to give a fair trial to both sides here?

PROSPECTIVE JUROR: No.

THE COURT: Anyone close to you also the victim of a crime?

PROSPECTIVE JUROR: Yes.

THE COURT: Who was that?

PROSPECTIVE JUROR: My sister, she was raped.

THE COURT: Anyone arrested?

PROSPECTIVE JUROR: Yes.

THE COURT: Prosecuted?

PROSPECTIVE JUROR: Yes.

THE COURT: You satisfied the authorities did the appropriate thing?

PROSPECTIVE JUROR: Yes.

THE COURT: Anything about that experience that would not cause you to give both sides a fair trial?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, ma'am. Continuing along the second row. Victim of a crime.

Mr. Stewart, yourself or someone close to you?

PROSPECTIVE JUROR: Someone close to me.

THE COURT: What was the crime?

PROSPECTIVE JUROR: Robbery.

THE COURT: Was a weapon involved?

PROSPECTIVE JUROR: No, on a few occasions, yeah. Yeah, on a few occasions, yeah. It happened like three times.

THE COURT: Anyone arrested?

PROSPECTIVE JUROR: No.

THE COURT: Satisfied the police did the proper thing in the case?

PROSPECTIVE JUROR: I guess.

THE COURT: Anything about that experience that would not enable you to give a fair trial to both sides here?

PROSPECTIVE JUROR: No.

THE COURT: Miss Rivera, I believe you had your hand up, you or somebody close to you?

PROSPECTIVE JUROR: Myself.

THE COURT: What was the crime?

PROSPECTIVE JUROR: My pocketbook was --

THE COURT: Snatched.

PROSPECTIVE JUROR: Well, they went in and pulled out.

THE COURT: Report it to the police?

PROSPECTIVE JUROR: Yes.

THE COURT: Anyone arrested?

PROSPECTIVE JUROR: No.

THE COURT: You said the police did what they could do?

PROSPECTIVE JUROR: I guess.

THE COURT: About how long ago was it?

PROSPECTIVE JUROR: About eight years.

THE COURT: Anything about that experience that would not enable you to be fair to both sides here?

PROSPECTIVE JUROR: No.

THE COURT: Anyone else? Yes, sir, Mr. Lininger, yourself or someone close to you?

PROSPECTIVE JUROR: Two incidents with myself.

THE COURT: What was the crime?

PROSPECTIVE JUROR: I was burglarized and assaulted. I was burglarized. My apartment was burglarized last year, and I was assaulted a few years ago.

THE COURT: These incidents reported to the police?

PROSPECTIVE JUROR: Yes.

THE COURT: Anyone arrested?

PROSPECTIVE JUROR: No.

THE COURT: You satisfied the authorities did what they could do?

PROSPECTIVE JUROR: No.

THE COURT: Is that going to affect the way you judge this case?

PROSPECTIVE JUROR: No.

THE COURT: Anyone among you or close friends or relatives been arrested, convicted of a crime or have a matter pending before a prosecutor's office? If you want to answer in private, you may.

Miss Adams is coming up at the bench.

(Whereupon the following side-bar discussion took place between counsel, the Court and a prospective juror.)

THE COURT: Yes. Do you think you were treated fairly by the system?

Anything about that experience that would enable you to judge this case?

Does anyone else wish to come up? This is Miss Williams coming over.

PROSPECTIVE JUROR: My sister was arrested.

THE COURT: Anything about that experience would cause you to not be a fair juror in this case?

PROSPECTIVE JUROR: No.

THE COURT: Thank you. Anyone else?

(Whereupon the following took place in open court.)

THE COURT: Anyone among you or close friends or relatives work for law enforcement in any way, shape or form or a criminal justice agency? Lawyers that would do criminal work? Anyone in the first row? I'll go, I'm sorry, Miss Molinaroi, who do you know?

PROSPECTIVE JUROR: My brother-in-law law works for the, in the Federal government with computer fraud in another state.

THE COURT: Anything about that relationship that would not enable you to fairly and impartially judge police testimony?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Continuing along the first row. Now going to the second row.

Miss Adams, who do you know?

PROSPECTIVE JUROR: My brother is a sergeant and my niece is sheriff and my nephew is in Corrections.

THE COURT: Anything about any of those relationships that would not enable you to fairly judge police testimony?

PROSPECTIVE JUROR: No.

THE COURT: Thank you. Anyone else?

Anyone among you have difficulty speaking or understanding the English language?

Now, I'm going to ask you a series of questions that I have asked the other two groups, where in Brooklyn you reside. If you're employed, I'll ask you what you do for a living.

If there are other adults living with you, I'll ask you what they do for a living, and you've been here all day, heard the type of questions we're asking. We ask you to volunteer any reason that you think that you couldn't be fair and impartial in this matter.

Miss Perez, the area of Brooklyn you live in?

PROSPECTIVE JUROR: Bensonhurst.

THE COURT: Are you employed outside of the home?

PROSPECTIVE JUROR: Yes.

THE COURT: What do you do, ma'am?

PROSPECTIVE JUROR: I'm a secretary for a real estate company.

THE COURT: Any other adults in your household that are employed?

PROSPECTIVE JUROR: No.

THE COURT: Any reason you would not be a fair juror?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Miss Molinaroi, the area of Brooklyn you reside in?

PROSPECTIVE JUROR: Kingston.

THE COURT: Are you employed outside of the home?

PROSPECTIVE JUROR: Yes, I am.

THE COURT: What do you do, ma'am?

PROSPECTIVE JUROR: Administrator for a State University.

THE COURT: Any other adults in your household who are employed?

PROSPECTIVE JUROR: No.

THE COURT: Any reason you would not make a fair juror, if you were selected?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, ma'am.

Miss Wilson, the area of Brooklyn you reside in?

PROSPECTIVE JUROR: Brooklyn, East New York.

THE COURT: Are you employed?

PROSPECTIVE JUROR: I'm a home attendant.

THE COURT: Any other people living in your household who are employed?

PROSPECTIVE JUROR: No.

THE COURT: Any reason you would not be a fair juror?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Miss Browne, the area of Brooklyn you reside in.

PROSPECTIVE JUROR: East Flatbush.

THE COURT: Are you employed outside of the home.

PROSPECTIVE JUROR: Yes, I am.

THE COURT: Any other adults in your household employed?

PROSPECTIVE JUROR: Yes, there are.

THE COURT: And who is that?

PROSPECTIVE JUROR: My parents.

THE COURT: Tell me what they do?

PROSPECTIVE JUROR: My mother's a teacher. My father's a lab technician.

THE COURT: Any reason you would not be a fair juror, if you were selected?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Mr. Trotsky, the area of Brooklyn.

PROSPECTIVE JUROR: Sheepshead Bay.

THE COURT: Employed, sir?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: What do you do?

PROSPECTIVE JUROR: Commodities trader.

THE COURT: Any other adults in your household?

PROSPECTIVE JUROR: My wife.

THE COURT: What does she do?

PROSPECTIVE JUROR: Cosmetologist.

THE COURT: Any reason you would not be a fair juror?

PROSPECTIVE JUROR: I don't think so.

THE COURT: Thank you, sir.

Mr. Dookwa, the area of Brooklyn you reside in?

PROSPECTIVE JUROR: Flatbush.

THE COURT: Are you employed, sir?

PROSPECTIVE JUROR: Yes.

THE COURT: What do you do?

PROSPECTIVE JUROR: Mail data entry clerk.

THE COURT: Any other adults in your household who are employed?

PROSPECTIVE JUROR: Yes.

THE COURT: Who is that?

PROSPECTIVE JUROR: My mother.

THE COURT: What does she do?

PROSPECTIVE JUROR: Data entry clerk.

THE COURT: Any reason that you would not make

a fair juror if you were selected?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, sir.

Mr. Kane, the area of Brooklyn you reside in?

PROSPECTIVE JUROR: Midwood.

THE COURT: And are you employed, sir?

PROSPECTIVE JUROR: Unemployed.

THE COURT: What do you normally do?

PROSPECTIVE JUROR: Excuse me?

THE COURT: What do you normally do?

PROSPECTIVE JUROR: Computer programmer.

THE COURT: Any other adults in your household employed?

PROSPECTIVE JUROR: My wife.

THE COURT: What does she do?

PROSPECTIVE JUROR: She's nurse.

THE COURT: Any reason you would not be a fair juror, if you were selected?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, sir.

Miss Williams, the area of Brooklyn you reside in?

PROSPECTIVE JUROR: Canarsie.

THE COURT: Are you employed outside of the home?

PROSPECTIVE JUROR: Yes.

THE COURT: What do you do?

PROSPECTIVE JUROR: Personal banker for a financial institution.

THE COURT: Any other adults in your household who are employed?

PROSPECTIVE JUROR: My father.

THE COURT: What does he do?

PROSPECTIVE JUROR: Mechanic.

THE COURT: Any reason you would not be a fair juror, if selected?

PROSPECTIVE JUROR: No.

THE COURT: I thank you.

Going to the second row. Mr. Montes, the area of Brooklyn you live in?

PROSPECTIVE JUROR: Flatbush.

THE COURT: Are you employed, sir?

PROSPECTIVE JUROR: Yes.

THE COURT: What do you do?

PROSPECTIVE JUROR: UPS.

THE COURT: Any other adults in your household employed?

PROSPECTIVE JUROR: Yes.

THE COURT: Who is that?

PROSPECTIVE JUROR: My mother and my sister.

THE COURT: What do they do?

PROSPECTIVE JUROR: Sister is a teacher. Mother works for a home attendant.

THE COURT: Any reason you would not be a fair juror, if you were selected?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, sir. Mr. Chambers, the area of Brooklyn you reside in, sir?

PROSPECTIVE JUROR: Canarsie.

THE COURT: And are you employed?

PROSPECTIVE JUROR: Yes.

THE COURT: What do you do, sir?

PROSPECTIVE JUROR: Electrical technician.

THE COURT: Any other adults in your household employed?

PROSPECTIVE JUROR: Yes.

THE COURT: Who is that?

PROSPECTIVE JUROR: My wife.

THE COURT: What does she do?

PROSPECTIVE JUROR: Registered nurse.

THE COURT: Any reason you would not be a fair juror?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, sir.

Miss Adams, the area of Brooklyn you reside in?

PROSPECTIVE JUROR: Canarsie.

THE COURT: Are you employed outside of the home?

PROSPECTIVE JUROR: Yes.

THE COURT: What do you do, ma'am?

PROSPECTIVE JUROR: I'm a clerk.

THE COURT: Any other adults in your household who are employed?

PROSPECTIVE JUROR: My husband is retired.

THE COURT: What did he retire from?

PROSPECTIVE JUROR: He was a mechanic.

THE COURT: Any reason you would not be a fair juror?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, ma'am.

Miss Rodriguez, the area of Brooklyn you reside in?

PROSPECTIVE JUROR: Greenpoint.

THE COURT: Are you employed outside of the home?

PROSPECTIVE JUROR: Yes, I am.

THE COURT: What do you do?

PROSPECTIVE JUROR: Collection rep.

THE COURT: Any other adults in your household who are employed?

PROSPECTIVE JUROR: My husband, he's not working, he's retired.

THE COURT: What did he retire from?

PROSPECTIVE JUROR: Supervisor.

THE COURT: Any reason you would not be a fair juror, if you were selected?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, ma'am.

Mr. Lininger, the area of Brooklyn you reside in?

PROSPECTIVE JUROR: East Flatbush.

THE COURT: Are you employed, sir?

PROSPECTIVE JUROR: Yes.

THE COURT: What do you do?

PROSPECTIVE JUROR: Program aide.

THE COURT: Any other adults in your household employed?

PROSPECTIVE JUROR: Yes, my wife. Registered nurse.

THE COURT: Any reason you would not be a fair juror, if selected?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, sir.

Mr. Stewart, the area of Brooklyn you reside in.

PROSPECTIVE JUROR: Brownsville.
THE COURT: Are you employed?
PROSPECTIVE JUROR: Yeah.
THE COURT: What do you do, sir?
PROSPECTIVE JUROR: IT technician.
THE COURT: Any adults in your household employed?
PROSPECTIVE JUROR: My Mom.
THE COURT: What does she do?
PROSPECTIVE JUROR: A corporate tech something.
THE COURT: Any reason you would not be a fair juror, if selected?
PROSPECTIVE JUROR: No.
THE COURT: Thank you, sir.
Miss Rivera, the area of Brooklyn you reside?
PROSPECTIVE JUROR: Kingston.
THE COURT: Are you employed outside the home?
PROSPECTIVE JUROR: No. Early retirement.
THE COURT: What do you retire from?
PROSPECTIVE JUROR: Banker.
THE COURT: Any other adults in your household employed?
PROSPECTIVE JUROR: Both retired.
THE COURT: What are they retired from?
PROSPECTIVE JUROR: Keyspan Gas Company.

THE COURT: Any reason you would not be a fair juror?

PROSPECTIVE JUROR: No.

THE COURT: Last but not least, Mr. Lininger, the area of Brooklyn you reside in?

PROSPECTIVE JUROR: Downtown Brooklyn.

THE COURT: Are you employed, sir?

PROSPECTIVE JUROR: Yes.

THE COURT: What do you do?

PROSPECTIVE JUROR: I'm a produce designer.

THE COURT: Any other adults in your household employed?

PROSPECTIVE JUROR: No.

THE COURT: Any reason you would not be a fair juror, if selected?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, all. I'll turn it over to the attorneys for about ten minutes each beginning with the Assistant District Attorney Miss Golowa.

MS. GOLOWA: Hi. I think probably everybody is a little bit tired. I'll try to make it quick.

There were a couple of things that I'm having trouble hearing sitting over here. I want to make sure I heard.

Mr. Stewart, I didn't hear where you lived or

what you do.

PROSPECTIVE JUROR: Brownsville, IT Technician.

MS. GOLOWA: Like computers?

PROSPECTIVE JUROR: Yeah.

MS. GOLOWA: And Mr. Dookwa, what do you do for a living?

PROSPECTIVE JUROR: Mail data entry clerk.

MS. GOLOWA: And, Miss Browne, I didn't hear what you said?

PROSPECTIVE JUROR: A special education teacher.

MS. GOLOWA: Now, you've got an opportunity to hear a little bit as both Mr. Fink and I were talking with the other jurors, and I want to go over some of the issues that were brought up before and see what you think of it and whether you can be fair jurors in this case and again, I know that it's hard to be here. We appreciate that everybody has other things going on in there lives. We all come together here to make the system work. And, you know, the Judge is going to be struck you on the law so what I'm going to ask you, Miss Perez, is if you hear evidence from witnesses who come here and take the stand and at the end of this case you believe the witnesses and you feel that I've proven the case beyond a reasonable doubt, and I'm telling you now and I've said it before,

nobody is going to come and say that this defendant was the one who held a gun and the victim is no relation.

Nobody is going to say that this defendant is the one who took the property from Joseph Davis. No relation, or anybody else in this case and the question is, if you believe the witnesses and you believe that I've proven the case beyond a reasonable doubt, would you be to follow the law and hold this defendant accountable for somebody else's actions?

PROSPECTIVE JUROR: Yes.

MS. GOLOWA: How but Miss Molinaroi?

PROSPECTIVE JUROR: Yes, I would.

MS. GOLOWA: Miss Wilson?

PROSPECTIVE JUROR: Yes.

MS. GOLOWA: And Miss Browne, are you able to do that?

PROSPECTIVE JUROR: Yes.

MS. GOLOWA: Mr. Trotsky?

PROSPECTIVE JUROR: Definitely.

MS. GOLOWA: Mr. Dookwa?

PROSPECTIVE JUROR: Yes.

MS. GOLOWA: Mr. Kane?

PROSPECTIVE JUROR: Yes.

MS. GOLOWA: Miss Williams.

PROSPECTIVE JUROR: Yes, as long as it's beyond

a reasonable doubt.

MS. GOLOWA: Okay. Mr. Montes, are you able to follow that law?

PROSPECTIVE JUROR: Yeah.

MS. GOLOWA: And Mr. Chambers what about you?

PROSPECTIVE JUROR: Definitely.

MS. GOLOWA: Miss Adams?

PROSPECTIVE JUROR: Yes.

MS. GOLOWA: Miss Rodriguez?

PROSPECTIVE JUROR: Sure.

MS. GOLOWA: Mr. Lahens?

PROSPECTIVE JUROR: Of course.

MS. GOLOWA: Mr. Stewart. You don't seem so confident about that?

PROSPECTIVE JUROR: Yeah.

MS. GOLOWA: You can. Okay. And Miss Rivera?

PROSPECTIVE JUROR: Yes.

MS. GOLOWA: And Mr. Lininger?

PROSPECTIVE JUROR: Yes.

MS. GOLOWA: And you know, you also heard that you may, in fact, hear from witnesses who have a criminal record who are going to sit here and you'll hear about it and as the Judge instructed you all, you will consider that in assessing that person's credibility.

Is there anybody here that feels or thinks they

cannot accept any testimony at all from somebody with a criminal record?

Mr. Chambers?

PROSPECTIVE JUROR: Yes.

MS. GOLOWA: Do you have any problem accepting testimony from someone with a criminal record?

PROSPECTIVE JUROR: No.

MS. GOLOWA: The fact that somebody has a criminal record, does that mean they're lying here about what happened?

PROSPECTIVE JUROR: No, doesn't necessarily mean that they're guilty.

MS. GOLOWA: The question is not going to be whether the witness is guilty of something or whether the witness is telling the truth here in court, right? Is it possible that the witness is telling the truth even though in the past they might have lied about other things?

PROSPECTIVE JUROR: Sure.

MS. GOLOWA: And do you understand, Mr. Montes, that when somebody, that anybody can be robbed whether they have in the past been, you know, criminals themselves or not. A person doesn't necessarily, you know, put themselves and say well, I have no criminal record, I should be the one that gets robbed because I'll

be able to testify about it. It's pretty much it could happen to anybody, right?

Now, the other thing I want to ask you about is the issue that involves the fact you may hear from more than one person and that you may not hear every single detail the same and we talked about this before. I was talking with the other jurors about, you know, the car accident and blue shirt and Browne shirt. The reason, question that I'm asking you is if you hear from more than one person and there are inconsistencies in their testimony on certain issues, the question is, would you feel that you have to discount everything that that persons says or do you think that you might be able to believe some of the things that they're saying. Miss Perez?

PROSPECTIVE JUROR: I think I can believe some of it, yeah.

MS. GOLOWA: And what would you base your decision on?

PROSPECTIVE JUROR: I guess how they say it.

MS. GOLOWA: Now, if one person says it was a blue shirt and one person says it was a Browne shirt, is it important as to the cause of the accident as to whether it was a Browne shirt?

PROSPECTIVE JUROR: I don't think so.

MS. GOLOWA: So you could still accept information from that witness about, let's say the cause of an accident even if they might be wrong about a detail?

PROSPECTIVE JUROR: Yes.

MS. GOLOWA: Miss Molinaroi, what about you?

PROSPECTIVE JUROR: Yes, the important details.

MS. GOLOWA: And Miss Wilson, what about you?

PROSPECTIVE JUROR: Yes.

MS. GOLOWA: You can. Miss Browne?

PROSPECTIVE JUROR: Yes.

MS. GOLOWA: I'm not trying to skip anybody. It's kind of a lot of people right in front of me here. And something that was talked about earlier in the first session is this. You'll hear two other people besides Mr. Davis that were involved because you heard that there is an allegation of somebody holding a gun and that that person is not Mr. Davis.

Now, you're not going to, you know, you may not hear what happened with those two other people because this case, the case that if you're selected as a juror that you're going to be deciding on is only against Mr. Davis.

Now, Mr. Trotsky, would you be able to weigh the evidence against Mr. Davis, Keith Davis without

speculating about what happened to the other two people?

PROSPECTIVE JUROR: Well he's on trial, not them.

MS. GOLOWA: The fact that you don't know what happened to the other two people or they're not on trial here, that won't affect your verdict in any way?

PROSPECTIVE JUROR: No.

MS. GOLOWA: Mr. Dookwa?

PROSPECTIVE JUROR: No.

MS. GOLOWA: Miss Browne, do you need to know what happened to the other two people or see them in court with Mr. Davis to hold Mr. Davis accountable?

PROSPECTIVE JUROR: No.

MS. GOLOWA: Is there anybody here who feels without seeing the other two people, without knowing what kind of responsibility they may or may not be taking, they can't find Mr. Davis guilty if I prove the case beyond a reasonable doubt?

If nobody has any problem with that, is there anything else that anybody here feels that they want to add about anything we have been talking about or anything that would affect the way they would be a juror in this case?

Thank you very much. And thanks for all your patience all day.

THE COURT: Thank you, Miss Golowa.

Mr. Fink, for about ten minutes, please.

MR. FINK: Almost time to say good evening, everybody. I'm sure everyone knows my name is Jonathan Fink, and of course, my client, Mr. Davis. Again, as I asked every group that's been up here, I'll ask the same to you. Is there anything that anyone has heard at this point makes them think they can't be a fair and impartial jury with regard to this case?

Miss Molinaroi.

PROSPECTIVE JUROR: No.

MR. FINK: Miss Wilson, anything that you've heard?

PROSPECTIVE JUROR: No.

MR. FINK: Miss Browne?

PROSPECTIVE JUROR: No.

MR. FINK: Mr. Trotsky.

Anybody heard anything at this point whether it's because the case is a robbery case or anything that might have happened to any of you in your lives or make you think you would not be a good juror for this case because pretty soon some of you are going to be sitting as jurors on this case. So now is the time to let us know if there are any concerns not once you're picked on the jury, okay.

Is there anyone here who feels that they would have to hear from my client in this trial? Anyone, by a show of hands?

Does everyone understand that the burden of proof is with the prosecution? Do you understand that? Miss Perez?

PROSPECTIVE JUROR: Yes.

MR. FINK: Do you think just because my client is sitting in this courtroom right now accused of a robbery, that he must have done something wrong?

PROSPECTIVE JUROR: No.

MR. FINK: Is there anyone here who disagrees with Miss Perez? Mr. Cane?

PROSPECTIVE JUROR: No, I agree.

MR. FINK: You agree with her.

Miss Williams, do you agree.

PROSPECTIVE JUROR: Yeah.

MR. FINK: You've heard a lot of talk about, you know, you might hear inconsistencies. You're going to hear from witness in this case. Miss Adams, what kind of things would you take into account to determine whether or not someone is being honest about a particular event that they'er talking about?

PROSPECTIVE JUROR: How they present themselves when giving the testimony, and I will observe them to

Voir Dire-Defense

see, you know, how their body language and stuff are. A lot of times your reactions speaks for itself. That's basically it.

MR. FINK: Would you take into account possible inconsistencies that you may or may not hear about? Assuming that you do hear about it. Maybe you won't hear any inconsistencies in this trial. If you were to hear an inconsistencies, for example, suppose a witness testified, testifies in court, different than from what they might have said at an earlier time, would you take that into account?

PROSPECTIVE JUROR: No. Sometimes it's, a person has said something in the beginning and gets in court, they have more time to think about it so most of the time when they have thought about what happened that is more likely to be, you know, the basic things that was going on with.

MR. FINK: So, I want to make sure I understand what you're saying. You're saying if somebody, for example, said that when a car accident happened, it was raining and when they testified, they say actually when the car accident happened it was sunny out, you would, your feeling would be what they're testifying to now is the way it had to be?

PROSPECTIVE JUROR: No. What I'm saying is

Voir Dire-Defense

that sometimes when something happens at that precise moment because the way it happened, something like that, a person might be like a little overexcited and once that they, you know, the excitement settles down, they become more to themselves.

MR. FINK: Let me follow this up. Suppose two weeks after an incident they said something two weeks after they have calmed down and then at trial they said something different from what they said at that two week point, would you take that into account that the person might be not telling the truth?

PROSPECTIVE JUROR: Not necessarily.

MR. FINK: Okay. Is there anyone that disagrees with Miss Adams?

Mr. Trotsky.

PROSPECTIVE JUROR: Well, the first statement is the truthful statement.

MR. FINK: You think the first time they say something is the most truthful?

PROSPECTIVE JUROR: I think so.

MR. FINK: Basically taking what Miss Adams said and turning it around. Yes.

PROSPECTIVE JUROR: Yes. When time passes, you forget details. Whenever an accident happens, everybody take a report, asks you 20 different questions different

ways and tries to turn either way, so, basically you should come up at the beginning with the most accurate information, then later on. Two years later, I'm sure you start forgetting things. So the beginning, I think, is more accurate information.

MR. FINK: Let me ask you this. You may be picked for a juror in this case. You've heard that the allegations of this case happened in 2001. How would you, if you're picked as a juror, how would you give that fact, evaluate a witness' testimony who is going to, you know, presumably come in here and testify?

PROSPECTIVE JUROR: Depend if he testifies.

THE COURT: Depends upon what you hear.

PROSPECTIVE JUROR: Right, of course. If he testifies about different information what he testified before when something happened, I'll start taking some inconsistencies so I have to see what is actually going to happen.

MR. FINK: Fair enough.

By the way, ladies and gentlemen, there are no wrong or right answers here. I'm just curious as to what all your personal feelings are. Certainly not here to judge anyone. That's not my job. I'm trying to pick jurors who I think can be fair and impartial for this case. I know Mr. Stewart you were kind of raising your

hand. What would you like to add to this interesting topic?

PROSPECTIVE JUROR: I was, like, he was saying before, like when it's fresh in your mind if -- I guess that will be like, the most truthful. I mean after weeks or months or even years, you start to lose details. You may remember oh, yeah, you had an accident, but you might not recall what intersection or, you know, minor details, you know. You would remember, yeah, you had an accident.

MR. FINK: Would you take, if you were to hear inconsistencies from a witness, would you take that into account in terms of their testimony?

PROSPECTIVE JUROR: Depends if it was like a crucial, you know, thing then, yeah, I would take it into effect, not the color of his shirt or anything like that.

MR. FINK: Getting back to the example that I used earlier with the juror, it's something in the box, the previous round, the red light and the green light in a traffic accident. Is that something that might cause you to think that you're not certain about what really happened?

PROSPECTIVE JUROR: Yeah. I mean kind of, yeah.

MR. FINK: Is it, Mr. Lininger?

PROSPECTIVE JUROR: Lininger.

MR. FINK: I couldn't hear where you lived and if you work?

PROSPECTIVE JUROR: I live in downtown Brooklyn in this neighborhood, and I'm a produce designer.

MR. FINK: Like boxes?

PROSPECTIVE JUROR: Kitchen.

MR. FINK: Do you think that you could be a fair juror for this particular case, fair and impartial juror?

PROSPECTIVE JUROR: Yes.

MR. FINK: Just in terms of the discussion about witnesses and inconsistencies, do you have any opinions about that? That's kind of broad.

PROSPECTIVE JUROR: Do you have anything specific?

MR. FINK: Let me ask you this. In terms of evaluating whether or not a witness is believable, what kind of things would you take into account?

PROSPECTIVE JUROR: Well, I don't know necessarily. I would think that the first statements were the most truthful. I think as maybe the case unfolded, some memories might come back, some clarity might come into play so.

MR. FINK: Okay. Do you understand that the burden of proof is with the prosecution?

PROSPECTIVE JUROR: Um-hum.

MR. FINK: And you realize that from a technical point, I really don't have to do anything at this trial, right. Obviously, again, I am but I don't. Is it Mr. Chambers?

PROSPECTIVE JUROR: That's right.

MR. FINK: I don't know if I asked you this question. If I did, I apologize. What kind of things would you take into account to determine whether you believe a witness is telling the truth?

PROSPECTIVE JUROR: Inconsistencies tells me right away someone's not telling the truth because I think that anything that's important, you would remember it. If somebody comes to you and says seven and four is 22.

MR. FINK: There might be something wrong with that?

PROSPECTIVE JUROR: Christmas falls on the 25th. I mean it's consistency.

MR. FINK: Now, that person can honestly believe it falls on the 23rd and might be just mistaken, right?

PROSPECTIVE JUROR: Sure.

MR. FINK: So it's another possibility, you would agree that, and I believe I said this earlier

today, that a witness would come into the courtroom, swear to tell the truth and in fact tell the truth, right?

PROSPECTIVE JUROR: Sure.

MR. FINK: They could believe they're telling the truth but, in fact, be mistaken, right?

PROSPECTIVE JUROR: Sure.

MR. FINK: Or could purposely lie. Those are, I think, those would be the three options in terms of what a witness or in items of evaluating whether or not a witness is telling the truth.

PROSPECTIVE JUROR: This is the reason why you have to weigh all the information.

MR. FINK: You haven't heard any evidence at this moment?

PROSPECTIVE JUROR: No.

MR. FINK: Miss Molinaroi?

PROSPECTIVE JUROR: Yes.

MR. FINK: You said there were someone in your family works with the federal government?

PROSPECTIVE JUROR: Yes.

MR. FINK: What specifically? Something with computers?

PROSPECTIVE JUROR: Computer fraud.

MR. FINK: And who was that particular person.

PROSPECTIVE JUROR: My brother-in-law.

MR. FINK: So after hearing all the evidence in this case, you return a verdict of not guilty, would you have any trouble going to your brother-in-law and saying you sat on a criminal trial, the person on trial was charged with robbery in the first degree and after hearing all the evidence, I returned a verdict of not guilty.

PROSPECTIVE JUROR: No, I wouldn't have a problem.

MR. FINK: Do you think you would be a fair and impartial juror on this case?

PROSPECTIVE JUROR: Yes, I do.

MR. FINK: And is it Mr. Montes, do you think you would be a fair and impartial juror on this case?

PROSPECTIVE JUROR: Yes.

MR. FINK: I just want to go over in terms of people's work and where they live. Just want to make sure I got all that. Mr. Chambers, I couldn't hear. You said your wife was a registered nurse?

PROSPECTIVE JUROR: Yes.

MR. FINK: What is it that you do?

PROSPECTIVE JUROR: Electrical technician.

MR. FINK: And, Miss Rodriguez, you said that you live in Greenpoint?

PROSPECTIVE JUROR: Greenpoint, Brooklyn.

MR. FINK: Are you employed?

PROSPECTIVE JUROR: Excuse me? Collection rep.

MR. FINK: That means that you try to get money?

PROSPECTIVE JUROR: Yes.

MR. FINK: Mr Lahens, what do you do?

PROSPECTIVE JUROR: Programmer aide.

MR. FINK: In other words, well, not in other words, what do you do exactly?

PROSPECTIVE JUROR: Help people do their stuff?

MR. FINK: Do you think you would be a good juror if picked for this particular case?

PROSPECTIVE JUROR: It depends.

MR. FINK: When you say depends, can you explain?

PROSPECTIVE JUROR: Yeah. Depends on what are the facts, depends.

THE COURT: Good juror means fair juror. Can you be a fair juror on this case?

PROSPECTIVE JUROR: Yeah.

MR. FINK: Thank you all very much. Thanks.

THE COURT: Ladies and gentlemen I'll ask you to step outside for a couple of minutes. Some of you are going to be become jurors in this case.

Don't discuss anything about it. Don't form any opinions concerning the guilt or innocence of this defendant. Anybody tries to talk to you about the case, let me know right away. Those of you selected will be back here in a few minutes, and I'll have some further instructions for you. Please follows the officer.

(Whereupon the panel of prospective jurors exit the courtroom.)

THE CLERK: People, from one to four for cause?

MS. GOLOWA: None.

THE CLERK: Defense, one through four for cause?

MR. FINK: None.

THE CLERK: People, one through four peremptorily?

MS. GOLOWA: Number three, Miss Wilson. Number four, Miss Browne.

THE CLERK: Defense, one and two, peremptorily.

MR. FINK: Number two, Miss Molinaroi.

THE CLERK: Jannette Perez will be number nine. Five, 6, 7, People, for cause?

MS. GOLOWA: None.

THE CLERK: Defense, 5, 6, 7 for cause?

MR. FINK: None.

THE CLERK: People 5, 6, 7 peremptorily?

MS. GOLOWA: No.

THE CLERK: Defense, 5, 6 and 7?

MR. FINK: One moment.

One moment. Number five, Mr. Trotsky.

THE CLERK: David Dookwa will be number 10. Stanley Montes will be number 11.

People, number 8 for cause?

MS. GOLOWA: No.

THE CLERK: Defense, number eight for cause?

MR. FINK: No.

THE CLERK: People, number eight peremptorily?

MS. GOLOWA: Yes.

THE CLERK: People, number nine for cause?

MS. GOLOWA: No.

THE CLERK: Defense, number nine for cause?

MR. FINK: No.

THE CLERK: People, number nine peremptorily?

MS. GOLOWA: Yes.

THE CLERK: People, number 10 for cause?

MS. GOLOWA: No.

THE CLERK: Defense, number 10 for cause?

MR. FINK: No.

THE CLERK: People, number 10 peremptorily?

MS. GOLOWA: No.

THE CLERK: Defense, number 10 peremptorily?

MR. FINK: Yes.
THE CLERK: People, number 11 for cause?
MS. GOLOWA: No.
THE CLERK: Defense, number 11 for cause?
MR. FINK: No.
THE CLERK: People, number 11 peremptorily?
MS. GOLOWA: No.
THE CLERK: Defense, number 11 peremptorily?
MR. FINK: Yes.
THE CLERK: People, number 12 for cause?
MS. GOLOWA: No.
THE CLERK: Defense, number 12 for cause?
MR. FINK: No.
THE CLERK: People, number 12 peremptorily?
MS. GOLOWA: Yes.
THE CLERK: People, number 13 for cause?
MS. GOLOWA: No.
THE CLERK: Defense, number 13 for cause?
MR. FINK: No.
THE CLERK: People, 13 peremptorily?
MS. GOLOWA: No.
THE CLERK: Defense, 13 peremptorily?
MR. FINK: No.
THE CLERK: Inez Rivera will be number 12. For alternate one, People number 14 for cause.

MS. GOLOWA: No.

THE CLERK: Defense, number 14 for cause?

MR. FINK: No.

THE CLERK: People, number 14 peremptorily?

MS. GOLOWA: No.

THE CLERK: Defense, 14 peremptorily?

MR. FINK: Yes.

THE CLERK: People, number 15 for cause?

MS. GOLOWA: No.

THE CLERK: Defense, number 15 for cause?

MR. FINK: No.

THE CLERK: People, number 15 peremptorily?

MS. GOLOWA: No.

THE CLERK: Defense, number 15 peremptorily?

MR. FINK: No.

THE CLERK: Jonathan Lininger will become alternate one.

People, number 16 for cause?

MS. GOLOWA: No.

THE CLERK: Defense, number 16 for cause?

MR. FINK: No.

THE CLERK: People, number 16 peremptorily?

MS. GOLOWA: No.

THE CLERK: Defense, number 16 peremptorily?

MR. FINK: No.

THE CLERK: Therefore Colleen Williams will be alternate two.

THE COURT: We will swear them in and excuse them until 10:00 on Monday morning. At which time I'll do an opening instructions, and then we'll have the opening statements of the attorneys and begin the trial.

You can excuse the others. I believe they have to return to the jury room tomorrow morning and place these in their proper seats.

MR. FINK: Your Honor, I'll request daily copy in this case.

THE COURT: 18-B you have it. Yes.

(Whereupon the chosen jurors enter the courtroom.)

THE COURT: Mr. Sweeney, please swear in the jurors.

THE CLERK: Jurors in the box, please rise and raise your right hands.

(Whereupon the jury was duly sworn by the Clerk of the Court.)

THE COURT: Please be seated for a couple of minutes.

Ladies and gentlemen, you're now sworn jurors in this case. As I indicated, the Court has other work to do tomorrow, so you're going to get credit for jury

service tomorrow. You'll be excused until ten a.m. on Monday morning. So when you leave the courtroom now, the officer is going to take you down to the fourth floor to a jury deliberation room. It has my name on the door. That's the room you will report to at ten a.m. on Monday morning.

And now, we have a full jury, we'll meet the other jurors and begin the trial at that time. You'll hear some opening instructions from me and the opening statements from the attorneys and then we'll begin the trial. Let me give you these following instructions now.

Now, that you're sworn jurors in this case you may discuss anything that you wish with each other and anyone else, except this case until you get to deliberate on it. Until that time, you must keep an open mind and wait until you hear all the evidence and my charge on the law.

Don't form any opinions concerning the guilt or innocence of this defendant until you have heard all of the evidence and my charge on the law. If anyone attempts to talk to you about this case in any way, shape or form, let me know through one of the officers.

You heard a location mentioned to you, it's the A train at a certain stop. If you have to use the subway, that's fine. What we don't want you to doing is

making any independent investigation about the facts of this case. Judge this case on what you hear and see in this courtroom. You're going to be excused until Monday morning at ten a.m.. Please have a good weekend. See you then.

(Whereupon the Jury exits the courtroom.)

THE COURT: All of the sworn jurors are outside the courtroom, anything for the record before you we adjourn until Monday morning at 10:00 sharp. That's May 3rd.

MS. GOLOWA: Nothing.

THE COURT: Anything for the record, Mr. Fink?

MR. FINK: I'm sorry, Judge, no.

THE COURT: See you Monday.

(The trial is adjourned to May 3, 2004 in Part 23.)

* * *

It is hereby certified that the foregoing is a true and accurate transcript of the proceedings.

Rosanne Terman

ROSANNE TERMAN,
SENIOR COURT REPORTER

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ MAR 1 7 2009 ★
BROOKLYN OFFICE

----------------------------------------------------------x

KEITH DAVIS,

Petitioner,

-against-

CV 08-4659 (DLI)

JAMES W. WALSH, Superintendent,
Sullivan Correctional Facility,

Respondent.

----------------------------------------------------------x

RESPONDENT'S EXHIBIT G (VOLUME 1 OF 5)

ORIGINAL COPY

CHARLES J. HYNES
DISTRICT ATTORNEY KINGS COUNTY
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

LEONARD JOBLOVE
HOWARD B. GOODMAN
Assistant District Attorneys
of Counsel

March 2009

Davis v. Walsh

CV 08-4659 (DLI)

RESPONDENT'S EXHIBIT G

Trial Transcript (Volume 1 of 5) (Pages 1- 96)

ORIGINAL COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - CRIMINAL TERM - PART 23
-----------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

KEITH DAVIS,

DEFENDANT

-----------------------------------------X

Indictment No. 9148/01
TRIAL

120 Schermerhorn Street
Brooklyn, New York
May 3, 2004

B E F O R E:

HONORABLE MICHAEL BRENNAN,

Justice and a jury

A P P E A R A N C E S:

OFFICE OF CHARLES J. HYNES, ESQ.
DISTRICT ATTORNEY - KINGS COUNTY
For the People
BY: Dvora Golowa,
Assistant District Attorney

Jonathan Fink, Esq.,
For the Defendant
New York, New York

ROSANNE TERMAN,
SENIOR COURT REPORTER

THE CLERK: Case on trial, indictment 9148 of 2001, Keith Davis.

Counsel, appearances.

MS. GOLOWA: Dvora Golowa for the Office of the District Attorney.

MR. FINK: Jonathan Fink for Mr. Davis. Good morning, Your Honor.

THE COURT: Anything for the record before we begin the trial?

MS. GOLOWA: No.

MR. FINK: Judge, there are a few things I want to put on the record.

THE COURT: Go ahead.

MR. FINK: The issue and I mentioned this to Miss Golowa earlier, the indictment does not charge criminal possession of stolen property in the fifth degree.

As Your Honor, I believe is aware, there will be or the prosecutor intends to elicit evidence and it was elicited in the Grand Jury that property was recovered from Mr. Muldrow who was apprehended at Hoyt and Schemerhorn right after the robbery took place.

It is my position since it was not charged in the indictment that is, the Metrocard, money, watch, those items which were taken, I believe from both Mr.

Fitzgerald and Mr. Davis. Since those things were not charged as a specific crime to the Grand Jury, I believe the Assistant District Attorney should be precluded from going into the things.

THE COURT: Application is denied. Exception for the record; it's probative.

MR. FINK: The second issue, Your Honor, I believe, I don't know whether or not the prosecutor intends to elicit a statement that's attributed to my client in that statement. I believe there is a mention of him being on parole. I believe that in the event she does try to elicit that, she should be precluded from going into that, the prejudice outweighs the probative value.

THE COURT: Yes.

MR. FINK: And there are other issues that are pertinent as to that.

THE COURT: That's granted.

MR. FINK: Lastly, before we start, I know this issue was addressed with Mr. Dorfman; it's my understanding that Your Honor made a ruling at the last trial that Police Officer Schule could testify to the fact that I believe it was Mr. Davis who stated that he indicated that he was robbed.

Basically you made a ruling that allowed Police

Officer Schule to elicit a hearsay statement on an excited utterance exception. That was Your Honor's ruling, I believe. I take exception to that. I believe there would need to be some type of hearing to determine if it was an excited utterance. That is my final issue for this morning.

THE COURT: You have an exception for that ruling.

As soon as the jurors are up, we will bring them in.

MS. GOLOWA: Judge.

THE COURT: Yes.

MS. GOLOWA: I'm just reminding the Court that we discussed that I would have to leave early this afternoon, so we would be finishing at the latest about 3:00.

THE COURT: It would nice if you could start right away.

How long do you need to talk to your first witness?

MS. GOLOWA: The first thing I'll have to figure out if he's here. If he's not here --

THE COURT: It's 11:00. You don't have a witness waiting outside the courtroom.

MS. GOLOWA: I do have witnesses waiting

outside the courtroom.

THE COURT: Then put that witness on.

Are we ready, Mr. Fink?

MR. FINK: Yes.

THE COURT: Bring them in.

(Jury enters the courtroom.)

THE CLERK: Do the parties waive a juror attendance poll?

MR. FINK: Yes.

MS. GOLOWA: Yes, so waived.

THE COURT: Good morning, ladies and gentlemen.

THE JURY: Good morning.

THE COURT: I'm going to give you some preliminary instructions, then you'll hear the opening statement of the attorneys, and then we will begin the trial. It's about 11:00 now. Obviously we can't get started until everybody is here. If you're going to be late for any reason, if you can give a call to the clerk so we can know that, we can anticipate you're on your way. It would be helpful.

Members of the jury, now, that you have been sworn, I am going to give you some preliminary instructions to guide you in your participation in this trial. It will be your duty to find from the evidence what the facts are. You, and you alone, are the sole

judges of the facts. You will then have to apply those facts to the law, as the Court will give it to you. You must follow that law whether you agree with it or not. But nothing that I may say or do during the course of this trial should be taken by you as any indication as to what your verdict should be.

Now, you've heard the term evidence. The evidence from which you will find the facts will consist of the testimony of witnesses, documents and other things received into the record as exhibits and any facts the lawyers may agree or stipulate to or that the Court may instruct you to find.

Certain things are not evidence, and must not be considered by you. I will list them for you now. Statements, arguments and questions alone by the lawyers are not evidence.

Objections to questions are not evidence. The lawyers have an obligation to their clients to make objections when they believe evidence being offered is inappropriate under the rules of evidence. You should not be influenced by the objections or the Court's ruling on it. If the objection is sustained, meaning upheld, ignore the question.

Again, questions alone are never evidence. If the objection is overruled, treat the answer that is

given just like any other. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Testimony that the Court has excluded or told you to disregard is not evidence and must not be considered. Anything you may have seen or heard outside of this courtroom is not evidence, and must be disregarded. You are to decide this case solely on the evidence presented here in this courtroom.

It will be up to you to decide which witnesses to believe, which witnesses not to believe and how much of any witness's testimony to accept or reject.

At the end of the trial, I'll give you some guidelines for the purpose of judging the credibility of witnesses. There are certain rules that apply to criminal cases. Let me remind you of them.

As, you know, this is a criminal trial. There are three basic rules about a criminal case that you must bear in mind.

First, the defendant Mr. Davis is presumed innocent until proved guilty. The indictment against Mr. Davis is only an accusation, nothing more. It is not proof of guilt or anything else. He therefore starts out with a clean slate.

Second, the burden of proof is on the People.

Preliminary Instructions

Mr. Davis has no burden to prove his innocence.

Thirdly, the People must prove him guilty beyond a reasonable doubt, and I will give you a detailed definition of reasonable doubt at the end of the trial.

Now, a few words about your conduct as jurors. First, I instructed you that you are not to discuss this case or anything about it with each other or anyone else until you retire to the jury room at the end of the entire trial to deliberate upon your verdict. You simply must not talk about this case.

Second, do not read or listen to anything touching on this case if anything appears in the media and if anyone in any way, shape or form tries to talk to you about this case, by bringing it to the Court's attention promptly through one of the court officers.

Thirdly, do not attempt to visit the scene of the alleged crime or any other place mentioned in this trial.

Fourth, do not try to do any research or make any independent investigation about this case on your own.

Finally, keep an open mind. Do not form any opinions concerning the guilt or innocence of Mr. Davis until all of the evidence is in. The trial will now begin.

First, the People will make an opening statement, which is simply an outline to help you understand the evidence as they believe it will come in.

Next, the defendant's attorney may, but does not have to make an opening statement.

Please remember that opening statements are neither arguments nor evidence.

The People will then present its witnesses and the attorney for the defendant may cross-examine them. Following the People's case, the defendant may present witnesses whom the People may cross-examine.

After all the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you, and finally the Court will instruct you on the law.

After that, you will retire to deliberate upon your verdict. Please bear in mind, ladies and gentlemen, nothing that an attorney may say in his or her opening statement in their closing statements or for that matter nothing that an attorney may say at any time during this trial will be evidence in the case.

Thus, the trial will commence and the Court will recognize Assistant District Attorney Dvora Golowa to deliver an opening statement for the People.

MS. GOLOWA: Thank you.

Good morning. Millions of people ride the subway here in New York every day. Some of you may have taken the subway to get here to court this morning. There are a lot of subways going back and forth, and there are lot of things that happen as part of the daily course of getting on that train and going to wherever it is that you need to go.

You get on the train, you might sit down, maybe it's crowded and you're standing, somebody might have a paper in your face. The same person might, in fact, be riding across from you every single day on your way to work. You might not notice or maybe you do.

There are a lot of things that could happen on a regular subway ride. The moment you get off you wouldn't necessarily remember any of those things. Regular everyday events.

But on November 29, 2001 here in Brooklyn on the A train something happened that really was not ordinary at all. Because on that day a gun was pulled out and placed to a person's head, knives were pulled out and a robbery happened. And that is exactly the kind of thing that doesn't stay as part of the ordinary things, part of the regular things that happen when you get on the train. That's the kind of thing that stays in your memories even years later and that you remember a lot

about and you notice the details.

Now, this case is going to take you back to November 29, 2001 on the A train here in Brooklyn going from Nostrand Avenue to Hoyt and Schemerhorn in Kings County, and what you'll hear as you listen to the evidence, as you get to see the exhibits that come in in this case is that you'll hear about how this, defendant Keith Davis, along with two other individuals who are not before you, committed a robbery using a gun and two knives and robbed Joseph Davis and Dennis Fitzgerald who were there with somebody by the name of Norwood Thomas.

So, let's go back to November 29, 2001 and just think as you listen to what happened, as you listen to the evidence that you're going to hear, pay attention, not just to the part that Keith Davis, this defendant was involved with because that's certainly very important to notice what his role was, pay attention also to the actions of the other two individuals. To the actions of somebody you'll hear was Jeremiah Muldrow and another individual whose name you'll learn was Andre Glover.

As you listen to the evidence as far as the three of them, you'll see these three individuals, those two people and this defendant acted together and they carried out this crime, this robbery together and so as you hear the actions of Keith Davis, together with those

other individuals and you hear this evidence, you'll understand how they come together and come to be responsible for each other's actions.

Now, just remember we talked during voir dire there is a person named Joseph Davis and the names are completely coincidental. There is no relation to the defendant, Keith Davis.

So, on November 29, 2001 Joseph Davis got on the subway. He was with two young people who were working with him.

Now, what you'll hear is that Joseph Davis at the time was working for Rough Riders. Some of you might have heard of it. It was a company dealing with hip hop music and Joseph Davis was a promoter for them.

You'll also hear that in the past that Joseph had, in fact, made a video of his own and he had a street name. His name for the video was Rome or Romeo. And people around knew him by that name, as well as by his name Joseph Davis.

What you'll hear is on November 29th, he went together with two young people who were working with him in promotions, they were trying to be become members of the street team, people out on the street trying to promote Rough Riders, and they all got on the subway together going to see a realtor in Clinton Hills having

to do with some business.

Joseph Davis at the time was wearing a lot of things that identified him as somebody that worked for Rough Riders. He was wearing a Rough Riders' jersey, a Rough Riders' backpack. He was wearing leather pants, a nice watch and he had all these things for Rough Riders trying to promote Rough Riders and he got on the A train at Nostrand Avenue on the express and that train goes from Nostrand directly to Hoyt Schemerhorn bypassing a bunch of local stops so it's actually a fairly long trip going through the tunnel before it stops again.

It was about 4:00 in the afternoon on a weekday so you can imagine that the train at that hour is not generally too empty. On that day there were a lot of people on the seats. It was the kind of train most of the A trains usually are with the orange and yellow seats with the seats some of them that come out like two and then the other side two facing back to back and then the three seats, you know next to those and the doors in between.

So they got on the train Joseph, Norwood and Dennis and there wasn't really anyplace to sit. So Joseph and Dennis were standing against the door on one side and Norwood was standing against the door opposite them. It's not such a wide train, you know, you can talk

from one door to the next.

And what you'll hear they were standing there and the train was going and all of a sudden they hear, you hear people talking. They're hearing the name Romeo and they look over and there are three individuals sitting in the two seats that are together with the three against the wall and that there were two people and one individual sitting in the two seats that come out against the window so that he was facing the other two. And he saw that the three, three of them were talking together.

One guy was fairly tall wearing a red jacket. Another guy also pretty tall with a doo rag and then the third one was a short individual with a scar on his face and you'll find out that that person turned out to be the defendant, Keith Davis, so they're on the train and, in fact, the car that they were in was the last car of the train so the doors that open in between cars, you can go through in the front but not in the back. And they noticed that these people are talking to each other and they heard the name Romeo, hear maybe Rough Riders something and certainly their interest is peaked because it sounds like the conversation is about them.

These are not people they know from anyplace. And all of a sudden they're being talked about. And then what happens, the person in the red jacket, the tall one

who was sitting facing the other two, who you'll learn was Jeremiah Muldrow gets up and switches seats and now he's actually on the side closer to Joseph Davis and Dennis Fitzgerald. Norwood Thomas still being opposite. And then the train is still going through this tunnel, hasn't stopped yet.

Jeremiah Muldrow gets up, walks over to Joseph Davis, takes a 25 caliber gun and puts it to his head. And at that time Keith Davis, this defendant, along with the other tall person who was sitting next to him who you'll learn was Andre Glover gets up and are now standing behind Muldrow who has got a gun to Joseph Davis' head.

There are other people on the train and all of a sudden somebody has gotten up and puts a gun to somebody's head. You can imagine that person is kind of scared. There's a lot of noise and everybody else starts moving. They start going towards the front of the train. They're not the ones that are being cornered. They're not the ones that anybody is paying attention to. All they want to do on a crowded train where there is only one exit in that car is get to that exit as quickly as possible. And everybody filtered out into the next car.

So what you have left is Dennis Fitzgerald standing next to Joseph Davis. Jeremiah Muldrow pictured

in front of him with a gun.

Keith Davis and Andre Glover behind them and Norwood Thomas who is basically right behind where Keith Davis and Andre Glover are. And what you'll hear is that Jeremiah Muldrow said to Joseph Davis, "Give" me all your stuff." And Joseph was scared, and he was sort of trying to, you know, take off his stuff; he was frightened.

And you'll hear how Muldrow wanted his watch, a Technomarine watch with diamond bevels. Muldrow starts to take his watch. Muldrow started to put his hand into Joseph Davis' pocket all the while Keith Davis and Andre Glover are standing there right behind him. And Muldrow puts his hand in Joseph Davis' pocket, pulls out a wallet $69 and a Metrocard.

And during this time Joseph Davis is having a hard time functioning. He's very scared and Dennis Fitzgerald goes right in between the gun and Joseph Davis. He's trying to help this person that he's with. And at that time he immediately gets pushed out of the way.

Now, you have Norwood Thomas who is standing behind and he's also trying to come to the help of his friend.

You'll hear that at the time he and Dennis were very close friends. They were living in the same place

for a while and he comes in and he tries to help Dennis who is getting pushed out of the way and Norwood gets punched by Andre Glover who first punches him in the head, and then Andre Glover together with Keith Davis and at that time Andre Glover had pulled out a knife and had a knife that he was showing to Thomas. And Keith Davis, you'll hear at that time, Norwood Thomas could see that Keith Davis had his hand in his pocket as if he also had some sort of weapon.

And you'll hear that they, actually the two of them Glover and this defendant pushed Norwood Thomas towards the back of the train, not the front where everybody was going through the doors but the back, away from where Muldrow was trying to get the wallet from Joseph Davis so he wouldn't do anything to help his friend.

They were just holding him back and at the same time, they're not that far away from where Muldrow still has got the gun on Davis and Fitzgerald.

And what you'll hear is that Muldrow then says to Davis after he's gotten the watch and the backpack and the money and the Metrocard and the wallet, he said to Joseph Davis, "I want your pants."

And Joseph Davis was wearing leather pants and Jeremiah Muldrow decided he was going to take that too.

He could take whatever he wanted.

At that time the train was starting to pull closer to Hoyt Schemerhorn, maybe closing down a little bit and one of the other two said to him, Andre Glover or Keith Davis says to Muldrow, "Leave the pants alone."

So one thing that did happen is that Muldrow saw Fitzgerald was wearing a diamond earring in one of his ears. He put the gun right at Dennis Fitzgerald's head, "give me you're earring" before I rip it out of your ear.

Fitzgerald took it out and gave that to Muldrow. The train is starting to pull into the station and the three people Glover, the defendant, Keith Davis, and Jeremiah Muldrow with the gun still out and the knife that Andre Glover had and at that time we will hear that Joseph Davis also saw this defendant, Keith Davis, with a knife start pushing Thomas, Joseph Davis and Dennis Fitzgerald towards the front, the place where everybody else had gone from the door to the next door. They're pushing them saying to them, "Get in between the cars."

So they're trying to open the door between the cars and whether they're nervous or really stuck, they were having a hard time and the other three are yelling and finally they get the door open and Joseph and Norwood and Davis are able to get in between and the train pulls

into the station and the doors haven't opened yet. Not something unfamiliar. Sometimes it takes whatever, the signal for the conductor or whatever else is going on and the doors to the train to the station had not opened yet.

Now, Joseph is trying to get into the next car. He wants to get as far away from the guns and knives and the people that are holding them as he can. He could not open the next door and at that time you'll hear that Keith Davis, this defendant comes in between the two cars with them, unhooks the chain that blocks in between the cars from the platform and jumps on to the platform because he wasn't waiting for the doors to open.

He just wanted to get away as fast as he could. And at that time pretty much about the same time he jumps off, the doors finally open and Muldrow and Andre Glover they get out of the door through the doors and they start running up the stairs and out.

Now, what you'll find out is that at the Hoyt Schemerhorn station up the exact stairs, that the last part is where the Transit District 30 is located and that's a police station just like a precinct that's out on the street, that specifically deals with an area of Transit and their headquarters is right there inside the train station with a window that's looking out on the platform on the middle level where the token booth is and

it's right at this top of the stairs that Muldrow, Davis and Glover run out.

And what you'll hear is that Joseph Davis, Norwood Thomas and Dennis Fitzgerald now realizing there are more people around and may be they will be successful, start chasing them and they're yelling, "We were robbed," and you'll hear how Jeremiah Muldrow turns and still has the gun on them and tells them, "Get back down the stairs." But they keep going and at the top of the stairs you'll hear how Keith Davis and Andre Glover got out the turnstiles and continue running up the stairs but the three, Joseph, Norwood and Dennis were able to jump on Jeremiah Muldrow and kind of take him down to the ground and in the meantime they're yelling, "Police police," and bystanders are notifying the police right there at the precinct and police officers start pouring in from both upstairs while, where police cars are located and from inside the precinct, and you'll hear when the police actually got there what could they see, four people in a big pile kind of jumbled on each other. Somebody said something about a gun.

First thing they do is cuff all four of them. They don't know what's going on and they're making sure everybody is safe.

What you'll hear is that one of the police

officers found on the floor as Jeremiah Muldrow was right on top of it, shoved the gun, the 25 caliber gun right underneath the gate that divides between the turnstiles and inside the system and outside and they pick up the gun from right under the other side of the gate. Everyone had come down in a pile and later when he opened the gun up, he found one round inside the chamber of that gun ready to be fired and another five rounds in the magazine.

And you'll hear that what the police did was started to try to sort everything out and Joseph Davis is yelling, pointing at Muldrow, "He robbed me; he robbed me." And as they start sorting everything out, they took the cuffs off the three victims and kept Jeremiah Muldrow in handcuffs and everybody went to the precinct.

You'll hear how the police actually found the diamond earring Andre Glover ripped out of Fitzgerald's ear.

Joseph Davis' wallet, his papers, his Metrocard, his money, his sunglasses and his Technomarine watch all from Jeremiah Muldrow.

And you'll hear that right away there were descriptions given of the other two individuals who were participants of this crime and that same day within the hour, Joseph Davis goes upstairs and goes with another

police officer to start looking around the police car and doing what's called a canvass to look for the other two people. And they didn't find anybody that day.

What you will hear is that the case was then assigned to the detective and that detective started investigating and eventually he was able to, in the course of his investigation, to figure out who the other two people were and he placed under arrest Andre Glover and this defendant, Keith Davis.

You'll also hear how the gun the one that had the round in the chamber and the five in the magazine was sent to the Police Ballistics Lab where they tested it and they found out, in fact, it did work. That you could shoot it and the bullet would come out.

And you'll get a chance to see that gun and to see some of the property that was recovered, either pictures of it or the property itself, the money, the Metrocard.

And as you listen to this evidence coming out to what these witnesses are telling you, think about this scene on a crowded train with lots of people and all of a sudden, there are only six people left. The only people that are left are the ones that are involved. Either the three that are being victimized or the three that are committing the crime. Because nobody else wanted to be

there and nobody else had any reason to be on that train.

Members of the Grand Jury, I am confident that when you hear all the evidence in this case and you get to see it for yourself, that you will deliberate and that you will come back with the only verdict that's consistent with the evidence in this case and that is a verdict of guilty on all counts charged.

Thank you.

THE COURT: Thank you, Miss Golowa.

Mr. Fink, does the Defense choose to make an opening statement.

MR. FINK: Yes, Your Honor.

THE COURT: Go ahead.

MR. FINK: Good morning, everyone.

THE JURY: Good morning.

MR. FINK: Keith Davis sits before you an innocent man, wrongfully accused of a crime that he did not commit.

Now, you just heard for approximately the past 20 minutes, the prosecutor talk about how it is that she intends to prove her case. And I would suggest to you, ladies and gentlemen, that it's one thing to promise something and something quite different to be able to deliver on that promise.

As you listen to this case, ladies and gentlemen, I would suggest to you that you are going to find that this case is infested with reasonable doubt. And we spoke about reason doubt and the Judge spoke about reasonable doubt during jury selection and again this morning. And what I ask you to focus on, and which I know you will all focus on is the testimony that you're going to hear. Because you're going to have to decide what it is or how it is that that evidence should be weighed and I would suggest to you when you think about it, listen to the Judge's instruction at the end of the case, you'll realize that reasonable doubt can come from two different areas.

You can find reasonable doubt based upon the evidence that's given to you, and you can also find reasonable doubt based upon things that are not given to you. What I suggest to you that is you'll find reasonable doubt in terms of the evidence that you do hear from, think about the inconsistencies that you will hear or I ask you to think about what inconsistencies you would hear as you sit in this case.

You know, again during jury selection you were asked questions about the fact that two people might see something differently. And that doesn't mean that that particular incident didn't happen. What I would suggest

to you after you hear all the evidence in this case is that the discrepancies are of such a serious and high magnitude that you simply cannot rely upon the witnesses that are presented to you.

And again, I suggest to you and I ask you to think about the fact that what things you will not hear from. You're not going to hear about a weapon recovered from my client or property recovered from my client. You're not going to hear about a confession he made to the police. Those things simply do not exist in this case. That's a lack of evidence, ladies and gentlemen.

Now, you may hear a witness from the Defense. It may turn out that I call a witness. You may even hear from Mr. Davis in this case, and I don't know whether you will or you won't. Even if that is the case, ladies and gentlemen, keep in mind that the burden of proof is with the prosecution, throughout the trial whether I choose to call the witness or not. The burden of proof, ladies and gentlemen, stays with the People throughout the case and remember it's proof beyond a reasonable doubt.

I would suggest to you, ladies and gentlemen, that after you have heard all the evidence in this case you have to return a verdict of not guilty based upon the reasonable doubt that exists in this case.

Thank you very much.

THE COURT: Thank you, Mr. Fink.

Miss Golowa, will you please call your first witness.

MS. GOLOWA: Judge, may we approach, please.

THE COURT: Come on up.

(Whereupon a bench conference was held off the record.)

MS. GOLOWA: The People call Police Officer Allan Schule.

A L L A N S C H U L E, called as a witness, having been first duly sworn, was examined and testified as follows:

THE CLERK: Be seated and using the microphone state your name, shield number and command?

THE WITNESS: Police Officer Allan Schule, shield number 27279, currently assigned to the 103rd Precinct in Jamaica, Queens.

THE COURT: You may inquire, Miss Golowa.

MS. GOLOWA: Thank you.

DIRECT EXAMINATION

BY MS. GOLOWA:

Q Officer Schule, by whom are you employed?

A By the New York City Police Department.

Q And what is your current assignment?

A My current assignment is patrol in the 103rd

Precinct.

Q I'll ask you to speak up a little bit, speak into the microphone. Thank you.

And what specifically is your assignment at the 103rd Precinct?

A Patrol.

Q Now, how long have you been at the 103rd Precinct?

A Approximately eight months now.

Q What was your assignment before that?

A I was assigned to Transit District 30 in Brooklyn.

Q And where specifically is Transit District 30 located?

A Transit District 30 is located in the Hoyt Schemerhorn train station.

Q How long were you assigned to Transit District 30?

A A little over five years.

Q And how long have you been a police officer?

A About six and a half years now.

Q What were your responsibilities at Transit District 30?

A I was also assigned to patrol there.

Q Now, before you started working at Transit District 30, did you have any particular training as a police officer?

A I was trained in the Police Academy.

Q And how long was that?

A Approximately six or eight months.

Q I'm going to ask you again to try to keep your voice up.

A Approximately six to eight months.

Q Did you have any particular training with regard to working in a Transit District?

A That training came later after I was assigned to Transit District 30.

Q What kind of training was that?

A Just patrolling in the subway system.

Q Now, I'm going to direct your attention to, Officer, to November 29, 2001, were you working on that day?

A Yes, I was.

Q And what tour were you working; what hours?

A It's considered a four to 12, the hours are from three p.m. to 11:35 p.m.

Q What was your assignment that day?

A That day I was assigned to the patrol supervisor.

Q And what does that mean?

A My assignment is to operate the RMP and to take the supervisor from destination.

THE COURT: RMP is a radio motor patrol car, a police vehicle?

THE WITNESS: Yes.

THE COURT: Go ahead.

Q That's the same as a marked police car?
A Marked police car.
Q You said that your job was patrolling the subway. Can you just explain how that relates to going around in a police car?
A Patrolling a subway, we have officers who are on foot that patrol the subway system. They go do train patrol, and they inspect each subway system, each subway station. The cars are extra coverage, sometimes the officers can't get to a destination fast enough so we have cars which cover patrol and are able to respond quicker.
Q Now, Officer Schule, when you started your tour that day, where did you report to?
A Transit District 30.
Q And you said earlier that it is at the Hoyt Schemerhorn station?
A Yes, it is.
Q Can you just explain where specifically within the Hoyt Schemerhorn station the command is?
A The command is located inside the system, which means it's inside the turnstiles in the mezzanine level.
Q And what else is on the mezzanine level, just so it's clear?
A The turnstiles and the token booth.
Q And is there any way to see from inside the command

of the Transit District to the mezzanine level where the token booth and the turnstiles are?

A Yes.

Q Can you just explain how?

A The precinct is located in the, I guess it would be the northeast corner of the mezzanine and it looks out over the mezzanine through the windows.

Q Now, directing your attention to November 29, 2001, at approximately 4:05 p.m., do you remember where you were?

A Yes.

Q And where are you?

A I was in the street area at Hoyt and Schemerhorn prepping the RMP, the radio motor patrol car, the marked car for patrol.

Q And by the way, that whole area, the Hoyt Schemerhorn train station and the command, what county is that in?

A That is in Kings County, Brooklyn.

Q Now, you said that you were prepping the car?

A Yes.

Q And where is that located with relation to the mezzanine level where the command is and the turnstiles?

A It is directly upstairs.

Q Now, while you were prepping the car, did something happen?

A Yes.
Q What happened?
A At that time there was a call over the radio for an officer needs assistance.
THE COURT: Don't tell us what the radio transmission stated. As a result of it did you do something?
THE WITNESS: Yes.
Q What did you do?
A I ran down into the subway system.
Q And when you say you ran down into the subway system, can you explain exactly what path you took?
A I went from the street area down the stairs through the mezzanine and I proceeded to enter the system through the exit gate.
Q And what is the exit gate?
A Exit gate is adjacent to the turnstiles. It's usually used for passengers with bicycles, carriages, emergency personnel.
Q And when you came in through the exit gate, what did you observe?
A I, immediately to my left I observed a group of individuals scuffling on the floor.
Q And at that time did you know any of those individuals?

A At that time, no.

Q I'm sorry?

A Can you repeat the question.

Q At that time as you first came into the system through the exit gate and noticed those individuals, did you know any of them?

A No.

Q Had you ever seen any of them before?

A No.

Q Now, what happened once you saw them scuffling?

A Well, with regard to the call, I immediately drew my firearm, ordered everybody to the ground and all the individuals were placed in handcuffs at that time.

Q Now, by the way, Officer Schule, were you in plainclothes or uniform on that day?

A I was in uniform.

Q When you came down and saw those individuals were there any other police officers there?

A Yes.

Q Approximately how many, if you remember?

A Immediately there was about three to four officers. Shortly after that there were a few more.

Q Now, you said that you drew your firearm and you cuffed each of them?

A Yes.

Q And why did you do that?
A The nature of the call was a violent crime transpiring.
Q And when you first got to that scene and you said that you saw the four groups of people, do you remember how many people there were?
A There were four individuals.
Q When you saw those individuals scuffling, were you able immediately to determine what was going on or if anybody had committed a crime?
A No, not at that time.
Q Now, was anybody saying anything at the time of those individuals?
A There was a lot of noise. It was hard to determine what exactly was stated. Shortly after the individual that I cuffed that individual was making statements.
Q And the person that you cuffed, did there come a time that you eventually did find out his name?
A Yes.
Q What did you find out his name to be?
A His name was Joseph Davis.
Q And you said that he was saying something to you?
A Yes.
Q What did he say?
A He was saying, he was pointing to another

individual stating that, "He robbed me, he robbed me."

Q And the person that he was pointing to, what did that person look like?

A That person's description was a male black, I believe in his late teens, early 20s.

Q And that person did you eventually find out his name?

A Yes.

Q What did you find out his name to be?

A His name was Jeremiah Muldrow.

Q Officer, I'm going to remind you again please shout a little bit. The acoustics are bad.

A Jeremiah Muldrow.

I feel like I'm placing an order at McDonald's.

Q You said that Joseph Davis was indicating Muldrow and saying what?

A Yes, stating that "He robbed me."

Q The two other individuals besides Muldrow and Davis, they were also cuffed?

A Yes.

Q That wasn't by you?

A No, that was by another officer.

Q And did there come a time that you learned their names?

A Yes.

Q What did you learn their names to be?
A Thomas Norwood and Dennis Fitzgerald.
Q Now, once the four individuals were cuffed, what happened then?
A At that time all four individuals were walked into District 30 and at that time we were trying to investigate as to what had just transpired.
Q Now, before you brought everybody into District 30, did anything happen outside while you were still next to that exit gate?
A Yes.
Q What happened?
A As the individuals were scuffling, I observed an individual slide a firearm underneath the gate.
Q Were you able to see which one of the people slid that firearm?
A Yes.
Q And who was it?
A It was Joseph Muldrow. I'm sorry, Jeremiah Muldrow.
Q And when the gun went underneath the gate, then what happened?
A Another officer who was responding observed the gun and it was -- and the gun was recovered.
Q And do you remember the name of that other officer?

A Yes.

Q Who was it?

A It was over Kenneth Wengert.

THE COURT: I'm sorry, I didn't hear the name?

THE WITNESS: Officer Kenneth Wengert.

Q Now, then what happened after Officer Wengert recovered the gun?

A Officer Wengert brought that firearm into the district to where it was unloaded safely.

Q And did you watch him while he unloaded it?

A Yes.

Q And did you see whether the gun was loaded or not?

A Yes.

Q And what, in fact, did you see?

A The firearm was loaded.

Q Now, did you recover any other property outside near the exit gate where everybody was handcuffed before you came inside to District 30?

A No, that was the only property that was recovered outside.

Q What happens once you got inside District 30?

A We learned that the individual, Jeremiah Muldrow, he was going to be placed under arrest.

Q Well, when you say that "we learned," what was that conclusion based on?

A It was based on the three complainants stating --

MR. FINK: Objection, Judge.

THE COURT: Overruled.

A It was based on the three complainants stating that that individual had robbed them.

Q Did you speak with the complainants at the time?

A Yes, I did.

Q And did you receive any other information from the complainants with regard to what had actually happened?

A Yes. They stated that they were robbed on a northbound A train.

Q Did they indicate whether the person that had been taken into custody, Jeremiah Muldrow, had acted alone or with any other people?

MR. FINK: Objection, Your Honor.

THE COURT: Sustained.

Withdrawn. You may answer yes or no. Did they give you any indication there was more than one person involved?

THE WITNESS: Yes.

Q And how many other people?

THE COURT: Sustained.

Q Well, did you receive any descriptions with regard to any other individuals that had been involved in this incident?

A Yes, I did.
Q And what were the descriptions? Who did you receive the descriptions from?
A I received the descriptions from Joseph Davis.
Q And what were the descriptions that you received?
A First individual was a male black in his early 20s, approximately six-three in height, wearing a black leather jacket and blue jeans.
Q And besides that individual, was there any other descriptions that you received?
A Yes, there was another of a second individual, a male black also in his early 20s, with a scar to his face wearing a black leather jacket and brown jeans.
Q And was that information with regard to the descriptions communicated to anybody else?
A Yes.
Q Who was it communicated to?
A I immediately put it over the Transit Police radio.
Q Now, did you -- you stated that you had -- that you had observed Officer Wengert recover the gun outside in the mezzanine area. Did you recover any other property from Jeremiah Muldrow?
A From Jeremiah Muldrow, yes.
Q And where did you recover that from?
A In his pocket.

Q What did you recover?
A There was $69 in U.S. currency. A Metrocard. And a watch, and some keys.
Q And was there anything else there?
A Yes, there was also a diamond earring, a diamond stud earring.
Q And did you recover anything else from Jeremiah Muldrow?
A Negative, no; I'm sorry.
Q Now, what did you do with the property that you had recovered?
A All of that property other than two articles of that property which were the watch and the keys were vouchered.
Q And did you show the items to anybody before you vouchered them?
A Yes.
Q Who did you show the property to?
A The property was shown to the complainants.
Q To all three of them?
A All three of them.
Q And you said that the watch and the keys were not vouchered?
A No, they were not.
Q What happened to the watch and the keys?

Direct-People-Schule

A They were returned to one of the complainants.
Q Who were they returned to?
A To Joseph David.
Q Did you do anything before you gave them back to Joseph Davis?
A Yes, I believe there were photos taken of those pieces of property.
Q Now, you said that the other items other than the watch, and the keys were vouchered?
A Yes.
Q Can you just briefly explain to the members of the Jury what vouchering is?
A Vouchering is a way the Police Department keeps track of articles which are taken into custody for either safekeeping, arrest evidence, found property. They're each labeled with their own voucher number, which is like a serial number.
Q And is that voucher number ever used again or is it unique to that particular item?
A Every voucher number is unique to each piece of property.
Q Now, is any paperwork prepared when you voucher an item?
A Yes.
Q What's prepared?

A A voucher.
Q And what kind of information is included on that piece of paper?
A Time, date, vouchering officer, the arrest number, which is relevant to the case.
Q What about the voucher number that you described; is that on that piece of paper?
A Yes.
Q And is there any place that you put a description of the items that are being vouchered?
A Yes.
Q Where do you put that?
A It's in the details section.
Q It's also on that piece of paper?
A It's also on there.
Q Now, you stated that you vouchered some items in this case?
A Yes.
Q And specifically what was it that you did voucher?
A There were four separate vouchers.
One was for the loaded firearm.
A second voucher was for a Metrocard.
Third voucher was for $69 of U S currency, and the last voucher was for the earring.
Q And where are those items now?

Direct-People-Schule

A I have all four of those items with me.
Q Where did you get them from?
A From the Property Clerk's Office.
Q When you say the Property Clerk's Office, explain what that means?
A New York City Police Department Property Clerk's Office holds all property. It's being held, I guess for arrest evidence.
Q And again I'm going to ask you to please keep your voice up.
Now, was there any procedure that you had to follow in order to take that property out from the Property Clerk's Office?
A Yes.
Q What kind of procedure did you have to follow?
A There are forms to sign.
Q Anything else?
A They take my photo, and my fingerprints also.
Q And do you have to show identification?
A Absolutely.
Q And from where -- when you picked up the items at the Property Clerk, where have those items been until just now?
A With me.
Q And you said that you have the Metrocard here with

you today?

A Yes, I do.

Q Is that in its own voucher or anything else with it?

A It's in its own voucher.

Q If you can please take that out.

Without showing it to the members of the jury. At this time, I'm going to ask that that be marked People's 1 for purposes of identification.

THE COURT: Deemed People's 1 for the purpose of identification.

(Item deemed marked for identification as People's Exhibit No. 1.) (Metrocard)

Q Now, Officer, looking at what's been deemed People's 1 for identification, can you explain specifically what that is?

A What that is is a New York City Transit Metrocard.

Q And what was the voucher number that was assigned to the Metrocard on November 29, 2001?

A Can I look to my notes?

THE COURT: You may refresh your recollection.

THE WITNESS: The voucher number for the Metrocard is L-164456.

Q And now, looking at what's deemed as People's 1 for purposes of identification, you stated that that's the

Metrocard that was vouchered on November 29, 2001?

A Yes, it was.

Q How do you know it was the same one?

A Because I vouchered it.

Q Is there anything in particular about that item that tells you that's the same Metrocard and the same voucher you vouchered on November 29, 2001?

A Yes. There is a serial number on the back of the Metrocard.

Q And that serial number did you mark that down anyplace?

A Yes, it's also in the voucher form.

Q And what was the serial number?

A Serial number is 0533563405.

Q And when you looked at this Metrocard in People's 1 for identification, does that serial number match?

A Yes, it does.

Q Now, the voucher number that you just testified to that you vouchered this Metrocard under, is that indicated anyplace on People's 1 for identification?

A The voucher number is also written on the invoice for the voucher.

Q And does the invoice in People's 1, does that match the voucher number that you vouchered the Metrocard under?

A Yes, it does.

MS. GOLOWA: At this time I would ask that what is deemed People's 1 for identification be moved into evidence as People's Exhibit 1.

MR. FINK: Can I see it very quickly again? I don't think I'll have an objection.

No objection.

THE COURT: Received in evidence and will be so marked.

(Item so marked in evidence as People's Exhibit No. 1 (Metrocard).

Q At this time, Officer, I ask that you take out, you stated that you had vouchered $69 in U.S. currency?

A Yes, I did.

Q You have that with you today?

A Yes.

Q If you can please take that out, and I ask that be deemed People's 2 for purposes of identification.

THE COURT: People's 2 for purpose of identification.

(Item deemed marked for identification as. People's Exhibit No. 2.) ($69 U.S. currency)

Q Now, Officer Schule, what was the voucher number that was assigned on November 29, 2001 to the $69 that you recovered from Jeremiah Muldrow?

A Voucher number is L-164454.

Direct-People-Schule

Q And looking at People's 2 for identification, is the voucher number for that indicated anyplace?
A Yes, it is.
Q And does that match the number it was vouchered under on November 29, 2001?
A Yes, it does.
Q Now, if you could just take a look at what's contained inside that envelope and describe specifically what's contained inside?
A There are three, $20 bills U.S. currency. And nine, $1 bills U.S. currency.
Q And, Officer, is there any markings on or any way that you can tell that those bills are the same bills that you recovered and vouchered on November 29, 2001?
A Yes.
Q And can you explain how?
A Yes, each bill has my initials on it.
MS. GOLOWA: At this time I ask what's deemed People's 2 for identification be moved into evidence as People's Exhibit 2.
THE COURT: Mr. Fink.
MR. FINK: No objection.
THE COURT: Received in evidence as People's Number two and so marked.
(Item so marked in evidence as People's

Exhibit No. 2 ($69 U.S. currency)

Q Now, Officer, do you have the earring that you recovered from Jeremiah Muldrow with you here today?

A Yes, I do.

Q What was the voucher number that you vouchered the earring under on November 29, 2001?

A Voucher number for the earring was L-164455.

Q Now, can you please take out the earring that you took got from the NYPD Property Clerk today and I ask that that be deemed People's 3 for purposes of identification.

THE COURT: Deemed People's 3 for the purpose of identification.

(Item deemed marked for identification as People's Exhibit No. 3.) (Earring)

THE WITNESS: Judge, apparently the cardboard has to be removed to see it.

THE COURT: Apparently the cardboard has to be removed to see it.

MR. FINK: I saw it, Judge. No problem.

Q Now, Officer, looking at what's deemed People's 3 for purposes of identification, is there any place on there that the voucher number is marked?

A Yes.

Q And does the number on People's 3 for identification match the voucher number that you vouchered it

on November 29, 2001?

A Yes, it does.

Q And I had --

MS. GOLOWA: I'd ask that what's deemed People's 3 for identification be moved into evidence as People's Exhibit 3.

THE COURT: Any objection?

MR. FINK: No, no objection.

THE COURT: Received in evidence as People's Number 3 and will be so marked.

(Item so marked in evidence as People's Exhibit No. 3 (earring.)

Q I'd ask at this time the cardboard be removed and the three items be published to the jury.

THE COURT: Yes.

(Exhibits published to the jury)

THE COURT: Pass all three down one at a time. You can take the money out and look at it, if you wish.

People's numbers 1, 2 and 3 exhibits have been published to the Jury.

Q Now, Officer Schule, you also stated that you picked up the gun from the Property Clerk today?

A Yes, I did.

Q And you stated that you also observed -- I'm sorry I'll withdraw that.

Who actually vouchered the gun on November 29, 2001?

A I did.

Q And who did you receive the gun from?

A After the gun was unloaded, it was received from, I'm sorry, are you stating this morning the gun was received?

Q No, I'll be more specific. November 29, 2001 you observed the gun being unloaded?

A Yes.

Q Where did that take place?

A Inside the district, Transit District 30.

Q Who did you observe unloading the gun?

A Officer Kenneth Wengert.

Q And then you stated that you received the gun?

A Yes.

Q Did you receive the gun from Officer Wengert?

A Yes.

Q And what was the voucher number that was assigned to the gun on November 29th?

A The voucher number assigned to the firearm is L-164453.

Q Now, did you voucher anything else together with that gun?

A Yes.

Q What else did you voucher with the gun?

A Would you like me to read off the voucher to you?

MS. GOLOWA: Judge, if the witness can refresh his recollection.

THE COURT: Refresh your recollection and then testify after you refresh your recollection as to what was vouchered.

A Okay, what was vouchered was a 25 caliber handgun. Make is a Phoenix. The model is Raven. There was also one, 25 caliber magazine.

There was also one, 25-caliber round that was found inside the chamber and then there were five 25-caliber rounds that were found inside the magazine.

Q Now, Officer, if you could please take out the vouchered handgun that you received from the New York City Property Clerk this morning.

(Witness Complies.)

MS. GOLOWA: And I ask that be deemed People's 4 for purposes of identification.

THE COURT: Deemed People's 4 for purposes of identification.

(Item deemed marked for identification as People's Exhibit No. 4.) (Gun)

Q Now, Officer Schule, if you can take a look at what's deemed People's 4 for purposes of identification and tell us how you recognize it?

A This is the firearm which was recovered on that day recovered by me.
Q How do you know that's the same firearm?
A My initials are on the firearm.
Q And when you say that your initials are on that gun, can you explain how you put your initials on the gun?
A My initials were carved in with something sharp to penetrate the metal on the firearm.
Q And when did you do that?
A When I vouchered it.
Q On November 29, 2001?
A Yes.
Q And is there anything else about that gun or the packaging that would convince you that's the same gun that you vouchered on November 29, 2001?
A This is the precinct, the Transit District 30 voucher number is on here.
Q And does that voucher number match the voucher number that you testified to earlier that you said that you vouchered the gun under on November 29, 2001?
A Yes, it does.
Q Now, what besides the gun, what else is contained in People's 4 for purposes of identification?
A The magazine is also inside here. The rounds that were recovered inside the magazine and there is also one,

spent round inside here.

Q Now, what does a spent round mean?

A It's a round that was fired from the firearm.

Q And besides the one spent round that's there, how many other rounds are contained in that exhibit?

A There are four.

Q Now, looking at People's 4 for identification, is there anything different about it from when you vouchered it on November 29, 2001?

A No.

Q Well, when you vouchered on November 29, 2001, had any of the rounds been spent?

A No, none of the rounds were spent at that time.

Q And how many rounds did you actually voucher on November 29, 2001?

A There were five rounds.

Q Well, you said that, you testified earlier there were five rounds that had been recovered from the magazine and one round recovered from the chamber?

MR. FINK: I'll object to the leading.

THE COURT: Overruled.

A Yes.

Q And did you voucher all of those rounds on November 29, 2001?

A Yes, I did.

Q So but today as you look at that exhibit there are four rounds in there?
A There are four rounds besides the spent round.
Q Other than those differences, is there anything else different about that, about People's 4 for identification from the way you remember it on November 29, 2001?
A No.
MS. GOLOWA: I would ask that People's 4 for identification be moved into evidence subject to connection of Detective Treese.
MR. FINK: Judge, may I have a brief voir dire.
THE COURT: As to admissibility?
MR. FINK: Yeah.
THE COURT: Go ahead.

VOIR DIRE EXAMINATION
BY MR. FINK:

Q I want to make sure I understand one thing, Officer. You indicated that you received this gun actually when you were inside Transit District 30, is that correct?
A Yes.
Q And who was it who gave it to you?
THE COURT: It's subject to connection, counsel. I'm not going to admit it now.
MR. FINK: Correct.

THE COURT: It's not going to be marked.

MR. FINK: I have no objection to the connection issue.

CONT'D DIRECT EXAMINATION

BY MR. GOLOWA:

MS. GOLOWA: At this time I'm going to ask that this be deemed People's 5-A and B for purposes of identification.

THE COURT: 5-A and B for purposes of identification.

(Item deemed marked for identification as People's Exhibit No. 5-A & B.) (A, Photograph of four keys. B photograph of watch.)

Q Officer Schule, looking at what's deemed as 5-A and B for identification; do you recognize those photographs?

A Yes, I do.

Q And what are those photographs of?

A Photograph A is four keys. Photograph B is of a watch.

Q And where do you recognize those photographs from, the items in the photograph from?

A Those were recovered from the individual placed under arrest.

Q You're referring to Jeremiah Muldrow?

A Yes.

Q And do the keys in the photograph and the watch in the photograph appear in the same or substantially the same condition as they appeared at the time that you recovered them from Jeremiah Muldrow?
A Yes.
MS. GOLOWA: At this time I ask that what's deemed People's 5 for identification be admitted into evidence as People's Exhibit 5.
MR. FINK: No objection.
THE COURT: Received in evidence as People's Number 5 and will be so marked.
(Item so marked in evidence as People's Exhibit No. 5-A & B (Keys & watch)
MS. GOLOWA: I'd ask at this time, for it to be published to the members of the Jury.
THE COURT: Just pass it through, let them take a look at it.
(Exhibits published to the jury).
MS. GOLOWA: Thank you.
At this time I'm going to ask that this photograph be deemed People's 6 for identification and be shown to the witness.
THE COURT: Deemed People's 6 for the purpose of identification.
(Item deemed marked for identification as

People's Exhibit No. 6) (Photo of Jeremiah Muldrow)

Q Officer, looking at what's deemed marked as People's six for identification; do you recognize that photograph?

A Yes, I do.

Q What is it?

A That was the individual who was placed under arrest. That's Jeremiah Muldrow.

Q And does Jeremiah Muldrow in that photograph appear in the same or substantially the same condition as he appeared on November 29, 2001 when you placed him under arrest?

A Yes.

MS. GOLOWA: I would ask what's deem People's 6 for identification be moved into evidence as People's Exhibit 6.

THE COURT: Any objection?

MR. FINK: Judge, I object to the relevance.

THE COURT: Overruled. It's admitted into evidence over Defense's objection as People's Number 6.

(Item so marked in evidence as People's Exhibit No. 6 (photo of Jeremiah Muldrow.)

MS. GOLOWA: I ask that the photograph be published to the jury.

THE COURT: Yes.

Direct-People-Schule

(Exhibit published to the jury)

MS. GOLOWA: At this time I'm going to ask that this diagram and photograph be deemed People's 7-A and B for purposes of identification.

THE COURT: Deemed People's 7-A and B for purposes of identification.

(Item deemed marked for identification as People's Exhibit No. 7-A and B (Photograph of inside subway car and diagram of train.)

MS. GOLOWA: And if that can be shown to the witness, please.

Q Officer Schule, looking first at the photograph in what has been deemed as 7-A for identification, do you recognize that photograph?

A Yes.

Q And what do you recognize that photograph to be?

A That is the inside of a subway train.

Q And do you recognize specifically what subway train the photograph is taken inside of?

A Yes, it looks to me as an A train interior.

Q And does that photograph fairly and accurately represent the inside of an A train interior specifically of the kind with the orange and yellow seats, if there was nobody inside?

A Yes.

Q And looking at the diagram in 7-B for identification, do you recognize that diagram?

A Yes.

Q And what do you recognize that diagram to be?

A That is a diagram of a subway car.

Q And do you recognize specifically what kind of a subway car that diagram represents?

A It's a diagram of a subway car of an A train.

Q And?

MS. GOLOWA: And at this time I ask what's been deemed People's 7-A and B for identification be moved into evidence as People's 7-A and B.

MR. FINK: I have no objection.

THE COURT: Received in evidence as People's 7-A and B and will be so marked.

(Item so marked in evidence as People's Exhibit No. 7-A and B (photograph of inside of subway car and diagram of subway car.)

MS. GOLOWA: I'm going to ask at this time that this be deemed People's 8-A through D for purposes of identification and be shown to the witness.

THE COURT: Deemed People's 8-A through D for purposes of identification.

(Item deemed marked for identification as People's Exhibit No. 8-A - D) (Photographs)

Q Officer Schule, do you recognize the photographs in People's 8-A through D?

A Yes, I do.

Q And starting with A, if you could describe what the photographs are and where you recognize them from?

A The photographs are of the Hoyt and Schermerhorn train station on the A, C and G.

Q And do those four photographs fairly and accurately represent what the Hoyt Schemerhorn train station looked like on November 29, 2001 other than the people that are contained inside the photographs?

A Yes.

Q And the people that are in those photographs right now, do they have anything to do with this case?

A No.

MS. GOLOWA: At this time I ask that People's 8-A through D be moved into for identification be moved into evidence as People's Exhibit A through D.

MR. FINK: No objection.

THE COURT: People's A, B, C and D are moved into evidence, and will be so marked.

(Item so marked in evidence as People's Exhibit No. 8-A - D. (Photographs of train station)

MS. GOLOWA: Actually, Officer, I'd ask that you post that exhibit, please.

Q Officer Schule, look at People's A can you just explain what People's A represents?

A People's A represents the inside of the system at the Hoyt Schemerhorn train station.

Q Okay, and what is People's B?

A People's B is also inside the system at the Hoyt and Schemerhorn train station.

Q And specifically what level do you see on People's A and B?

A That is considered the mezzanine level.

Q And what's represented in People's C?

A That is a stairway leading from the platform up to the mezzanine.

Q What about People's 8-D?

A That is a stairway leading from the mezzanine down to the platform.

Q Are the staircases in People's 8-C and 8-D the same staircase?

A That I'm not sure of.

Q Now, I'm going to ask, with the Court's permission, if the witness could approach the board and be handed these stickers?

THE COURT: Yes, you may approach the exhibit.

(Witness Complies.)

Q Now, Officer Schule, you stated that you came to

the location you went through an exit door?
A Yes.
Q Do you see that exit door in any of the pictures in this exhibit?
A Yes.
Q Where do you see that exit door, if you can point to it, please?
(Witness Complies.)
Q And that's in 8-B?
A Yes.
Q If you could take one of the stickers marked exit and place it by the door?
(Witness Complies.)
Q Now, does that exit door appear in any of the other pictures?
A Yes, it does.
Q Where else does it appear?
A Also in A.
Q And if you could take another sticker marked exit and place it in the exit door in Exhibit 8-A?
(Witness Complies.)
Q And you testified that when you came into that exit door you observed a scuffle?
A Yes.
Q And that involved Jeremiah Muldrow as well as

Joseph Davis and Norwood Thomas and Dennis Fitzgerald?

A Yes.

Q The locations where you observed that scuffle is that location depicted in any of the pictures?

A Yes.

Q Where is that?

A It's in two pictures.

Q Please show in each picture if you can point to the locations.

(Witness complies)

A B in this area here, in A, and this area here in B.

Q And if you could take the stickers marked scuffle and just put those in the area that you just indicated in 8-A and 8-B?

(Witness complies.)

Q Now, Officer Schule, you also testified that you observed the gun being slide from Jeremiah Muldrow under the exit door and be recovered by Officer Wengert?

A Yes.

Q Do you see on the picture where the spot, where officer where you observed officer Wengert recovered the gun?

A Yes.

Q Which picture do you see it in?

A I see it in two pictures; in A and in B.

Q And can you point to the location where you see it

Direct-People-Schule

in each picture?

A The area where it was recovered is just adjacent to the exit gate, which is under the gate right here and also here.

Q And if you could just take the sticker marked gun and put it in where you pointed on 8-B?

(Witness Complies.)

Q Okay, and I'm going to ask if the officer can be handed this pencil. If you can mark gun on another sticker and where you saw it on 8-A?

(Witness Complies.)

Q Now, Officer Schule, the Transit District 30, the actual command that you referred to in your testimony with the window, can you see that in any of those pictures?

A Yes.

Q Where do you see it?

A In picture A.

Q Can you point to where you see it in picture A?

A Yes, the district is located back here.

Q Take the sticker marked 30 and place it where you just indicated on the picture --

(Witness Complies.)

Q -- Transit District 30?

I'll ask that you please take your seat.

(Witness Complies.)

Q Now, Officer, you testified that Jeremiah Muldrow was placed under arrest on November 29, 2001?
A Yes, he was.
Q Was who was the arresting officer in that case?
A I was.
Q And can you just briefly explain what the responsibilities of an arresting officer are when you make an arrest?
A The arresting officer handles all the paperwork in regard to the case.
I also did all of the vouchering in regard to the arrest.
Q And as part of processing the arrest and the arresting officer, did you take what's commonly known as pedigree information from Jeremiah Muldrow?
A Yes.
Q Explain for the jury what pedigree information is?
A Pedigree information is individual's labeled as male female. Race, and by age.
Q And does pedigree information also include like date of birth, address, phone numbers?
A Yes.
Q And did Jeremiah Muldrow tell you what his address was on November 29, 2001?
A Yes, he did.

Q And what address did he give you on that date?

MR. FINK: I'll object, Your Honor.

THE COURT: Overruled.

THE WITNESS: May I refresh my recollection?

THE COURT: Yes, you may.

A Jeremiah Muldrow's address at that time was 38-08 Beach Channel Drive, Far Rockaway, New York.

Q And, Officer, are you familiar with that location?

A No, I'm not.

Q Now, Officer Schule, did you do anything further with regard to this investigation after processing the arrest of Jeremiah Muldrow and vouchering the property?

A Yes, the Transit Squad was also notified, the Transit Detective Squad.

Q And do you know the name of the case detective that was assigned from the Transit Squad?

A I don't recall.

Q Now, besides notifying -- after you notified the detective from the Transit Squad, were you involved any further in the continuing investigation in this case?

A No, I was not.

Q And did you have anything to do with the apprehension of any other individual with regard to this case?

A No, I did not.

Q And if you could, just take a look at the defendant, the man sitting next to Mr. Fink over here; did you ever see Mr. Davis before with relation to your work as a police officer other than in prior court proceedings?

A No, I have not.

MS. GOLOWA: I have nothing further.

THE COURT: Come on up for a second.

Officer Schule, we're going to talk our luncheon recess now. I'll ask you to return at 2:00 for cross-examination by Defense counsel.

Please don't discuss the case with anyone over the lunch hour.

THE COURT: You're excused until then.

THE WITNESS: Thank you.

(Witness Excused.)

THE COURT: Ladies and gentlemen, we're going to take our luncheon recess. Please be back in your room, I'll give you an hour and a half. I'll give you elevator time up and down. I know you're on the fourth floor.

You'll hear me say this every time you leave the courtroom, I have to do it by law. Don't discuss the case with anyone or among yourselves or with anyone else.

Keep an open mind until you hear everything in the case including my charge on the law. If you go

outside the courthouse, don't attempt to visit any of the locations mentioned here for purposes of investigation.

If anybody tries to talk to you about the case, please notify me immediately through the officers.

We will see you at 2:00 promptly. I believe we will finish the cross-examination of this witness and another short, in duration, witness by the People and you should finish about three, between three and 3:30 so you know where we're going.

Enjoy your lunch. 2:00 promptly so we can get started.

(Whereupon the Jury exits the courtroom.)

THE COURT: All the sworn jurors outside the courtroom. Anything for the record before we take our luncheon recess?

MS. GOLOWA: No, Your Honor.

MR. FINK: No.

THE COURT: 2:00 prompt.

A F T E R N O O N S E S S I O N

A L L A N S C H U L E,

recalled as a witness, having previously been sworn, was further examined and testified as follows:

THE CLERK: Recalling case on trial. Counsel are present with defendant.

THE COURT: Anything for the record before we

bring the jury in and continue?

MS. GOLOWA: No.

MR. FINK: No, Your Honor.

COURT OFFICER: Ready for the jury?

THE COURT: Bring them in please.

(Jury enters the courtroom.)

THE CLERK: The parties waive a juror attendance poll?

MR. FINK: So waived.

MS. GOLOWA: So waived.

THE COURT: Good afternoon, ladies and gentlemen?

THE JURY: Good afternoon.

THE COURT: It's been brought to my attention by the Court Officer a couple of you inquired about note taking. I have no problem with note taking as long as you do it for yourself. As you can see we have a court reporter here and everything that is said in this courtroom is being transcribed. So if you take the notes for your own purposes, that's fine.

If an issue arises out of your deliberations what was said during the courtroom, what you'll have to do is make a request and we'll have it read back to you verbatim.

In other words, we don't want you to use your

notes to tell the rest of the jurors what was said. If you take them for your own purposes, that's fine, okay.

Also all of the evidence that's been admitted into this case will be available for you for your examination in the jury. With that admonition, if you wish to take notes for your own purposes, that's fine.

Officer Schule, I remind you you're still under oath.

Mr. Fink, you may cross-examine.

MR. FINK: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. FINK:

Q Good afternoon, Officer Schule.

A Good afternoon.

Q I want to draw your attention back to November 29, 2001. You obviously have a fairly good recollection of that day, is that correct?

A Yes, sir.

Q When you responded to Hoyt Schemerhorn, the mezzanine, I believe as you referred to it, is it fair to say it was chaotic at that particular time?

A Yes.

Q This was approximately 4:10, 4:1:5 or so in the afternoon?

A Just shortly after four.

Cross-Defense-Schule

Q And there were a lot of people in that area, yes?
A In the immediate area where the scuffle was taking place, most of the passengers from the train had moved away from that area.
Q Approximately how long did it take you after you received your radio run to get down to the mezzanine area?
A I'd say between five and ten seconds.
Q And you were inside a vehicle at this particular time?
A I was standing next to the vehicle.
Q And this was actually parked on Schemerhorn Street, is that correct?
A Yes.
Q About a block or so from where you are sitting right now?
A A block or so from here, the car was parked directly in front of the entrance to the subway.
Q And you then proceeded down into the subway, the way a person who wanted to take the A train, the C train or G train would do, correct?
A Yes.
Q So you walked down the stairs from the street level down to the mezzanine level, correct?
A I sprinted.
Q You sprinted. And you were sprinting by yourself?

Cross-Defense-Schule

A At that time by myself from that area.
Q And when you got to the location where you later learned a person by the name, I believe was Jeremiah Muldrow was on the ground, that was in a matter of seconds from the time you received the radio run?
A Yes.
Q And there were other police officers in that area who got there before you?
A I would say we all kind of converged around the same time. The original officer who puts the call over, I guess was probably the first officer there.
Q Do you know who that was?
A Not exactly sure, I believe it was Officer Willie Rodriguez.
Q So, Officer Willie Rodriguez got there before you did, but this case was ultimately given to you for your arrest, correct?
A It wasn't given to me, I was an acting officer in the whole situation so the arrest was mine.
Q Who -- did someone assign the arrest to you?
A Absolutely not.
Q Because you were -- withdrawn.
Were you the first person to actually have contact with Mr. Muldrow?
A Like I had said, there was a few officers, we all

converged around the same time including the sergeant.

Q But is it fair to say it was your handcuffs that went on Mr. Muldrow, is that correct?

A My handcuffs were not on Mr. Muldrow.

Q They were on Mr. Davis?

A Mr. Davis.

Q Whose handcuff went on Mr. Muldrow?

A I don't know.

Q Obviously that person would not be the arresting officer in this case?

A No. Everybody at that time was taken into custody they're not placed under arrest. They're taken into custody for our safety and the public's safety.

Q And did you have a chance to -- withdrawn.

You indicated, I believe on direct examination you spoke with Mr. Joseph Davis, is that correct?

A Yes.

Q And you also -- withdrawn.

Did you have a chance to speak with Mr. Fitzgerald in this case?

A Yes.

Q And did you have a chance to speak with Mr. Norwood Thomas?

A Yes.

Q And you spoke to them about what happened on the

train, correct, on the A train?

A Yes.

Q By the way, Hoyt and Schemerhorn, I don't know if I asked you this but, but is that considered a busy train station based upon your experience there as a police officer?

A Yes.

THE COURT: It was busy on that day?

THE WITNESS: Yes.

Q 4:00 in the afternoon this wasn't a weekend day, was it?

A I don't recall. I believe it was a weekday and it was rush hour.

Q So based upon those things assuming it was a workday and it was rush hour, it would be, that's a generally fair to say, generally, busy subway area, is that correct?

A Yes. Between the kids coming out of school and people starting to head home, it gets pretty busy around that time.

Q By the way, are there video cameras in that area?

A No.

Q There are not video cameras?

A None that I'm aware of. None set up by the Police Department anyway.

Q Now, you said that you had a chance to speak with Mr. Joseph Davis, Mr. Fitzgerald and Mr. Thomas, correct?

Cross-Defense-Schule

A Yes.
Q And I believe you indicated on direct examination that you received a description of two other individuals, is that correct?
A Yes.
Q Now, this is based upon your conversations with all three of these individuals, is that correct?
A The first conversation took place with Joseph Davis.
Q But in terms of descriptions?
A I went with his immediate description. All three were complainants. He was directly involved and he had stated that he had a good look at all three individuals.
MR. FINK: Judge, I'll move to strike. I don't think it's responsive.
THE COURT: Overruled. You may finish your answer.
A I went with Joseph Davis' description for the immediate fact that officers were in the area and they were going to do a canvass so I didn't want to waste time.
Q But you also indicated with regard to a description, you spoke to Mr. Thomas and Mr. Fitzgerald as well, is that correct?
A Yes.
Q It's also fair to say that well, -- withdrawn.

Cross-Defense-Schule

You indicated that you then went on a canvass with Mr. Davis, is that right?

A Mr. Davis went on a canvass with two other officers.

Q But not with you?

A Not with me.

Q Did there come a time that you filled out paperwork with regard to information that was given to you and also with regard to observations that you made back on November 29, 2001?

A Yes.

Q Based upon well, -- withdrawn.

Did you fill out a document, Officer, called a field investigation worksheet?

A Yes, it's called a TP 67 at the time.

Q I'm sorry, field investigation worksheet is referred to as a TP 67?

A Yes.

Q And that's something a Transit officer such as you were at the time, would fill out in a situation like you were faced with on November 29, 2001, is that correct?

A Yes, TP 67 is a transit complaint report. It's used strictly for transit at that time. I don't believe they use it anymore.

Q And, in fact, you're required to fill one of these

documents out, is that fair to say?

A Yes.

Q Is it fair to say that you would do so in the ordinary course of your employment as a transit police officer?

A Yes.

Q And do you recall when it was that you filled out this document?

A I'm sorry.

Q Do you know when it was that you filled it out on November 29th of 2001?

A Yes, it was a complaint report for a robbery in the first degree.

Q But when is -- my question is when on that date?

A When?

Q Yes?

A Sometime that evening. I don't exactly recall exact time.

Q It would be after four p.m.?

A Yes, after four p.m.

Q And would have been after you spoke with Mr. Davis and Mr. Norwood Thomas and Mr. Fitzgerald, is that correct?

A Absolutely.

Q Do you happen to have a copy?

THE COURT: Counsel, when you say Mr. Davis I

suggest you use the first name.

Q Let me make that clear. In my reference to Mr. Davis, I'm referring to Joseph Davis?

A Yes, I'm aware.

Q You've never had a conversation with my client, is that correct?

A That's correct.

Q Other than seeing him in this room, you've never seen him before, right?

A No.

Q I'm sorry. Now my next question is do you actually have your report with you?

A I can look through my notes.

Q Could you, please?

A Sure.

THE COURT: If you have a copy, it might save time.

MR. FINK: It's little blurry.

A I don't believe I have a copy here. The photocopy I have here is partially cut off.

Q If I can just show you the copy I have.

THE COURT: You can show a piece of paper to him.

MR. FINK: Two pieces of paper.

THE COURT: And he can review them to see if it

refreshes his recollection about his report.

MR. FINK: Yes.

THE WITNESS: Okay.

Q Is that the-

A This is the TP 67 field investigation worksheet.

THE COURT: It's a piece of paper.

MR. FINK: It's two pieces.

THE COURT: Two pieces of paper.

MR. FINK: Yes.

THE COURT: If you're going to introduce it for some purpose, you're going to put it into evidence you have to lay a foundation. You're asking questions about the report and refreshing his recollection about it. You can't have it both ways. One way or the other.

Q Is that a report that you filled out?

A Yes.

Q And did you fill that out in the ordinary course of business as a Transit police officer back on November 29, 2001?

A Yes.

Q And are you required to fill out that report as an employee with the New York City Transit Department?

A Yes.

MR. FINK: Your Honor, I would ask that it be moved into evidence as a business record.

THE COURT: Ask is it a copy.

Q Is it an actual copy of the report that you filled out?

A Yes, it's a little smudged, yes.

MR. FINK: I ask that it be --

THE COURT: Come up.

(Whereupon a bench conference was held off the record.)

Q Officer, the report, I don't know if I had it marked for identification.

THE COURT: It's deemed defendant's A for purposes of identification.

(Item deemed marked for identification as Defendant's0 Exhibit A (TP 57 worksheet.)

Q Defendant's Exhibit A for identification, Officer, does that give descriptions in it?

A Yes.

Q And is it also fair to say that in addition to the descriptions, it also asks you to put down if any kind of weapon was used in a particular crime?

A Yes.

Q And, in fact, you indicated that a weapon was used, is that fair to say?

MS. GOLOWA: Objection.

THE COURT: Counsel, ask him about his report

and then he can refresh his recollection. You can't have him read from it if it's not in evidence.

Q Does the report refresh your recollection as to what kind of weapons were told to you were used if any, in the robbery that happened back on November 29th, of 2001?

MS. GOLOWA: Objection.

THE COURT: Overruled.

A Yes, there was a knife -- no excuse me. There was a firearm, which was recovered, and I believe there was a knife that was also used, which was not recovered.

Q And where in your report does it indicate a knife was used?

A It does not indicate that.

Q It's not in the report?

A No.

MR. FINK: Your Honor, I asked that it be moved into evidence as a prior inconsistent statement.

MS. GOLOWA: Objection.

THE COURT: Overruled.

It's in evidence as Defendant's A and will be so marked.

(Item so marked in evidence as Defendant's Exhibit A (TP 67.)

THE COURT: Is it marked?

COURT OFFICER: Yes.

Cross-Defense-Schule

THE COURT: Would you let the People in the hallway know this is a courtroom.

MS. GOLOWA: Judge, can we approach?

THE COURT: Come on up.

(Whereupon a bench conference was held off the record.)

THE COURT: Go ahead.

Q Officer, you indicated that you received actual physical descriptions, is that correct, with regard to two other people?

A Yes, I did.

Q Where included in those descriptions, and I understand you gave a description on direct examination, but did anyone ever indicate to you facial hair with regard to these two other people?

A I don't recall.

Q And would that be indicated in your report, if it was?

A Yes, I guess it would, if it was mentioned.

Q And is it indicated in your report?

A Can I look to my notes, Judge?

THE COURT: Which report?

Any report or the one we just put in evidence?

MR. FINK: The one in evidence, Defense Exhibit A.

A No, it does not appear that it's marked on there.

Q Was there any indication about unusual teeth by any of the people?

A I don't recall; it's quite some time.

Q And I don't believe you said on direct examination anything about a hat, but was that part of the description given to you plaid hat?

A I believe it was a hat; I don't recall the color or the style of the hat.

MR. FINK: Just one moment, Judge.

THE COURT: Yes, take your time.

MR. FINK: I have nothing further.

THE COURT: Redirect.

MS. GOLOWA: Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. GOLOWA:

Q Officer Schule, you stated that you got the description from Joseph Davis?

A Yes.

Q And do you remember approximately what time or when in the course of the events as they unfolded on November 29, 2001 was it that you got their descriptions?

A I'm sorry.

Q When was it that you got the description from Joseph Davis?

A Shortly after they were all taken into custody.

Q And at the time that you were talking to Joseph Davis, were you filling out the report that's in evidence as Defense A at that time?

A No.

Q Now, at the time that you asked Joseph Davis for a description of the other two individuals, what else was going on?

A Officers were canvassing the area. I guess waiting on my description.

Q So was this -- I'll withdraw that.

When you got the description from Mr. Davis, did you ask him whether any of the individuals had any facial hair?

A I don't recall; it's been some time.

Q Do you remember whether you specifically asked Mr. Davis about what kind of teeth any of the individuals had?

A At that time I -- I asked for any particular things that stand out on this individual that will characterize them more than the average person on the street. Something that will help us find that person that stands out directly for that individual.

Q And he gave you a description?

A Yes.

Q And did you ask specific questions after Mr. Davis

gave you a description?

A Yes. I asked, like I said, any particular, anything in particular such as, you know, as a scar a tattoo, you know, jewelry, you know, glasses. I don't recall if I asked for facial hair. It's usually a standard question.

Q Did you have a lot of time to discuss the description with Joseph Davis at that time?

A No, no. To get that description out as soon as possible, this way the officers responding to the area that are going into a canvass, so to speak, need to patrol the area to look for these individuals. You try to be as quick and brief as possible.

Q You said you did ask about a scar and tattoo?

A Yes.

Q Did you get any response with regard to that individual?

A One of the individuals had a scar on his face.

Q And you said that one of them was a taller individual and one was them was a shorter individual?

A Yes.

Q Which one was referred to as having the scar on the face?

MR. FINK: I'm going to object.

THE COURT: Overruled.

THE WITNESS: I believe it was the shorter of

the two individuals.

Q Now, you said that the report that's in evidence as Defendant's A, the TP 67 was filled out later that evening?

A Yes.

Q And was Mr. Davis present at the time that you were filling out the report?

MR. FINK: Judge, just so we're clear Mr. Joseph Davis.

Q Yes, Mr. Joseph Davis.

THE COURT: I can't hear.

MR. FINK: I ask the record be clear as to which Davis.

Q Was Mr. Joseph Davis present at the time you were filling out the report?

A I don't recall.

MS. GOLOWA: Nothing further.

THE COURT: Recross.

MR. FINK: No.

THE COURT: Officer Schule, you're excused with the thanks of the Court. You may step down, sir.

THE WITNESS: Thank you.

(Witness Excused.)

THE COURT: People, call your next witness.

MS. GOLOWA: People call Police Officer Rutherford.

B R I A N   R U T H E R F O R D, called as a witness, having been first duly sworn, was examined and testified as follows:

THE CLERK: Be seated.

And using the microphone state your name, shield number and command.

THE WITNESS: My name is Officer Rutherford record. Shield number 5839. Command Transit District 30.

THE COURT: You may inquire, Miss Golowa.

MS. GOLOWA: Thank you.

DIRECT EXAMINATION

BY MS. GOLOWA:

Q Good afternoon, Officer Rutherford.

A Good afternoon.

Q By whom are you employed?

A City of New York.

Q In what capacity?

A Police Department.

Q And how long have you been employed as a police officer?

A Approximately six and a half years.

Q I can't hear.

A Six and a half years approximately.

THE COURT: Slide up a little closer to the

mike, it will pick your voice up better.

Q What is your current assignment with the Police Department?

A I'm uniformed patrol.

Q With any particular command?

A Yes, Transit District 30.

Q How long have you been assigned to Transit Decision 30?

A Six and a half years.

Q So since you started with the Police Department?

A Yes.

Q Now, I'd like to direct your attention to November 29, 2001, were you working on that day?

A Yes, I was.

Q Do you remember what tour you were working on that day?

A I was working a three in the afternoon by 11:30 at night.

Q And so what does that mean? What time did you start work that day?

A Start at three and ended at 11:30.

Q What was your assignment for that particular day?

A I was assigned to a marked patrol car.

Q Were you working by yourself or with a partner?

A No, I was with a partner.

Q Who was your partner that day?
A Officer Donnelly.
Q Were you in uniform or plainclothes that day?
A In uniform.
Q Now, I'm going to direct your attention to that particular day November 29, 2001 at approximately 4:05 p.m., had you left the command, Transit District 30 to go on patrol yet?
A Yes, I did.
Q And where were you at that time, approximately 4:05 p.m. on that day?
A I was in the street at the corner of Hoyt Street and Schemerhorn Street.
Q So even though you had left you were right outside the district?
A Because I was a assigned to a marked RMP, the car was in the street. We have to go upstairs to do an inspection of the vehicle.
Q At approximately 4:05 p.m., what were you doing?
A Inspecting the vehicle.
Q Now, did something happen at that time?
A Yes, there was a call for assistance at the Hoyt Schemerhorn train station.
THE COURT: Don't tell us what the call stated, please.

Q And did you respond to that call?

A Yes.

Q And where did you go?

A Down into the subway at Hoyt and Schemerhorn.

Q What did you observe when you got downstairs?

A By the time we got down there, already there was a bunch of officers because the police station is inside that train station. Officers were already there on the scene. They had two or three people in handcuffs already and everything was pretty much done by the time we even got downstairs.

Q Do you remember specifically how many people it was that was handcuffed?

A No, I don't remember off hand.

Q Did you yourself place any of those people in handcuffs?

A No.

Q Did you have anything further to do with that incident or any investigation relating to that incident?

A Yes. What my part was is -- when something an incident happens and they're actually looking for somebody they do what's called an area search. We take the complainant in the marked RMP and do a canvass of the area around the train station, and that's what we did.

THE COURT: By canvass, you mean driving around

are the area on the street looking for an individual?

THE WITNESS: Yes.

THE COURT: Go ahead.

Q You said that's what you did on November 29, 2001?

A Correct.

Q And that was with regard to this specific incident in the Hoyt Schemerhorn train station?

A Yes.

Q Now do you remember how many people came in the car with you well, did your partner come with you to canvass?

A Yes, me, my partner and one other.

Q One other gentleman?

A Yes.

Q Do you remember the name of the person who came with you to canvass?

A No, I don't.

Q Did you receive a description at that time with regard to the person or people that you were looking for?

MR. FINK: Objection.

THE COURT: We did receive a --

Yes or no?

THE WITNESS: Yes.

Q Approximately what time did you leave the command in order to go on this canvass?

A Approximately 20 minutes after four.

Q And how much time did you spend canvassing?
A About 15 minutes.
Q Did you find anybody that matched any of the descriptions that you had?
A No.
Q And what did you do with the person who was in your car after you finished canvassing?
A We brought the person back to the train station at Hoyt and Schemerhorn to the police station.

MS. GOLOWA: No further questions.

THE COURT: Cross-examination.

MR. FINK: No cross.

THE COURT: Officer Rutherford, you're excused with the thanks of the Court.

Counsel, come up please.

(Witness Excused.)

THE COURT: Ladies and gentlemen, that concludes our work for today. We're moving right along. I'm going to ask you to come in sharply tomorrow at 10:00, and we'll get as much as the testimony as we can. Once again don't discuss the case among yourselves or with anyone else.

Don't read anything or listen to anything about the case as it appears in the media.

Don't visit any of the locations mentioned

here. Of course, if you have to take the A train or use the Hoyt Schemerhorn station, you're welcome to do so. Just don't stop and make any independent investigation about the facts of the case. Could be very well changed since then, okay. And if anybody tries to talk to you about the case, please let me know immediately.

10:00 tomorrow morning in your jury room and we'll get started. Have a good evening.

(Whereupon the Jury exits the courtroom.

THE COURT: Anything for the record before we adjourn until tomorrow morning at 10:00?

MS. GOLOWA: No.

THE COURT: Tomorrow I'm going to look up on a 2001 calendar to take judicial notice what day of the week it was. I made a note to myself to do that. I'll be able to ascertain the date.

10:00 tomorrow sharp and we'll continue. See you then.

(The trial is adjourned to May 4, 2004 in Part 23)

* * *

It is hereby certified that the foregoing is a true and accurate transcript of the proceedings.

Rosanne Terman

ROSANNE TERMAN,
SENIOR COURT REPORTER

# I N D E X P A G E


| PEOPLE'S WITNESSES | PAGE |
|---|---|
| A L L A N S C H U L E | 26 |
| DIRECT EXAMINATION BY MS. GOLOWA | 26 |
| VOIR DIRE EXAMINATION BY MR. FINK | 53 |
| CONT'D DIRECT EXMAINATION BY MS. GOLOWA: | 53 |
| CROSS EXAMINATION BY MR. FINK | 69 |
| REDIRECT EXAMINATION BY MS. GOLOWA: | 82 |
| B R I A N R U T H E R F O R D | 86 |
| DIRECT EXAMINATION BY MS. GOLOWA: | 86 |

I N D E X P A G E


| PEOPLE'S EXHIBITS | PAGE |
|---|---|
| Item deemed marked for identification as People's Exhibit No. 1.) (Metrocard) | 43 |
| Item so marked in evidence as People's Exhibit No. 1 (Metrocard) | 45 |
| Item deemed marked for identification as People's Exhibit No. 2.) ($69 U.S. currency) | 45 |
| Item so marked in evidence as People's Exhibit No. 2 ($69 U.S. currency) | 46 |
| (Item deemed marked for identification as People's Exhibit No. 3.) (Earring | 47 |
| Item so marked in evidence as People's Exhibit No. 3 (earring.) | 48 |
| Item deemed marked for identification as People's Exhibit No. 4.) (Gun) | 50 |
| Item deemed marked for identification as People's Exhibit No. 5-A & B.) (A, Photograph of four keys. B photograph of watch.) | 54 |
| Item so marked in evidence as People's Exhibit No. 5-A & B (Keys & watch) | 55 |
| Item deemed marked for identification as People's Exhibit No. 6) (Photo of Jeremiah Muldrow) | 55 |
| Item so marked in evidence as People's Exhibit No. 6 (photo of Jeremiah Muldrow.) | 56 |
| Item deemed marked for identification as People's Exhibit No. 7-A and B (Photograph of inside subway Car and diagram of train. | 57 |
| Item so marked in evidence as People's Exhibit No. 7-A and B (photograph of inside of Subway car and diagram of subway car.) | 58 |
| Item deemed marked for identification as People's Exhibit No. 8-A - D) (Photographs | 58 |

INDEX PAGE

Item so marked in evidence as People's Exhibit No. 8-A - D. (Photographs of train station) 59

I N D E X    P A G E


| DEFENSE EXHIBITS | PAGE |
| --- | --- |
| Item deemed marked as Defense Exhibit A For identification (TP 67 worksheet) | 79 |
| Item marked in evidence as Defense Exhibit A (TP 67 worksheet.) | 80 |