UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ MAR 17 2009 ★
BROOKLYN OFFICE

----------------------------------------------------------x

KEITH DAVIS,

Petitioner,

-against-

CV 08-4659 (DLI)

JAMES W. WALSH, Superintendent,
Sullivan Correctional Facility,

Respondent.

----------------------------------------------------------x

RESPONDENT'S EXHIBIT G (VOLUME 2 OF 5)

ORIGINAL COPY

CHARLES J. HYNES
DISTRICT ATTORNEY KINGS COUNTY
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

LEONARD JOBLOVE
HOWARD B. GOODMAN
Assistant District Attorneys
of Counsel

March 2009

Davis v. Walsh

CV 08-4659 (DLI)

RESPONDENT'S EXHIBIT G

Trial Transcript (Volume 2 of 5) (Pages 97- 223)

ORIGINAL COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS : CRIMINAL TERM : PART 23
------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK
-against-
KEITH DAVIS
DEFENDANT.
------------------------------------------x
Indict. No. 9148/01 120 Schermerhorn Street
TRIAL Brooklyn, New York
May 4, 2004

B E F O R E :
HONORABLE MICHAEL BRENNAN,
Justice, and a jury.
(Appearances same as previously noted.)

ROSANNE TERMAN
SENIOR COURT REPORTER
* * * *

THE CLERK: Calling the case on trial, indictment 9148 of 2001, Keith Davis. Defendant is present. Counsel, appearances.

MS. GOLOWA: Dvora Golowa for the office of the Assistant District Attorney.

MR. FINK: Jonathan Fink for Mr. Davis. Good morning, Judge.

THE COURT: Good morning. Anything for the record before we bring up the jury?

MS. GOLOWA: No, Judge, but can we approach?

THE COURT: Come on up.

(Whereupon a bench conference was held off the record.)

THE COURT: Please bring them in.

(Jury enters the courtroom.)

THE CLERK: Do the parties waive the jury attendance poll?

MR. FINK: So waived.

MS. GOLOWA: Yes.

THE COURT: Good morning, ladies and gentlemen.

THE JURY: Good morning.

THE COURT: I apologize for the delay. The Court does have other matters to take care of and we had some scheduling problems but we will continue now.

Miss Golowa, please call your next witness.

MS. GOLOWA: Thank you. The People call Detective Joseph Treese.

J O S E P H   T R E E S E, called as a witness, having been first duly sworn, was examined and testified as follows:

THE CLERK: Be seated and using the microphone state your name, shield number and command.

THE WITNESS: Detective Treese, shield, 32346 Firearms Analysis Section New York City Police Department.

THE COURT: You may inquire, Miss Golowa.

MS. GOLOWA: Thank you.

DIRECT EXAMINATION

BY MS. GOLOWA:

Q Good morning, Detective Treese.

A Good morning.

Q By whom are you employed?

A New York City Police Department.

Q In what capacity?

A I'm a detective assigned to the Firearms Analysis Section as a firearms' examiner.

Q How long have you been a member of the New York City Police Department?

A I'm coming to the end of my 20th year.

Q And how long have you been a member of the Firearms' Analysis Section?

A Over eight and a half years.

Q Can you just briefly explain to the members of the jury what the Firearms Analysis Section is?

A My unit is responsible for analyzing and testing any firearms or ballistics evidence which comes into the possession of the New York City Police Department.

Q Did you receive any particular type of training when you joined the Firearm Analysis Section?

A Initially when I was assigned to the unit, I was paired up to one-and-one training with the detectives already in the unit.

I observed them doing examinations for a period of time and eventually I started doing examinations with their

guidance and assistance until I reached a degree of proficiency to do examinations on my own.

Also in the time I've been in the unit, I have attended the following manufacturer Armory schools. Smith and Wesson for semi-auto pistols and revolvers. Glock, Clark, Sig Sauer and Beretta for semi-automatic pistols and Mossberg, for Mossberg shotguns.

I also attended a basic course of shooting scene reconstruction and an advanced course on shooting scene reconstruction.

I have attended seminars on bullet path and penetration and postmortem path and penetration giving by the New York City Medical Examiner's Office, and I'm also guided by the Bureau of Alcohol, Tobacco and Firearms and in serial number restoration

Q What have been some of your duties and responsibilities over the past eight years at the Firearms Analysis Section?

A Again, I'm a firearms' examiner. I test firearms and ammunition for operability, and I also do serial number restorations.

Q And can you explain what operability is?

A An operability test is a test performed to determine that the gun is readily capable of firing a shot.

Q Now, approximately how many firearms have you

examined and tested during your career at the Firearms Analysis Section?

A Over 7,500.

Q And have you ever previously testified as a ballistics expert with regard to the operability of firearms in a court of law?

A Yes.

Q Approximately how many times?

A Over 170.

Q In what jurisdictions?

A I've testified in Bronx, Kings, and Queens County. Criminal, Family and Supreme Courts. New York and Westchester County Supreme Court and also the United States Southern District.

Q And have you ever been denied expertise in any courts of law?

A No, I haven't.

MS. GOLOWA: Your Honor, at this time I ask that Detective Treese be qualified as an expert in firearms; identification and examination.

THE COURT: Any objection?

MR. FINK: No, Your Honor.

THE COURT: You're declared by the Court to be an expert in the examination and operability of firearms.

Q Now, Detective, what type of firearms do you

examine? Is it called FAS for short?

A Firearms Analysis Section, FAS.

Q What type of firearms do you usually examine?

A I've examined semi-auto pistols. I've examined revolvers, shotguns, rifles, as well as fully automatic weapons.

Q Can you just briefly explain the difference between a pistol and a revolver?

A A revolver is a weapon that has a cylinder. Inside the cylinder are individual chambers. Chambers can be six, can be five whatever the manufacturer's specs are for their particular model.

To load the weapon, you have to flip the cylinder out in the frame and individually load each chamber with the live round of ammunition.

Once you load the weapon, load the cylinder, its then locked back into the frame. To fire the weapon, you pull the trigger. As you're pulling back on the trigger, the cylinder is revolving. It comes to rest and it's aligned with it. Aligns a live round of ammunition with the chamber and the barrel of the weapon.

As you continue to pull the trigger backwards, the hammer comes back also. When the hammer reaches it's rearward most motion, it's released, comes forward under tension. That strikes the primer of the cartridge causes the

cartridge to discharge.

To fire the gun again, you pull the trigger. That sequence take place, each individual pull of the trigger. When you exhaust the load in the gun, you then have to flip the cylinder out one more time and manually reject the discharged cartridge case and manually reload.

A semi-auto pistol is essentially a pistol that loads and unloads itself and it has a magazine. Most of what I seen have a detachable magazine. It's a box type piece. It's got a spring inside. It's got a piece called follower.

To load the magazine, you just take the cartridges and push them down the top of the follower and depress the spring until you reach the capacity for the magazine.

To load the gun, you load and lock the magazine. It's called the magazine well of the firearm.

To fire, you pull back the slide and release the slide. The slide comes forward under spring tension. As it comes forward, it strips off top cartridge case from the magazine and chambers it into the chamber. At that point the gun is also cocked and ready to be fired.

When the trigger is pulled, the firing pin or firing mechanism strikes the cartridge causing it to discharge sending a bullet down the barrel into the muzzle of the well.

The opposite force to that causes the cartridge

case to slam what's called a breech face. It's part of the slide, that automatically pushes the slide rearward. As it goes rearward, there's another component called an extractor which pulls out the discharged cartridge case from the chamber; it slides in the third component called an ejector slams against the ejector and it's ejected out of the weapon.

As the slide then reaches it's rearward most motion, it comes forward once again under spring tension automatically strips off the next round and the gun is ready to be fired again.

That sequence will take place each individual pull of the trigger until the magazine is exhausted of the load.

In which case drop the magazine and replace it with a freshly loaded one.

Q Now, Detective, did you review your paperwork with regard to this case before coming to testify in court today?

A Yes, I did.

Q And did there come a time that you received property vouchered under voucher number L-164453?

A Yes.

Q And what was the date that you received that property?

A On November 30, 2001.

Q What specifically did you receive?

A I received a 25 auto caliber Phoenix semi-auto

pistol along with six round magazine for the weapon and six, 25 auto caliber cartridges.

Q I'm going to ask that the witness be handed People's 4 that is in evidence subject to connection.

THE COURT: We have it up here.

Q Detective, you can take a look at that exhibit and tell us what it is.

A This is the weapon that I just described, 25 auto caliber Phoenix semi-auto pistol. There is also a magazine. There are four remaining live cartridges and there's one discharged cartridge case with the bullets, which is one of the test rounds.

Q How do you recognize this gun and magazine and ammunition as the same gun magazine and ammunition that you examined on November 30, 2001?

A On the outside of the bag is still, excuse me, the bag is still heat sealed, as I did when I last saw it.

On the outside of the bag, I've indicated precinct of occurrence, along with the voucher number, year of occurrence.

I also signed and dated the bag and entered my command designation. I've also initialed and dated the bottom seal.

I initialed and dated the top seal, which are still in tact and also inside the heat sealed bag is a copy of my

original report with my original signature.

Q And is that bag and all the contents inside the same or substantially the same condition as they were when you last saw it on November 30, 2001?

A Yes, excuse me, yes, they are.

MS. GOLOWA: At this time I would ask that People's 4 that was in evidence subject to connection be moved into evidence.

THE COURT: Again subject to connection.

Q Now, Detective, can you tell us how you came to receive this particular gun and ammunition to examine on that date?

A We have what's called an evidence control room, which is in the same floor as our office. Inside the evidence control room when we receive firearms, they are categorized in a file cabinet by borough and by type of occurrence, by arrest, found, investigator, whatever.

I reported to the evidence control room, I asked for one of the cases that had to be completed, and I signed out this particular case.

Q And what did you do with it next?

A The first thing I did was remove the entire package back to my workstation. At my workstation I cut open the top seal and I removed the paperwork that was contained in the bag. That consisted of the property voucher, the request for

lab analysis, and also a copy of the complaint report.

The first document I reviewed was the request for a laboratory analysis, and I determined that there were no other examinations requested that would have to be performed prior to my test firing or handling of the weapon.

When I was satisfied nothing else was requested, I then made sure the gun itself was safe, and then I inventoried the contents of the bag against what was listed on the voucher, and I was satisfied that everything listed on the voucher was, in fact, contained in the bag.

The next thing I did is what's called a function test, and simply what that function test of the firearm is putting it through its battery of operation without actually introducing any live ammunition to the gun. This is just a determination that the gun was safe, if it was actually loaded.

In the case of a semi-automatic pistol, I examined the outside of the frame. While examining the exterior portion of the weapon, I did notice that the serial number had been defaced by drilling.

I then pulled back the slide and looked into the chambered area. I looked down the barrel for any evidence of discharge or any obstructions.

I then released the slide and made sure it comes back in the spring tension, as it should.

The next thing I examined was the magazine. I determined that the magazine appeared to be in good working condition, and that it was, in fact, a proper magazine for the firearm.

I then inserted the magazine into the firearm, pulled back, release the slide. Again with having no ammunition either in the magazine or the weapon and lastly, what I did was pull the trigger, and I heard the firing pin release, which indicates to me the gun would be in safe working condition.

The last thing I examined were the six cartridges. I determined that all six cartridges were the proper caliber and they were also in good working condition.

And also on the vouchered as well as the lab request, one of the six rounds was indicated as having been recovered from the chamber of the weapon.

I then selected the one that was, one cartridge indicated from the chamber along with one additional cartridge from the vouchered ammunition, and I also obtained two, 25 auto caliber cartridges from our own supply.

I marked all the items properly. I marked the two cartridges from our own supply.

I then took the two test cartridges I marked from the vouchered ammo, I took the two cartridges that I obtained from our own supply. I took the magazine and the firearm

Direct-People-Treese

along with the ammo into our test tank room, which is on the same floor as our office.

Inside the test tank room is a stainless steel bullet recovery tank. The tank is about ten feet long, about four feet wide and it's filled with water.

Once I was in the room, the first thing I did was examine the inside of the tank. I determined there were no prior test specimens in the water; it was clear.

With that, I then moved to one end of the tank. There is a control panel where there is a hydraulic lid over the top of the lid.

Lowered the four cartridges into the magazine, I then loaded and locked the magazine into the firearm and there is a tube that's angled out towards the weapon. Aimed the weapon down towards the weapon, pulled back, released the slide that chambered the top round, the gun was also cocked and ready to be fired.

I pulled the trigger, the first round discharged. The cartridge case ejected properly as did the next three.

I then recovered the bullets from the water. I recovered the discharged cartridge case and I removed all the items back to my workstation

Q Now, can you just explain when you say you marked the ammunition properly explain how you marked it?

A I engraved everything with an electric engraver.

Q Now, Detective, did you form an opinion with regard to the operability of the firearm that you examined?

A Yes. I determined that the firearm as well as the ammunition were operable.

Q Okay, and do you have an opinion based upon a reasonable degree of scientific certainty as to the operability of the firearm and the ammunition?

A Yes, the ammo and the firearm were operable.

Q Now, what did you do after you finished testing it?

A After the firearm examination, I then attempted to raise the serial number. I did a serial number restoration processing --

MR. FINK: I'm going to object.

THE COURT: I'm sorry.

MR. FINK: Can we approach?

THE COURT: Come up.

(Whereupon a bench conference was held off the record.)

THE COURT: Objection overruled.

A Prior, excuse me. After completing the firearm examination and completing the firearm examination notes, I then processed the firearm for serial number restoration.

Q And can you explain very briefly how you did that?

A To restore a serial number first where the serial number is defaced, it's polished down either with a drilling

tool or just emery cloth.

It's -- you try to sand it down so it's an even shiny surface. Then in an attempt to raise the serial number, you do a series of what's called acid wash where you take a swab. In this particular case I used a chemical called acidic chloride essentially removing layers of metal in an attempt to go down to where the imprints would be able to be raised again.

Q And were you able to successfully store the serial number in this particular case?

A No, it was drilled too deep.

Q Now, the process that you used including the acid that you just mentioned, did that cause any change to the condition of the firearm?

A Yes, it does.

When you are using the acid, obviously taking off the metal, you're taking off the finish and what happens is you have bare metal sometimes moisture remains when you use the acid wash in order to neutralize the acid you put on the firearm, it's then flushed with water and then it's hit with acetone to evaporate the water even with that some moisture remains with the gun.

When the gun is sealed in plastic, you can see where the metal is corroded because of the moisture and finish being removed.

Q When you initially received the gun and tested it on November 30, 2001, did it have any of this corrosion?
A No, it would have been noted on my report and notes.
Q Looking at the gun in evidence in People's 4, do you observe any of the kind of corrosion you just mentioned?
A Yeah, there seems to be some surface corrosion on the firearm itself.
Q Thank you.
After you finished the test with regard to the serial number, what did you do next?
A I then completed my report, I sealed the -- one of the test rounds from the vouchered ammunition in this corner of the bag. I sealed the remaining four cartridges in their own bag in the opposing corner.
I then sealed the firearm and the magazine in the middle compartment. The information that I received the ammunition in are sealed above that.
Directly above that is the security envelope that the vouchering officer used.
Directly above that is the original seal that I removed from this bag and resealed inside.
And lastly my report is sealed in here. The bag is then initialed. The top seal is initialed and the entire package was returned back to the property room.

Also, on the test round the two test rounds that I fired from our own supply as well as one of the test rounds from the vouchered ammunition were placed in an envelope and sealed and that was distributed to the computerized ballistics system also in our office

Q So taking into account the three specimens that are in the ballistics data base, together with the five specimens that are here for a total of eight specimens, does that account for the six round that you received when you got this package plus the two you took from ballistics supply?

A Yes, it does.

MS. GOLOWA: Thank you. I have no further questions.

THE COURT: Cross-examination.

MR. FINK: No cross.

THE COURT: Detective, you're excused, with the thanks of the Court. You may step down.

THE WITNESS: Thank you, Judge, have a good day.

(Witness excused.)

THE COURT: Ladies and gentlemen, we have two other witnesses scheduled for today. They won't be here until two p.m.. I'll give you an early lunch today.

We have one witness that will be here promptly at two and another witness will follow. You're going to be excused for lunch until two p.m..

Don't discuss the case among yourselves or with anyone else. Don't attempt to visit any of the locations and do any investigations on your own.

If anyone tries to talk to you about the case, let me know immediately. Please enjoy your luncheon recess. We will get to work promptly at two. See you then.

(Whereupon the Jury exits the courtroom.)

THE COURT: All of the sworn jurors are outside the courtroom, anything for the record before we take our luncheon recess?

MR. FINK: Judge, just with regard to my objection and at the bench conference my position is simply that I don't think it's relevant that the gun was defaced. I understand that the prosecutor's concern was how the gun appeared, but doesn't seem to be relevant and if anything, it's prejudicial to my client. I think the jury hearing that a gun is defaced raises certain sinister, if you will --

THE COURT: I didn't hear the word defaced. I heard he was unable to raise the serial number, that's all I heard. Also his testimony as to that aspect explains the present condition of the weapon relative to any discoloration.

MR. FINK: My application would be to strike

the testimony with regard to that.

THE COURT: You have your exception for the record.

Two p.m. sharp, please.

(Whereupon a luncheon recess was taken.)

A F T E R N O O N   S E S S I O N

THE CLERK: Come to order. Part 23 is back in session. Recalling the case on trial. Defendant is present. Attorneys of record present.

THE COURT: Anything for the record before we continue?

MS. GOLOWA: No, Judge, can we approach, please.

THE COURT: Come on up.

(Whereupon a bench conference was held off the record.)

MS. GOLOWA: Judge, just for the record, I would like to place on the record that I just had a conversation with Mr. Fink, which I disclosed to him two prior out-of-state convictions that the witness, Dennis Fitzgerald had. I had run a rap sheet and neither of these things had come up. In fact, I had disclosed to Mr. Fink the only that did come up and doesn't come up anymore is a long time ago ACD for jumping a turnstile.

I found out about it for the first time this

afternoon, and I disclosed it to Mr. Fink as well as disclose to him, and I want to let the Court know that I discovered this afternoon, even though it did not appear, Mr. Fitzgerald told me he has an open warrant in North Hampton County, Pennsylvania. I spoke with North Hampton County DA's Office, and I confirmed with him that, in fact, a warrant was issued for a case he was already sentenced. It's not an open case. For failure to report and North Hampton County faxed us a document saying they're not going to extradite, and let him turn himself in voluntarily and he was given the proper contact information.

THE COURT: Okay.

Bring them in.

(Jury enters the courtroom.)

THE CLERK: Do the parties waive the jury attendance poll?

MS. GOLOWA: So waived.

MR. FINK: Yes.

THE COURT: Good afternoon, ladies and gentlemen. We're going to continue but first let me indicate to you that the Court has examined the calendar for 2001 and November 29, 2001, the date of the alleged incident was a Thursday. That was the day of the week. The Court is taking judicial notice of that. That is now

evidence in the case.

Okay, Miss Golowa, call your next witness, please.

MS. GOLOWA: The People call Dennis Fitzgerald.

D E N N I S F I T Z G E R A L D, called as a witness, having been first duly sworn, was examined and testified as follows:

THE CLERK: Be seated and using the microphone state your name.

THE WITNESS: My name is Dennis Fitzgerald.

THE COURT: You may inquire, Miss Golowa.

MS. GOLOWA: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. GOLOWA:

Q Good afternoon, Mr. Fitzgerald.

A Good afternoon.

THE COURT: Mr. Fitzgerald, speak directly into the microphone, it would pick up your voice and we'll all be able to hear you.

That's it.

Q Mr. Fitzgerald, how old are you?

A I'm 21.

Q And where do you live?

A I live in Bensonhurst at the moment.

Q And that's here in Brooklyn?

Direct-People-Fitzgerald

A Yes.
Q How long have you lived in Brooklyn?
A All my life, within two years.
Q Have you ever lived anywhere else?
A Yes, for two years I lived in Poconos, Pennsylvania.
Q And were you living with a family there at the time?
A Yeah.
Q What family were you living with?
A I was living with my father.
Q Now, have you gone to school?
A Yes, I have.
Q And how far did you go school?
A Completed the 12th grade.
Q Do you have a high school diploma?
A Yes, I do.
Q Do you have a job?
A Not at the moment.
Q And why not?
A I'd say I'm looking for a lot of things, right now I can't find it.
Q And have you ever worked before?
A Yeah, I have.
Q What kind of jobs did you do?

A I did carpentry, telemarketing. I worked at fast food places. I do mostly side jobs.

Q Now, Mr. Fitzgerald, who do you live with?

A Right now it's just me and my girlfriend.

Q And how long have you been together?

A Six years.

Q Now, have you ever been convicted of a crime?

A Yes, I have.

Q And can you tell the members of the jury when and where?

A It was about 2001, it was in Pennsylvania. It was aggravated assault, resisting arrest, disorderly conduct, and the consumption of, purchase of alcohol but most of the charges got dropped so I only was left with two of them. Left with purchase of alcohol and resisting arrest. The rest got dropped.

Q Okay. And do you have any other criminal convictions?

A No.

Q Did you ever get convicted of a crime in New Jersey?

A Oh, yeah, yeah, yeah, I have. That was the same thing with that because I got extradited to PA.

Q Can you just tell the members of the jury what crimes you were convicted of in New Jersey and what year it

was?

A It was I had marijuana and speeding ticket; that was it.

Q So you were convicted of possession of marijuana and speeding?

A Yes.

Q And do you remember what year that was?

A That was last year in the summer.

Q 2003?

A Yes.

Q Now, Mr. Fitzgerald, do you know somebody by the name of Joseph Davis?

A Yes, I do.

Q And how do you know him?

A I was trying to get a job with him at the time so he was basically my boss.

Q And when you say at the time, when are you talking about?

A 2001, the same time this incident happened and I kind of just met him so.

Q How did you come to meet Mr. Joseph Davis?

A Well, me and my friend we were rhyming on the train, on the L train.

Q Explain what you mean by rhyming?

A Hip hop, rap, music and we were just doing it to

ourselves and he stumbled upon us and gave us his card and said, "Would you like to work?"

Q Who was your friend you were with at the time?

A Norwood Thomas.

Q And did there come a time that you did start to work with Mr. Joseph Davis?

A Yes, started to work.

Q When was that?

A I'd say two weeks after we started. I don't know the exact date but he was trying to show us the ropes, tell us who is this, who is that; introduce us, trying to fit us in.

Q And did you have any responsibilities while you were working with him?

A I was the driver.

Q And what kind of job was it that he was taking you along on?

A Advertisement street team. When you see that paper of this guy this rapper doing this show tonight or this guy's going to do those, handing those out, kind of like flyers.

Q Was it a for a particular company?

A Rough Riders Street Team.

Q Did you have any relationship with Joseph Davis other than him being your boss?

A No.

Direct-People-Fitzgerald

Q And are you currently in touch with him?
A No.
Q When was the last time you saw him or had any contact with him?
A It was the last time I spoke in the courtroom about this incident which was last year, in the beginning of last year.
Q Well, when you say, "It was the last time that you spoke in court," is that when you came to meet with the Assistant District Attorney for the first time?
A Yes.
Q And that wasn't me at the time, right?
A Yeah, it was.
Q I'm sorry.
A The last time I seen him is when I went to court about this incident. I gave my report of what happened.
Q I'm sorry.
A I gave a report on what happened in the courtroom.
Q And how long after the incident was that?
A Excuse me?
Q Do you remember how long after the incident that you're talking about was?
A Couple, two weeks.
Q So it was within weeks of the incident that you're going to be testifying about?

A Yeah.

Q And since that time, 2001 you haven't had any contact with him?

A No.

MR. FINK: I would object to the leading, Your Honor.

THE COURT: Sustained.

Q Well, now, you said you were rhyming with Norwood Thomas?

A Yes, I was.

Q How do you know Norwood?

A Norwood I know, well, something happened with me and my parents in Pennsylvania the reason I ain't with them now, my father let go of me, and stumbled upon Norwood and he was basically he didn't have a home like that. Well, he did, he didn't consider it a home and we both met on the street and he gave me a place to stay.

Q And I'm going to ask you if you could maybe move a little closer to the microphone. I'm having a hard time hearing you.

Where was it that you and Norwood were staying.

A In Bethlehem, PA.

Q Now, how long did you know Norwood Thomas for?

A I known him for about six months before the incident.

Q And he was also working with you for Joseph Davis?
A Yes, he was. We both came down to Brooklyn together.
Q And now, when was the last time that you saw or spoke to Norwood Thomas?
A I'd say three and a half to four months after the incident.
Q After the incident?
A He went back up to Pennsylvania to take care of his kids.
Q So and since then, have you been in touch with Norwood Thomas?
A No, I haven't.
Q Now, I'm going to direct your attention to November 29, 2001, were you working with Joseph Davis at that time?
A Say the date over again?
Q November 29, 2001?
A Yes, I was.
Q And was anybody else working with you and Joseph on that day?
A No.
Q Was Norwood Thomas there with you that day?
A Yeah, he was.
Q I just asked you if anyone else was working; did you understand my question?

A Working with who?

Q With you and Joseph Davis?

A Yeah, was working.

Q Besides you and Norwood and Joseph, was anybody else with you that day?

A No.

Q Now, do you remember that day?

A Yeah.

Q And is there anything in particular that makes you remember that day?

A Everything.

Q Can you explain what you mean?

MR. FINK: Objection, Judge.

THE COURT: Overruled.

A What I mean by that is well, anything could remind you of it. It comes to your head. Anything, anything reminds me of it. You can see a piece of a gun, it will remind you of it. Or have an argument with your friend, you remember the yelling, you remember this and that. It right behind me; I remember it clear as day.

clear as day

Q Now, I'm going to direct your attention to approximately four in the afternoon on that day, where were you?

A I was on the A train.

Q And were you with Joseph and Norwood at the time?

Direct-People-Fitzgerald

A Yes, I was.

Q Do you remember where you got on the train?

A We got on the train on Utica.

Q And did there come a time that you well, -- withdrawn.

Was that the local or the express?

A We got on a local.

Q And did there come a time that you switched to the express?

A Yes.

Q Where was that?

A That was on Nostrand.

Q And was that here in Brooklyn?

A Yes, it was.

Q Where were you going?

A Well, I really don't know where we were going. I know where we were supposed to be going.

Q Where did you think you were going?

A We were supposed to be going to work. He'll go and do something before he go to work. Take a time out, doing something on his own behalf. I can't say nothing because I'm working for the man.

Q When you say "he," who are you referring to?

A Joseph Davis.

Q Now, do you remember what you were wearing on that

Direct-People-Fitzgerald

day?

A Yeah.

Q What were you wearing?

A I was wearing a black jacket, jean jacket, some black pants to match and some black shoes to match with a hat.

Q Do you remember what Joseph Davis was wearing?

A Yes, he was wearing a Rough Rider logo T-shirt with some leather pants, glasses, a Swiss Navy knife and a Rough Rider book bag.

Q And do you remember what Norwood was wearing

A Gray jacket, black pants, black shoes and that's about it.

Q Now, when you got on to the A train at Nostrand Avenue on to the express, what car did you go into?

A I'd say about the last one.

Q And did Joseph and Norwood get into the same car as you, were you together?

A Yes.

Q Now, was the car at that time, was it empty or crowded; how would you describe it?

A It was crowded. It was crowded enough where we couldn't sit. So all three of us were standing.

Q And can you describe what kind of train that particular A train was like? You're familiar with different

kinds of, you know, layout of trains?

A Yeah, the seats stuck out where the windows were at. They stuck out towards the inner, so the seats were facing you and you had seats on the wall, so I think it was a local train so where you could sit by the and look out.

Q Now, I'm going to ask that People's 7 in evidence be posted?

THE COURT: Yes.

Yes, post it.

Q Now, Mr. Fitzgerald, if you take a look at the exhibit that's just been posted, People's 7, if you look first at the photograph in 7-A; do you recognize that photograph?

A Yes. It looks like the train.

Q That looks the same as the train you were on November 29, 2001?

A Yes, it does.

Q And is there any difference between that picture and when you were on the train?

A The lighting.

Q Where? Were people on the train on November 29th?

A Yeah. Yes, there was.

Q And you said the light is different?

A Yeah. It was just darker in the train; that's it.

Q That picture looks like it's taken outside, I

Direct-People-Fitzgerald

think?

A Yes.

Q At 4:00 on November 29, 2001 going through Nostrand, do you remember what the next stop is after Nostrand?

A Hoyt and Schermerhorn.

Q Were you outside or were you underneath?

A Underneath, in a tunnel.

Q Now, was there light on the train?

A Excuse me?

Q Now, was there light on the train?

A Yeah, there was lighting in the train.

Q Were you able to see what was going on around you and everybody's faces?

A Perfect.

Q Now, I'm going to ask you to take a look at what's, the diagram that's in evidence as 7-B, does that look familiar?

A Yes.

Q And what do you recognize that to be?

A Looks like the whole train, the whole car.

Q And when you say the whole car, you're talking about the A train car that you were on November 29, 2001?

A Yes.

Q Now, you said that when you got on to the train

Direct-People-Fitzgerald

that you didn't get seats?

A No, we haven't.

Q And so were you standing?

A We were standing, I say by the door and one was across from us.

Q I'm sorry, I can't hear you.

A I said we were standing by the door. We were standing up.

Q And can you just explain how you and Joseph and Norwood were standing by the door, like, what the position was?

A I say from the door up on the left side, I was standing closer towards them and Joseph was standing up.

MS. GOLOWA: Judge, I'm going to ask if the witness can approach the exhibit.

THE COURT: Yes, and have him orient which direction the train was going in so we can understand the diagram.

You may approach the exhibit.

(Witness Complies.)

A The train was going in this direction.

Q So you're saying that the bottom would be the back of the train?

A Yes.

Q Do you know what -- just so that it's clear and we

understand it. If you could just take this marker and if you could just put a B at the back end and an F at the front so we know what side you're talking about.

(Witness Complies.)

Q Now, show us where the back and the front was. Show us by pointing with your finger where you, Joseph and Norwood were standing?

A I was standing, right here. Joseph was standing, right here and Norwood was standing, right here.

Q Now, if you can take the stickers that you have been given with each of those names and place them in the spot that you just pointed to?

(Witness Complies.)

Q Thank you.

THE COURT: May he be seated?

MS. GOLOWA: Yes, for the meantime.

(Witness complies.)

Q Now, once you were standing inside the car, did you notice anybody in particular?

A Not really, until I overheard something.

Q Okay, and what is it that you overheard?

A I heard his name.

THE COURT: Speak into the microphone, please.

A I heard the person next to me's name.

Q When you say the person next to you, who are you

talking about?

A Joseph.

Q Did you hear somebody say Joseph?

A No. They called him by a street name as if they knew him. as if they knew him

Q What was Joseph Davis' street name?

A Romeo.

Q And you heard somebody say Romeo?

A Yeah.

Q And did you hear, did you notice who it was that said that?

A I didn't notice who exactly it was, but I know where it came from.

Q Where did it came from?

A From the seats right next to me.

Q And did you see who was sitting in those seats?

A Yes, I did.

Q And can you describe the people that were sitting in those seats?

A One of them was wearing a red jacket, tall, light-skinned.

One short with a scar, green hat.

The other one real black, tall, with a black leather bandana on.

Q So a total of three people sitting there?

A Yes, there was.
Q And did you notice what they were doing?
A They were talking amongst each other whispering, switching seats.
Q All of them?
A Yes.
Q When you say, "switching seats," explain what you mean. Who switched seats?
A The gunman switched seats.
Q Well, when you say the gunman, you haven't talked about the gunman yet. Explain which person of the three descriptions that you gave that you're talking about?
A I don't know his name.
Q But you described three people.
A The one with the red jacket, the tall, light-skinned one.
Q Now, you said the person with the red jacket switched seats?
A Yes.
Q And, you have to answer yes or no.
A He actually asked the lady to move over so he could sit in that seat.
Q You stated that you heard the name Romeo coming from that group of three people who you saw talking amongst themselves?

A Um-hum.
Q You need to answer yes or no, please.
A Yes.
Q And did anything else happen or did you notice anything else before the man with the red jacket switched seats?
A No. Just look here and there. You get that everyday.
Q What do you mean?
A Looking back and forth. There was a lot of eye contact, you know.
Q Between you and those three people?
A No. I don't think they knew I was with them.
Q Who were they looking at?
A Joseph.
MR. FINK: Objection, Your Honor.
THE COURT: Sustained as to the form of the question. In what direction were they looking?
THE WITNESS: They were looking in the direction of Joseph.
Q Now, did any of them have anything covering any of their faces?
A No.
Q So you were able to see the faces of each of those three people?

A Yes.

Q And you said that at some point the person with the red jacket switched seats?

A Yes.

Q And just, I know you started to talk about the fact that he spoke to a woman; can you just explain what we're talking about?

A He asked her to move, you know. Why would you ask somebody to move out their seat if you sitting?

MR. FINK: Objection, Your Honor, move to strike.

THE COURT: Tell us what you saw and what happened?

THE WITNESS: I seen him move, asked the lady to switch seats and he sat in the seat.

Q Where did he switch from and where did he go to?

A He switched from Norwood's side of the train. He switched to my side in a seat where he's looking straight at us.

MS. GOLOWA: I'll ask again if the witness can please approach the exhibit.

THE COURT: He may.

(Witness Complies.)

Q Mr. Fitzgerald --

THE COURT: We're going to have to go up and

ask them to stop while we conduct Court. I know they're doing the elevators but we need to do Court too. Just wait a second.

It sounds like a dentist office.

You can sit down for a second.

MS. GOLOWA: Can we approach for a second?

THE COURT: Not right now.

(Pause in the proceedings.)

THE COURT: We can't find out where they are. We'll try to continue. Everybody a little louder, please.

You want him back at the board?

MS. GOLOWA: Yes, please.

(Witness complies.)

Q Now, Mr. Fitzgerald, you said that the three individuals were seated on the train?

A Yes.

Q And again if you can --

THE COURT: A little louder, please.

Q You've kind of got to shout; you're not by the microphone.

Can you with your finger just point to the spot where the man with the red jacket was sitting at first?

(Witness Complies.)

Q Okay. So they were --

MR. FINK: For the record, Judge, indicating.

Q So that he was closer to the back of the train than you?

A Yeah.

THE COURT: He pointed to where he was.

Q Now, if you could take the sticker that's marked red jacket and place that at the spot where you just pointed to?

(Witness Complies.)

Q Now, you described one of the other people as being very tall. Again you have to answer yes or no.

A Yes.

Q And if you can take the sticker marked tall man and place it where he was sitting.

(Witness Complies.)

Q And what did the third person look like?

A The third person I said had a green hat on, that's how I remember.

Q I can't hear.

A A green hat on with a scar, the third person.

Q Where was the scar?

A The scar was on the right side.

Q It was on his face?

A Yeah, it was on his face.

Q Now, if you can just first tell us where he was

sitting. Take the sticker that's marked with man with a scar and place it where he was sitting?

(Witness Complies.)

Q You said that the person in the red jacket switched seats?

A Yes.

Q Where did he move over to? Don't move the sticker.

A Moved, right here. (Indicating.)

Q If you can just take the marker that you have and draw an arrow from where that sticker is to where he moved.

(Witness Complies.)

Q Thank you. You can take your seat.

(Witness Complies.)

Q Now, Mr. Fitzgerald, did you know any of these three individuals that were seated on the train before that day?

A No, I don't.

Q Had you ever seen them before?

A Never did.

Q Now, I'm going to ask you to stand up and take a look around the courtroom and see if you see anybody in this courtroom that you recognize as any of those individuals on the train on in that day.

(Witness complies.)

A Him.

Q If you could --

THE COURT: Pointing in the direction of the person and indicate an article of clothing he or she might be wearing.

THE WITNESS: The guy with the braids.

THE COURT: Could you point in his direction?

(Witness Complies.)

THE COURT: And what color clothing or shirt is he wearing?

THE WITNESS: I don't know what color that is, Your Honor.

THE COURT: For the record, the witness has indicated the defendant. You may be seated, sir.

(Witness Complies.)

Q And, Mr. Fitzgerald, the person that you just indicated, which one of the three do you recognize him as?

A The one with the green hat.

Q The one that you mentioned with the scar on his face?

A Yeah.

Q Now, you said that the man in the red jacket switched seats?

A Yes.

Q And how long would you say the three of them were talking before you saw the man in the red jacket switch

seats?

A I'd say three to -- two minutes.

Q And what happened after the man in the red jacket switched seats?

A They still continued talking.

Q So he was talking across the aisle?

A Yeah.

Q Did you hear what they were talking about?

A No, it's mostly bickering and giggling.

THE COURT: A little louder, please.

A No, I couldn't hear them.

Q And then what happened?

A Then, they switched seats again.

Q And who switched seats the second time?

A The same man with the red jacket and one of the other people that were sitting in the seats.

Q I'm sorry, I can't hear you. Shout.

A Someone that was sitting in the seat. The two that were sitting on the right side, one of them moved over. He moved between them so he was in the middle of both of them there.

Q So who was in the middle?

A The one with the red jacket.

Q Was in the middle of the other two people that had been sitting in the same place the whole time?

A Yes.
Q And by the way, the girl that you saw switch seats with the man in the red jacket, did you know her?
A No.
Q Had you ever seen her before?
A Never.
Q So once the man in the red jacket switched seats for the second time, at that point what happened?
A After that they jumped up.
Q Who jumped up?
A All three of them.
Q How long was the man in the red jacket sitting on the opposite side before he came back over to the original side?
A Not too long.
Q You know, like a few minutes or?
A Probably that, or less than.
Q And how long was he sitting with the other two individuals until he, until they all three got up?
A Five seconds.
Q Now, during this entire time while all the switching of the seats was going on, where were you and Joseph Davis and Norwood Thomas?
A We were sitting -- standing in our designated area.
Q When you say, "designated," you mean the same areas

Direct-People-Fitzgerald

you put the stickers on?

A Yes.

Q And when the three of them jumped, up what happened?

A Well, it looked like the one in the red jacket positioned himself in the middle because he's the one who had the gun. When he switched his seat, he jumped straight towards Joseph Davis and the other two. Norwood grabbed the gunman on the shoulder, the one with the red jacket, and he got punched in the face by the tall, black man and they both backed him down.

I jumped in front of the gun because Jason looked like he was going to go into convulsions, shock -- Joseph, excuse me, looked like he was going into convulsions. The guy was forcibly telling him to "take it off, take it off" with a lot of curse words added and he was scared and I was helping him take the stuff off.

The guy was talking about, talking about he was gonna kill him. "Take it off, I'm gonna kill you." He wanted his book bag, his glasses, his watch, snatched his watch off. He told him to take his pants off.

Q When you say, "he told him," who specifically?

A The guy with the red jacket.

Q Told who?

A Joseph Davis.

Direct-People-Fitzgerald

Q Now, just to step back for one moment. You said that the man with the red jacket had pulled out a gun?
THE COURT: Don't lead, please.
THE WITNESS: Yes.
MS. GOLOWA: I'm sorry.
THE COURT: Don't lead.
Q Now, did you see where he took the gun from?
A His pocket.
Q And how was he holding the gun?
A One handed. Other hand grasping Joseph.
Q And was he pointing the gun at any particular direction?
A Yeah, his head.
Q Whose head?
A Both of ours; he would switch.
Q When you say, "both of ours," you're talking about you and who else?
A Joseph.
Q What did the gun look like?
A It was a 25, it was silver. It was dingy, kind of grimy.
Q So you recognized it as a 25?
A Yeah.
THE COURT: You have to the answer out loud, sir?

Direct-People-Fitzgerald

THE WITNESS: Yes.

Q And at the time that the man in the red jacket pointed the gun at both of your heads, where were the other two individuals, the tall man and the defendant?

A They seen that Norwood --

MR. FINK: Objection.

THE COURT: Don't tell us -- just tell us what they did?

A Told him to go back, moved them into the front of the car.

Q At the time that the guy, the man in the red jacket first got up and pointed the gun at your head, can you just describe what the other two people did?

A They moved towards the front of the car. They moved Norwood towards the front of the car.

Q Now, you're talking about after Norwood --

THE COURT: Don't lead, please.

Q Well, Mr. Fitzgerald, you said that the first thing that happened was that the man in the red jacket got up and put a gun to Joseph Davis' head, is that right?

A Yes.

Q And at that time what did the tall man do? What was the first thing the tall man did?

A He punched Norwood in the face.

Q Where was -- did he punch Norwood in the face from

his seat?

A No. I said all three of them got up at the same time.

Q So when the tall man got up, where did he go before he punched Norwood?

A They just stood there.

Q When you say stood there, where was he standing in relation to the man with the gun?

A Who?

Q The tall man?

A He stood right behind him on his right side.

Q And what about the defendant, was he also standing?

A Yes, he was.

Q And where was he standing in relation to the man with the gun?

A Right behind the one with the red jacket and right on the left side of the tall guy.

Q And while the three of those three people were standing just the way you said, what was the man with the gun doing?

A He was still asking, forcefully asking for Joseph's stuff.

Q And you said that Norwood did something?

A Norwood put his hand on his shoulder.

Q On whose shoulders?

A On the guy with the red jacket's shoulder.
Q And then what happened?
A He got up, punched him in his face.
Q Who punched him?
A The tall guy.
Q Now, were you able to see the tall man's hand?
A No.
Q Did you see if the tall man had any weapons?
A I didn't see it, no.
Q Now, after -- well, were you able to see the defendant at that time that was standing behind the man with the gun?
A I glimpsed at all of them.
Q Were you able to see his hand?
A No.
Q The defendant's hand?
A No.
Q Were you able to see if the defendant had any weapon at that time?
A No.
Q No, you couldn't see or no, he didn't have one?
A No, I couldn't see.
Q And after the tall man punched Norwood, well, let me first ask you this. What part of Norwood's body did the tall man punch?

A The left side of his face.
Q And then what happened?
A Then they told him to move back.
Q Who is they?
A The tall guy and the guy with the green hat.
Q The guy with the green hat and the scar?
A Yes.
Q You're talking about the defendant?
A Yes.
Q Now, when you said that they told him to move back, did they do anything, the defendant and the tall man?
A No.
Q Did Norwood move back?
A Yes.
Q Which direction did Norwood move in?
A Towards the front of the car.
Q And at that time what did the defendant and the tall man do?
A They were moving with him to make sure he didn't do anything.
Q So they were also moving towards the front of the car?
A Yes.
Q And where were you at that time?
A I was standing directly in front of Joseph.

Direct-People-Fitzgerald

Q And you stated that earlier you were standing next to Joseph?
A Yes.
Q Can you explain how it came to be you ended up standing in front of Joseph Davis?
A I seen the way he was looking so I stepped in front of him. He didn't look like he knew what was going on.
Q When you say, "he," who are you talking about?
A Joseph.
Q When you say, "He didn't look like he knew what was going on," explain specifically what kind of things you noticed?
A Like he lost reality because if someone had a gun in my face, I'd give him what they want. He turned his head and started shaking, like he was sliding down.
Q Now, you said that the man with the red jacket was asking for property?
A Yes.
Q And what specific property did he ask for?
A Everything. Everything, he asked for.
Q Did -- was Joseph able to -- withdrawn.
Did Joseph give the man with the red jacket any property?
A He didn't give it to him.
Q What happened?

A He put his hand in his pocket and took everything.

Q Who is he? Put his hand in whose pocket?

A The man with the red jacket.

Q Put his hand in whose pocket?

A Joseph.

Q Did you see what the man with the red jacket took out?

A Yes.

Q What did he take out?

A Took out his money, whatever belongings he had. He didn't have anything else that he wanted so he threw it all on the floor.

Q And what else did the man with the red jacket take from Joseph?

A His watch. I helped him take his watch off.

Q You helped Joseph or helped the man with the red jacket?

A I helped Joseph. Joseph was trying to take it off. He wasn't even looking. The guy had him by the wrist, kept saying the same thing after another, "I'm gonna kill you; I'm gonna kill you." I asked -- helped him take the watch off. He wanted his book bag. Gave him the book bag, and he asked for his pants and his friend started laughing, "Nah, nah, don't take his pants."

Q When you say, "his friend," who are you referring

Huh?

to?

A The tall guy. The one with the green hat. The stop was coming up he was asking for his pants. That's a little ridiculous.

Q So they told him not to take Joseph Davis' pants?

A Yeah.

Q Now, you said that you saw Joseph Davis was seeming to be losing touch with reality, what did you do?

A I stepped in front of him.

Q And when you stepped in front of Joseph Davis, where were you standing in relation to the man with the gun?

A Right in the middle.

Q In the middle?

A Smack dab in the middle of Joseph and the guy with the red jacket.

Q And at that time how close were you to the man with the gun?

A I was in his face.

Q And what happened?

A He put the gun in my face.

Q Then what happened?

A He told me to, "stay out of it." I don't think he knew I was with them, you know.

Q So he told you to -- the man with the gun told you to "stay out of it"?

A Yeah.
Q And what happened?
A I still stood there.
Q And then what happened?
A I just told him to "Stop saying what he was saying," and then he looked at me and he was like -- I'm pushing at the same time. I'm pushing Joseph towards the front like get out of here. I kind of just met him, I didn't know it was going to be like that. He put the gun on me and mushed me in the back of the head. He said, "Oh, really." He told me to take my earring before he pull them out my ear.
Q When you say, "he," who are you talking about?
A The guy with the red jacket.
Q When he told you to take your earring out, what did you do?
A I took it out.
Q What do you do with it?
A I gave it to him.
Q Did you see where Norwood was at the time this was happening that you were having this interaction with the man with the red jacket?
A He was stuck between cars.
Q And did you see how he got there?
A Yeah. They told him to go back there.
Q First of all, I'm going to -- explain what you mean

by between cars?

A Between cars is not in one and not in the other.

Q And how do you get from the car to between the cars?

A Well, those trains you can't even open the doors. Somehow someone opened the door and got out. When Norwood went to get the door they closed it on him. So we're all stuck between the cars.

Q I'm going to take you back for one moment to the time that you said that Norwood was pushed between the cars. You have to answer yes or no.

A Yes.

Q Did you see how Norwood got from where he was at the front of the car with the tall man and the defendant to between the cars?

A It was in the very beginning, he was in between the cars. He was in between the cars before they put the gun to me. Right after he punched him in the face, they told him, "Move between the cars." They walked him there and they walked back.

Q And when you say that "they walked back," where did they come back to?

A They walked, right back to basically where the seats were but still standing.

Q Now, you stated earlier that the car was crowded at

the time that you got on?

A Yes.

Q Now, when -- was the car still crowded at the time that the man in the red jacket got up and pointed the gun at you and Joseph?

A Yes, it was.

Q And what happened at that time with regard to the all the rest of the people on the train besides the man with the red jacket, the tall man and the man with the green hat and you and Joseph and Norwood?

A Well, all the people, I'd say towards the front part between us. Say we're in the middle, they all went out and people there were standing up against the wall. They looked like they were on top of each other.

Q When you say here, explain specifically where you're talking about?

A The back of the car.

Q So was there anybody left at the part of the car where you and Joseph were with the man with the gun and the other two individuals?

A I don't understand what you're saying.

Q Well, you said that Joseph was -- I'm sorry that the man with the red jacket --

THE COURT: Don't lead, please. Ask him a direct question.

Direct-People-Fitzgerald

MS. GOLOWA: Judge, I need to orient it.

THE COURT: At the point -- describe a point in time and ask him to relate what happened.

Q At the point in time when the gun was pointed at you and Joseph and the other two individuals had come back from putting Norwood into the cars --

THE COURT: Counsel, don't repeat his testimony and then ask him to agree with it. Ask him a question.

MS. GOLOWA: Judge, my question is at that time --

THE COURT: Ask a question. I objected to the question you just asked.

Q Was their anybody else in the area where you and Joseph and the other people were at that time when the gun was being pointed at you?

A Yes.

Q Who else was there?

A There was a bunch of people there.

Q Now, you said that some people went to the front of the car?

A Yeah, a lot. I say the whole train was packed; it was rush hour.

Q And did some people go to the back of the car?

A I'd say the people that was in the back of the car had nowhere to go. They were up against the wall. The

people that were able to go to that side went.

Q After the people that were on the train moved to the front and the back of the car, was there anybody left from those people standing near you and Joseph and the other people?

A No.

Q So it was just you at that time?

A Just us.

Q Now, what happened after you gave your earring to the man with the gun?

A I told him I was going to get him.

I'm going to get you

Q I'm sorry, I can't hear you?

A I told him I was going to get him and he laughed at me.

Q And then what happened?

A He put the gun in my head and he was pushing me towards the middle of the car.

Q And when you say, "towards the middle," is that towards the front of the car or the back of the car?

A Front. Front.

Q And where was Joseph at that time?

A He was already between cars; I pushed him.

Q Can you explain how Joseph got to the point of between the cars from where he was standing at?

A I was pushing him before he took the earring from

me. I told him to go and I basically put myself out there for him to notice what I had.

Q And at the time that you were pushing Joseph, did you see where the defendant was?

A He was standing behind. Well, he kind of walked past me before I pushed him to finish with Norwood. He walked past and he was standing about in front of his seat.

Q And did you see if he was doing anything?

A Um-um. They were just standing there.

Q And where was the tall man at that time?

A He was right next to the other, the defendant.

Q Now, at the time that the man with the gun was pushing you towards the front of the car, what were the other two individuals, the tall man and the defendant doing?

A They were in the back telling their friend they have to hurry up.

Q And when you say, "their friend, "who are you talking about?

A The guy with the red jacket.

Q And then what happened?

A They were trying to forcefully push us between the car. The door wouldn't open. They didn't want us to be around.

Q When you say, "they," who are you talking about?

A The three individuals. The tall guy, the guy with

the red jacket and the guy with the green hat.

Q So you said that they were trying to push you between the cars. Where in the train car were you at that moment?

A We were already between the cars. They were just pushing us like if the door was going to open magically.

Q All of you were at the front of the train car at that time?

A Already.

Q Where were the people from the train that had moved to the front of the car?

A They were in the next car.

Q So they had all gotten into the next car?

A Yes.

Q Do you know how they got through?

A Someone opened the door for them.

Q And were you able to get into the next car?

A No, we weren't.

Q And what happened next after you were all between the cars?

A The stop came.

Q And what stop was that?

A That was Hoyt and Schermerhorn.

Q And then what happened?

A Then we had a couple of words exchanged.

Q What kind of words?
A Me and Norwood told the guy with the red jacket that we was gonna get him.
Q And then what happened?
A And then the stop came, the doors opened, both of them ran out on the platform and the defendant jumped between the cars on the platform.
Q When -- now, you said that the defendant came between the cars?
A Yes.
Q When did the defendant come between the cars?
A Right when the stop came.
Q Had the doors of the subway train opened yet at that time?
A Just about.
Q And when you said that the defendant jumped to the platform, can you just explain what you mean?
A He hopped up on the -- he took one of the wires that go across to connect the trains. He unlatched it and he hopped up on top.
Q And what did the man with the gun and the tall man do?
A They ran out the regular door, and they ran up the stairs.
Q And then what happened?

A Then I ran after them.
Q How did you get off the train?
A I ran out the door they ran out.
Q So you went back into the train car?
A Yeah.
THE COURT: Answer out loud, sir.
THE WITNESS: Yes.
Q What about Joseph Davis and Norwood, what did they do?
A They ran with me.
Q And where did you all run?
A We all ran upstairs basically run out of the train station.
Q And you said a moment ago that the defendant and the other two ran upstairs?
A Yes.
Q Did you run up the same stairs or different stairs?
A Same.
Q And where were you going at that moment?
A I was going to get them.
Q As you were running up the stairs -- well, let me ask you this. I'll withdraw that question.
Did you ever lose sight of any of the three people that is, the defendant, the tall man and the man with the red jacket?

A Yeah.
Q When was that?
A That was when the stop just came and they ran out the door.
Q When did you see them again?
A A second later when I ran right out behind them.
Q When you were running up the stairs, were you able to see any of those three individuals?
A Yeah.
Q Which ones?
A I seen the guy with the red jacket first.
Q And what was he doing?
A He was -- Romeo was on his, the sleeve of his jacket.
Q And when you say, "Romeo," you mean Joseph Davis?
A Yes.
Q Whose sleeve was Joseph Davis on?
A The red jacket.
Q And was this on the stairs?
A This was, right above the stairs.
Q Now, did the man with the red jacket still have the gun at that time?
A Yes, he did.
Q Did you see where it was?
A You couldn't see it, he was standing. It was

probably in his pocket at the time.

Q You didn't see the gun at that point?

A Um-um.

Q Was there any point that you got off the train that you saw the gun?

A I seen him running up the stairs with the gun. He still had the gun when he ran out, but he threw it in his pocket when he grabbed his sleeve. He had the gun out in the train station.

Q When you say that the man with the red jacket had the gun out in the train station, how was he holding it?

A Holding it in a downward position as if he forgot he had it in his hand.

Q Were there other people in the train station at that point?

A Yeah.

Q Did you notice whether there was any reaction by the other people in the station?

A Everybody was running left and, right. All you hear is, "oh he's got a gun," and everybody was running.

Q And you stated that when you went up the stairs you saw the man with the red jacket; did you see either of the other two individuals?

A Yeah.

Q Where did you see them?

A I seen them trying to get out the train station.
Q And did you see them leave the train station?
A No, they didn't.
Q I'm sorry.
A They didn't leave.
Q They didn't leave?
A No.
Q Did you see where they were?
A Yeah, they were right outside the gate.
Q And when you say, "outside the gate," can you explain what you mean?
A Well, you got to pay to get in, so there is a gate in front of you. Right there.
Q Did you see the tall man and the defendant going out to the other side of the gate?
A Yes, I seen them leave.
Q How did they go out?
A What do you mean how did they go out.
Q Did they go out through the turnstile?
A Through the turnstile.
Q What about the man with the red jacket?
A He tried to hop the turnstile.
Q And what happened?
A He got grabbed before he got to the other side.
Q Who grabbed him?

A Me.
Q Who else?
A Norwood.
Q Anybody else?
A Romeo was there, but I don't think he had a hold of him because he was holding him the whole time.
Q And then what happened?
A He got beat up.
Q Who got beat up?
A The guy with the red jacket.
Q Did you see where the gun was at that point?
A Yeah. When I threw him -- he tried to hop the turnstiles, and I grabbed him in mid air, he kind of went backward so when he got on his feet, he hit the floor, everything flew out. His gun went there. The money went there, the watch went here. Everything he stole just hit the floor, and the gun went right to where the bars was at from inside and out and the defendant was standing, right over it.
Q And then what happened?
A I just watched him. I was on top of his friend punching him in the head and watching him to see if he was going to take the gun.
Q You were watching the defendant?
A Yes.
Q And then what happened?

Direct-People-Fitzgerald

A He didn't take it; he ran.

Q Did you see where the defendant ran to?

A He ran out of the train station.

Q And how did he head out of the train station?

A On foot.

Q Were there any more stairs to get out of the train station?

A I would say there were stairs on each side. Two ways you could get out.

Q Did you see if he went up the stairs or not?

MR. FINK: Judge, I'm going to object.

A Yes, I seen him go up the stairs.

THE COURT: We didn't get the last answer.

Did you see him run up the stairs?

THE WITNESS: Yes. I seen him running up the stairs.

Q Did you see where the tall man was at that point that you were down on the ground with the red jacket?

A He was by the stairs.

Q And did you see what he did next?

A He just stood there.

Q And then what happened?

A He ran up. He was the first one to go.

Q He ran up the stairs also?

A Yes.

Q Now, at the time that you were watching the defendant to see whether he would take the gun, were you able to see the defendant's face at that time?
A Yes.
Q Was there anything blocking his face?
A No, there wasn't, and there could have been something blocking it. Wouldn't stop me from looking at him.
Q Well, was he wearing anything that covered his face?
A No.
Q Now, what kind of a lighting was there in the subway station at that point?
A Lighting was pretty good in the subway station.
Q So you didn't have any problem seeing?
A No.
Q Now, after you saw the defendant and the tall man go up the stairs, what happened next?
A We just beating on the other guy.
Q And then what happened?
A Then the cops came and I tried to well, the Transit Authority came, and I tried to explain that the guys are, right there. They didn't leave yet, they were still there.
Q The man with the red jacket was still there?
A No. All of them were still there. I was still on top of the man with the red jacket, and he pulled a gun on me

and I go, "there, over there, there, over there." He wasn't listening.

Q Who were you talking to?

A The officer.

Q A police officer?

A Yes, it was.

Q Do you know which police officer it was?

A No, I don't.

Q Then what happened next?

A And then they basically cuffed us and they got away and we explained the story.

Q Who got away?

A The defendant and the friend, the tall guy.

Q And when you say they "cuffed us," who are you talking about?

A The Transit Authority.

Q Now, when you say, "the Transit Authority," are you referring to civilians or police officers?

A Police officers.

Q Were the police officers that you're talking about in uniform?

A Yes.

Q And who got cuffed?

A All four of us.

Q And then what happened?

A Then we explained our story and they let us go.
Q When you say, "we," who are you talking about
A Me, Joseph and Norwood.
Q At what point did you explain what was going on?
A We were already in custody.
Q Did the police take you anywhere once you were cuffed?
A Took us to the police station.
Q And where is that police station?
A They took us to Franklin. The one over on Franklin Avenue.
Q Where was the first place that you went once you were cuffed?
A We went straight into the Transit Authority station, right there.
Q At the same station of Hoyt and Schermerhorn?
A Yes.
Q And where were you when you were uncuffed?
A I was in the office.
Q Well, was it outside still on the platform or inside the police station?
A Inside when we were uncuffed.
Q And did you talk to the police about what had happened?
A Yes, I did.

Q Did you give the police a description of the two other people that had gotten away?
A Yes, we did.
Q Do you remember what the description was that you gave them?
A I gave them the same description I gave you here now.
Q Which was what?
A One was tall dark, with a black leather bandana on his head.
One was short, scar, green skullie. The one with the red jacket was tall and light-skinned and he had a red jacket
Q One moment.
What happened after you gave the description to the police?
A They were just asking me if we knew the people or would I know if -- would I know them if I seen him? A bunch of questions that I really couldn't answer.
Q Did you ever see your earring again?
A No.
Q Well, did you talk to the police about your earring at all?
A Yeah, we spoke about it. I didn't see my earring, but I drew it. I drew a picture of it.

Q And who did you draw that picture for?
A I drew it for the police officer.
Q And after you drew the picture for the police officer, did any of the police officers show you the earring?
A Yeah, and the picture was perfect.
Q You did see the earring at that point after you drew the earring?
A Yes, then I seen the earring.
Q Do you know where that earring is today?
A No.
Q I'm going to ask at this time that the witness be shown People's 3?
THE COURT: Yes.
Q Mr. Fitzgerald, do you recognize what you see there in People's Exhibit 3?
A Yes, I do.
Q And what do you recognize that to be?
A That's my earring.
Q When you say that's your earring, are you referring to the earring that was taken from you on November 29, 2001?
A Yes, I do.
Q I'm going to ask at this time that the witness be shown People's 5 and I'm going to need 8 also, please.
THE COURT: Yes.
MS. GOLOWA: Officer, if you can start with

five, which is the watch. People's 5 is the one with the watch and the keys, please. Thank you.

THE COURT: Hold it so the jury can see it. It's in evidence and the witness can see it.

Q Mr. Fitzgerald, do you recognize any of the items in that exhibit?

A I recognize the watch.

Q Where do you recognize the watch from?

A It was on Joseph's hand. It was on his arm.

Q It was on Joseph's hand?

A His wrist.

Q And when was it on Joseph's wrist?

A I don't know the date.

Q To be specific, are you talking about the same watch that was taken during the incident?

A That's the same one.

Q Thank you.

Now, I'm going to ask before we get to eight, I'll ask if the witness can approach the exhibit that's posted for one moment.

THE COURT: Yes.

(Witness Complies.)

Q And if the witness can be handed these stickers.

Just going back to something that you were talking about earlier, Mr. Fitzgerald. If you could just shows us

with your finger where the man with the gun, the defendant and the tall man were standing at the time that they first got up and came over to you.

THE COURT: I didn't hear the question.

Q If, Mr. Fitzgerald, if you could please point with your fingers on the picture the spot where the man with the gun the defendant, and the tall man were when they first got up on the train and came over to you?

THE COURT: He's already done that.

MS. GOLOWA: No.

A The guy with the red jacket was right here. (Indicating).

Q Take another sticker, mark "man with the gun" and place it at the top you just pointed to?

(Witness Complies.)

Q And where was the defendant?

(Witness Complies.)

Q And where was the tall man?

(Witness complies)

MS. GOLOWA: If the record could reflect the witness placed stickers.

THE COURT: He placed the stickers on the exhibit, yes.

MS. GOLOWA: Thank you.

Q I would ask now that the witness, please, be shown

Direct-People-Fitzgerald

People's 8 and if we can have that posted, please?

THE COURT: Do you need him at the board?

MS. GOLOWA: Yes.

THE COURT: Post eight.

Q Now, Mr. Fitzgerald, do you recognize those pictures?

A Yes, I do.

Q What do you recognize those as?

A That's the staircase.

THE COURT: A little louder.

A This is the staircase I ran up. This is where the incident happened, right here. (Indicating).

Q When you're saying, "Where the incident happened right here," can you tell us which picture you're referring to?

A This one.

Q Which letter?

A A.

Q And is there anything marking the spot that you just pointed to?

A It's marked scuffle, right here.

Q Is that the right place where the incident happened?

A Yeah, he was laying on the floor, right here.

Q And just looking at photograph D, do you recognize

that photograph?

A Yes, I do.

Q And what is that a picture of?

A It's looking down the stairs.

Q And is that the stairs in photograph D, is that the same stairs as the one in photograph C?

A It looks like it, yeah.

Q Now, can you point to -- if you see the spot in any of the pictures, place where you saw the defendant standing and looking at the gun when you were down on the ground?

A Right here, I'd say because the gun was basically, right here. Just more on my side. He was standing upright here and I was on top of his friend, and I'm still hitting him and I look over and I seen the green hat and I remember it was his friend. He was standing right there.

THE COURT: On the other side of the partition?

THE WITNESS: Yeah, on the other side. He was -- already jumped over.

Q On the other side of the gate. How close to the gate?

A He was, right on the gate.

MS. GOLOWA: Thank you. You can take your seat.

(Witness complies.)

Q Now, after you spoke to the police in the station

that day, did you ever -- I'll withdraw that question.

After that day on the train, and in the station, did you ever see the defendant again before today?

A Never.

Q And have you ever seen the tall man again?

A Never.

MS. GOLOWA: I have no further questions.

THE COURT: Before we have cross-examination. Does anyone need a break?

Okay, we're going to take about ten or 15 minutes, and then we'll have cross-examination by the Defense attorney.

Don't discuss the case among yourselves. Don't form any opinion about the guilt or innocence of the defendant.

Anybody tries to talk to you about the case, let me know. We will continue with the case in about 15 minutes.

You can step down. Be made available because the Defense attorney has to question you, okay.

(Whereupon the Jury exits the courtroom.)

(Witness Excused.)

THE COURT: Sworn jurors out of the courtroom anything for the record?

MS. GOLOWA: Judge, I have one item. I think

it would be better if we did it outside the presence of the witness.

THE COURT: Sir, could you step outside for a couple of minutes. Please remain available.

THE WITNESS: Yes.

The witness is outside the courtroom.

MS. GOLOWA: Just one thing. I had spoken with Mr. Fink and disclosed the convictions that I had just learned about from Mr. Fitzgerald before he testified. And I had disclosed to Mr. Fink he was convicted of just resisting arrest in North Hampton County, although the witness conveyed he was convicted of underage drinking, in fact, that charge was dismissed according to North Hampton Count. Certainly he can cross-examine here.

THE COURT: About ten, 15 minutes, please.

(Whereupon a recess was taken.)

THE CLERK: Recalling the case on trial. Defendant is present. Defendant and attorney are present. Anything for the record before we continue? We will recall Mr. Fitzgerald to the stand and then bring in the jury.

D E N N I S F I T Z G E R A L D,

recalled as a witness, having previously been sworn, was further examined and testified as follows:

COURT OFFICER: Jury entering.

(Jury enters the courtroom.)

THE CLERK: Do the parties waive the jury attendance poll?

MS. GOLOWA: So waived.

MR. FINK: Yes.

THE COURT: Ladies and gentlemen, I have good news. The officers have secured a jury room on this floor so when you leave here this evening, you'll be shown your new room and when you come in tomorrow, the room is on this floor so it will make life a lot easier for all of us.

Mr. Fitzgerald, I remind you you are still under oath.

Mr. Fink you may cross-examine.

MR. FINK: Thank you, Judge.

CROSS EXAMINATION

BY MR. FINK:

Q Good afternoon, Mr. Fitzgerald.

A Good afternoon.

Q I would ask you to keep your voice up. I don't know if it's the acoustics or my hearing. I am having a little trouble hearing you, and it's important that the jury hear what you have to say as well.

Before you came in here today, and subsequent to November 29, 2001, did you have a chance to speak with either

Mr. Norwood or Mr. Joseph Davis about this case?

A Yes.

Q And could you tell the jury starting first with Mr. Joseph Davis approximately how many times you spoke with him since the incident on the train?

A About five or six.

Q Five or six times.

And when you spoke with him, it's fair to say that you spoke with him about what happened on November 29, 2001 at four p.m. as you, he, and your friend, Norwood Thomas, were on the A train, correct?

A Yes.

Q And he told you things that he saw and you told him things that you saw, right?

A No, not really.

Q Well, you did talk to him, what you recalled happened to you, correct?

A We all saw the same things.

Q I'm asking you for that simple yes or no answer.

THE COURT: Don't direct the witness how to answer. You have an objection for the way he's answering.

Mr. Fitzgerald, just answer the lawyer's questions as simply and concisely as you can.

THE WITNESS: Yes, Your Honor.

Cross-Defense-Fitzgerald

Q Let's go back to what you just said. You're testimony is that you all saw the same things, is that correct?
A Yes, sir.
Q And again you told him your recollection of what happened that particular day, right?
A Who?
Q Mr. Joseph Davis?
A We were not able to speak to each other until a couple of hours after we got taken, so they already got reports down before we even spoke to each other. No, we really didn't even talk about if much.
Q In spite of what you said, you spoke to him approximately five times about this incident you're now telling this jury that that's incorrect?
A I said we didn't speak about it much. Five times ain't much, and if you speak about something or have a conversation about something, it's two different things.
Q Speaking about something and having a conversation about something are two different things?
A Brought it up, but we didn't speak about it much.
Q Is the same true for Mr. Norwood Thomas as well? Let me withdraw that question.
How many times did you speak with him, if any, about what happened on November 29, 2001?

A We spoke a good amount of times, me and Norwood.
Q When you say good amount of times, give us an approximation?
A No, I can't give you an approximation.
Q Well, would you say more than ten times?
A Probably, yeah.
Q More than 20 times?
A Nah.
Q So somewhere between 10 and 20 times you talked about what happened on the A train?
A Somewhere between 15 and 20 times.
Q You spoke about what it was that happened on that particular day?
A We both already knew what happened. All we did was just reminisce.
Q When he told you about what happened, you agreed because it was exactly what you recall, right?
A Yeah.
Q And when you told him what happened he agreed with you because it was exactly what he recalled, right?
MS. GOLOWA: Objection.
THE COURT: Sustained as to the form of the question.
A We never told each other what happened.
THE COURT: Sir, Mr. Fitzgerald, I just

sustained an objection. That means you don't have to answer that question. Next question.

Q Now, was there ever a time when all three of you -- when I say all three, I mean, you, Mr. Joseph Davis and Mr. Thomas were together that you spoke about what happened back on November 29, 2001?

A Probably about that same day it happened. Afterward I really didn't want no part with him. I didn't know where he was coming from.

Q When you say -- withdrawn.

When you say, "he," are you referring to?

A Joseph.

Q Joseph Davis. And when you say you didn't know where he was coming from, are you saying that in terms of the possible relationship that he was looking for from you?

A No, no, not me. What I mean by that is I overheard them say his name, so they knew him. He didn't tell me about that. That's putting my life at risk. I ain't gonna hang out with anybody like that. That's not being a responsible friend. I could have got hurt there too. I stood away from him.

Q You were concerned hanging out with Joseph Davis could be dangerous to your livelihood, is that what you're telling us?

MS. GOLOWA: Objection?

Cross-Defense-Fitzgerald

A You can say that.

THE COURT: The answer will stand.

MR. FINK: I'm sorry.

THE COURT: I said the answer will stand.

Q How long had you known Romeo or Joseph Davis on November 29, 2001?

A I know him for about a month.

Q And he indicated that he was going to help you in terms of your rapping, is that correct?

A He was just trying to help me get a job.

Q It did not -- having to do with rap music?

A Yeah, it has -- it's a music company and if you see somebody got a spirit in music and you bring them in the music industry, it's going to bring out a good person in them.

Q You said that well, -- withdrawn.

Now, there came a time that you spoke to a prosecutor with regard to this case, is that correct?

A Yes, I have.

Q And could you tell us how many times it is that you spoke with a prosecutor with regard to this case?

A I think it was just that one time.

Q Excuse me, one time being when?

A What do you mean by prosecutor? Which one, I don't know which is which.

Q Do you know that Miss Golowa is an Assistant District Attorney?
A All right then. Yes, I do.
Q I'm sorry?
A Yes, I do.
Q How many times is it that you have spoken with district attorneys with regard to this case?
A Several; like, three, four.
Q Three or four times or three or four different assistant district attorneys?
A No, the same one.
Q You always spoke to the same Assistant District Attorney?
A Yes.
Q So every time that you spoke to a prosecutor with regard to this case, it's been Miss Golowa; is that your testimony?
A That's what I remember, yes.
Q And you remember that because you have a real good memory, right?
A No. I remember that because that's all I remember. I can speak to a million different people, I don't know who they are, who they work for. What their status is.
Q You're not sure -- withdrawn.
Is it your recollection that the only time that you

had spoken with an Assistant District Attorney, that person has been Miss Golowa?

A Yes; that's what I recollect, yes.

Q Do you recall testifying in the Grand Jury with regard to this case?

A Yes.

Q And when you testified in the Grand Jury, was it a district attorney who asked you questions?

A Yes.

Q And, in fact, when that person asked you questions you took an oath the same way that you took an oath today to tell the truth, right?

A Yes.

Q Was that Assistant District Attorney Miss Golowa?

A No, it wasn't. But I also thought he was a judge.

Q You thought that the Assistant District Attorney in the Grand Jury was also a judge?

A Yes, and it says it in the report. It says I called him Your Honor. I didn't know he was an Assistant District Attorney. As I said, I don't know what jobs they are. I just know who I see.

Q So it's your testimony now, that you spoke to an Assistant District Attorney other than Miss Golowa, is that correct?

A Yes, I have. I wasn't aware of it.

Cross-Defense-Fitzgerald

Q Did you have a chance to read through the your Grand Jury testimony before you came here and testified?

MS. GOLOWA: Objection.

THE COURT: Overruled. You may answer.

A Yes, I have.

Q And did you do that today, sir, before you came in here to testify?

A Yeah, it was in front of me, but to tell you the truth, I didn't even read it.

Q Well, did you ask to see it?

A No, I didn't.

Q Did Miss Golowa give it to you and ask you to read it?

A She didn't give me and ask me nothing. She just told me what it was.

Q And you didn't read it?

A I looked at it. I told her, but I didn't read it. I told her I didn't want to read it.

Q And did you ever look at your testimony any other time?

A Yes.

Q Prior to today?

A Yes. One other time before this.

Q And can you tell us when that was, approximately when?

Cross-Defense-Fitzgerald

A That was like four, three and a half months ago.
Q Did you read through your testimony on that day?
A Yes, I read it.
Q And how many times would you say you read through it?
A Once.
Q And when you were down in Miss Golowa's office, were you by yourself?
A No.
THE COURT: When?
MR. FINK: I'm sorry.
Q The last time that you -- withdrawn.
The first time that you read your Grand Jury testimony, a couple of months ago, whenever it was that you first read it, were you in your office by herself or with anyone else?
A I was with someone else.
Q Who was that?
A I was with her and a police officer.
Q You don't have to look at Miss Golowa.
A I was with her and a police officer and her assistant.
Q And what police officer were you with?
A I don't know his name.
Q Were you ever with Mr. Thomas or Mr. Davis in her

office?

A No.

Q And when you were with Miss Golowa, did she tell you what questions she was going to be asking you?

A Yeah.

Q Did you rehearse what you were going to be testifying to today?

A Yes.

Q How many times did she ask you questions about what you were going to testify to well, -- withdrawn.

Approximately how long did you spend with her going over what you will be testifying to today?

A Two minutes.

Q Two minutes.

In total?

A Total.

Q Did she ask you a lot of the same questions that she asked you today?

A Yeah.

Q And it only took two minutes?

A About, yeah.

Q Did she show you any pictures?

A No.

Q The train diagram, I believe that's 7-A and B that you too put all those red dots on?

A Yeah.
Q Is that the first time that you're looking at that diagram today in this courtroom?
A No, it's not.
Q It's not. You happen to see that same diagram or something similar in the office?
A It's a diagram; it's not a picture.
Q I think there is a picture next to it?
A I didn't see that picture next to it. I only saw the diagram.
Q You only saw the diagram?
A And that was a long time ago.
Q Did she have you point on it where you recall things happening back on November 29, 2001?
A Yeah.
Q And everything that you indicated to her at that time is exactly what you have indicated today, correct?
A Yes.
Q Did you happen to put dots on the diagram on that particular day?
A No, everything I did in here was different. She never studied on this. She just asked a couple of questions about the diagram. I showed her an overall. It was the same story.
Q I want to direct your attention, if I could now,

to the date in question, November 29, 2001. You indicated that you got on the A train at Nostrand Avenue, is that fair to say?

A Yes. Utica.

Q On Utica Avenue?

A Yes.

Q And you got on with your two friends, is that correct?

A Yes, I did.

Q And how long had you been with them prior to getting on the A train at Utica Avenue?

A What do you mean by that, sir?

Q It was 4:00 approximately, right, at the time that you saw this person pull out a gun, right?

A Yes.

Q The guy you referred to as having a red jacket, right?

A Yes.

Q My question to you is how many hours were you with Mr. Joseph Davis and Norwood Thomas before you got on the train that day?

A The whole day.

Q The whole day starting at what time?

A As soon as I woke up.

Q Were you guys staying together at that particular

time? Did you hook up with them somewhere?

A I stayed with Norwood. I didn't have a home to stay with.

Q You were living with Norwood Thomas?

A Yes, I was.

Q And when you went home that night and were you still living with Norwood Thomas?

A Yeah.

Q And did you talk about this incident that particular night?

A No, because I didn't go to Norwood's house, I went to Joseph house that night.

Q Did you speak to Joseph about what happened that night?

A We spoke about it, but not much.

Q Now, you indicated that, I believe you have a prior -- one second. I believe you said you have a conviction down in Pennsylvania; a criminal conviction?

A Yes.

Q And I believe you said that that happened in 2001, is that right?

A Yes.

Q And I believed you said you were convicted of resisting arrest, is that right?

A Yes.

Q And you also indicated that particular case, correct me if I'm wrong, involved drinking and assault, is that right?
A Yes.
Q Okay, and were you with Mr. Thomas when that particular incident happened?
A Yes, I was.
Q And did he get arrested also on that date?
A Yes, he did.
Q And the two of you had a fight with somebody else; is that fair to say?
A No, we didn't.
Q Did you have a fight with each other on that day?
A No, we didn't.
Q You were arrested for fighting with somebody?
A No.
Q Did you have a problem with the police officers?
A No.
Q But you got charged with -- you were convicted of resisting arrest?
A And aggravated assault.
Q Resisting arrest was when the police tried to arrest you?
A Yes.
Q So you did have a problem with the police officer?

A Not really. You don't have to actually have a problem with the police officer.

Q You also indicated that in New Jersey, I believe you had a speeding ticket and you had some marijuana on you at the time, is that correct?

A No, it was in the car.

Q It was in a car?

A Yes.

Q Do you smoke marijuana?

A Yes, I do.

Q And do you drink a lot?

A No.

Q Were you smoking marijuana back on November 29, 2001?

A No.

Q You weren't?

A Was I smoking weed at the time or was I intoxicated?

Q I'm not asking if you were smoking weed on the train. But that particular day you got up, had you had any marijuana?

A No, I hadn't.

Q Had you had any the night before?

A No.

Q How often were you smoking marijuana at that time?

A Whenever I felt like it.

Q So does that mean you would generally smoke every day?

THE COURT: Sustained.

A I didn't know I had to have a schedule to smoke.

THE COURT: You don't have to answer.

Q What was the aggravated assault regarding?

A Excuse me?

Q The case in Pennsylvania, what happened?

A They dropped that charge because within two years they didn't know whether his finger was broken or not.

Q You were charged with breaking someone's finger?

A They said his thumb was supposedly broken, and it's a two year old case. It was out of line, so the Judge threw it away.

Q Don't you currently have an outstanding warrant in Pennsylvania for not going back for sentencing?

A Um-hum. Not sentencing. I was supposed to call up my probation officer but at the time I was on the move, I didn't get none of her phone calls or none of her mail. I found this out yesterday or the day before that I was supposed to be in court, and I spoke to people about it already and I'm going to handle it.

Q You were supposed to go back to court and you didn't go back to court?

Cross-Defense-Fitzgerald

A I don't have no money to go over there.
Q You indicated that you got on the train at Utica Avenue, correct?
A Yes.
Q And when you got on the train, the train was very crowded, yes,
A Very crowded.
Q It was rush hour?
A Yes.
Q Let me ask you something. If you were -- is it fair to say if you have to put dots, red dots on that diagram I believe 7-B in evidence, is it fair to say there would be dots on almost every single dot on that diagram?
THE COURT: Assuming the dots represent a person.
MR. FINK: Assuming a dot represents a person.
A Yeah. That would be dots in a lot of places.
MR. FINK: Can I have that diagram hung up possibly?
THE COURT: Yes.
MR. FINK: Could you give me a -- officer is it possible to post it?
THE COURT: Yes.
Q Is it fair to say there would be -- if a dot represents a person, as the Judge said, there would be

hundreds of dots on that particular car; yes?

A Yes.

Q Now, I believe on direct examination you said that -- just one moment. I believe your testimony was that you, when Miss Golowa asked you whether or not you got on the last car on that particular train, when you got on at Utica Avenue, you testified you said, "I'd say about the last car"?

A Um-hum.

Q Do you know if you were on the last car or you're not sure?

A You can't be too sure of anything these days.

Q So --

THE COURT: Is your recollection that it was the last car?

THE WITNESS: Yes, it was, Your Honor.

THE COURT: Go ahead.

Q But you're not a hundred percent certain, are you?

MS. GOLOWA: Objection.

THE COURT: Overruled. You may answer.

A Yes, I'm a hundred percent sure.

Q You're a hundred percent sure.

Now, you said that when you got on the train with your friends, well, -- withdrawn.

MR. FINK: Could -- I'd ask if the witness could step up to 7-A and B, Your Honor?

THE COURT: Yes.

(Witness Complies.)

Q Could you show us what side it is, if the top of the diagram is the front of the train, the way the train is going.

What side did you actually enter on?

A (Indicating.)

Q You entered on the right side of the train.

MR. FINK: Indicating the right side of the train.

Q Is it fair to say when you got on the train, you and Mr. Joseph Davis walked across to the other side, is that correct, walked from the right side to the left side?

A Yes, sir.

Q And there was nowhere to sit, right?

A No.

Q Every seat on that particular car was taken, is that fair to say?

A No. You don't -- all seats don't have to be taken. Not all seats have to be taken to stand up. Just people got the courtesy to stand.

THE COURT: Do you recall if the seats were taken?

THE WITNESS: I can't say all the seats were taken. Some of the seats don't have to be taken.

Sometimes there's no room.

Q Do you recall there being empty seats when you got on the train?

A There were empty seats, yeah.

Q And again, you and Mr. Joseph Davis walked across to the left side of the train?

A Yes, sir.

Q And Mr. Norwood Thomas he stayed on the -- by the doors that you all three initially entered?

A Yes.

Q To get into the train, correct?

A Yes.

Q He stayed on the right side of the train, right?

A Yes.

Q And you indicated that you saw the guy with the red jacket, and you saw the tall guy, and I believe you said you saw my client?

A Yes, I did.

Q Where were they when they got on the train?

A They were all sitting, right here on the right side of the train.

Q And could you indicate on the picture in 7-A that's in evidence, where that would be?

A One was sitting here. One was sitting here and basically were sharing three seats, if you can understand

Cross-Defense-Fitzgerald

what that means.

Q Was there anyone else with them?

A Not that I know of. I just seen them three. If there was, I didn't know. There was only one. One here. One here, and one here.

Q Who was sitting here?

A The red jacket. (Indicating.) The defendant, and the guy with the leather headband, bandana.

Q The tall guy had a leather headband?

A A leather bandana that stands out; it was black.

Q I'm sorry. It was black?

A Yes, it was black.

Q Did he have anything else on his head, the tall guy?

A No, he was bald.

Q He was bald?

A He was bald and he had a black thing on his head. There was a lady sitting here. He asked her to move over. He jumped over here and they were over here.

Q Let me stop you for a second. I want to make sure I understand and the jury understands.

The person who you said had the gun, he was sitting in -- point again to which chair?

(Witness Complies.)

Q If you can just take one of those red dots up there

just put a --

(Witness Complies.)

THE COURT: Which way is the train going towards us or away from us in that picture?

THE WITNESS: Towards us.

THE COURT: Go ahead.

Q So you were standing where? Now where were you?

A Me? I'm, right here on the door.

Q And, I'm sorry, the train is going?

THE COURT: Coming towards you.

Q Coming towards me.

A This way. (Indicating.)

Q You would have been on the left side of the train, right?

A Yes, left side.

Q And the person with the gun went where now?

A He moved from here to this seat. (Indicating.)

Q Did he ask someone to move?

A Yes. He asked the female.

Q And where exactly where was Mr. Davis?

A Which one?

Q I'm sorry. Mr. Joseph Davis.

A He was right on the side, the left side.

Q He was to your left?

A Yes.

Cross-Defense-Fitzgerald

Q So he okay. -- withdrawn.
And you were both standing against the doors that open up on the train?
A Yes.
Q And I believe you indicated on direct examination -- actually can you put another red dot where the person with the gun went to.
(Witness Complies.)
Q I believe you said he switched his chairs a second time?
A Yes. He went back.
Q He went back to where you indicated he was sitting initially or no?
A No. He went back to the middle but between where I told you there was space.
Q Can you put a read dot there?
(Witness Complies.)
Q And could you just point on 7-A where Mr. Norwood Thomas was at this particular time?
A On this door. (Indicating.)
MR. FINK: Indicating as the train was going towards me, it would be the, right side of the train.
THE COURT: The left side of Exhibit 7-A.
MR. FINK: Right. The left side of the photograph but again as the train is, if the photo an

Cross-Defense-Fitzgerald

indication of the train going towards me, it would be the right side of the train.

Q Now, you then indicated -- you can sit down by the way.

(Witness Complies.)

Q By the way, you said my client had that green skullie, is that right?

A Yes.

Q What's that? What's a skullie?

A A skullie is a hat with no brim which covers your ears to keep you warm.

Q It's not referred to as a doo rag?

A No.

Q Just a hat with no brim.

And was there anything on it; just a solid green?

A No, it had designs but it was mainly green.

Q What kind of designs did it have on it?

A I seen green; I didn't check out the hat for the designs.

Q Now, you indicated that at some point the person with the gun got up and came over to you, right, came over to Mr. Davis?

A Yes.

Q Had you heard the gunman say anything to my client or the tall guy before he did that?

Cross-Defense-Fitzgerald

A Yeah. They were all talking amongst each other.
Q Did you hear my client say, "let's do a robbery"?
A I didn't hear any of them say it. It looked like they were doing it, right?
Q Well, did you see anyone hand the gun, man the gun?
A No, I didn't see that.
Q This gunman got up by himself?
A They got up together. In the military it would be precision.
Q They all got up at the same time?
A Yeah.
Q And where was the gunman holding the gun; what hand?
A Right hand.
Q Right hand?
A Right hand.
Q And he went, right up to Mr. Davis and put the gun, right to his head, is that correct?
A As if he slaughtered his family. He went straight up to him.
Q As if he slaughtered his family?
A Yes.
Q And you stood there and then you went, right in between the gun and Mr. Davis?
A Yes.

Q Were you -- withdrawn.

You never saw my client --

THE COURT: I didn't hear the question.

Q You never saw anything in my client's hand, did you?

A No.

Q You didn't.

And you never saw anything in this tall person's hand, is that correct?

A No, I didn't.

Q You said that you noticed the gun that the gunman was holding was a 25, is that right?

A Yes, I did.

Q And you seen a 25 caliber gun in the past?

A Yeah.

Q And you're able to distinguish between a 25 caliber and a nine millimeter?

A Yeah. Not a professional but.

Q Did the police -- didn't tell you what kind of gun it was?

A They said it was a 25.

Q They said it was a 25. You knew it was a 25 before they even told you?

A It's something that I proved myself, right.

Q I'm sorry?

Cross-Defense-Fitzgerald

A It wasn't nothing big me knowing it's a 25.
Q I didn't say it was.
MS. GOLOWA: Objection.
A I knew it was a 25.
THE COURT: Don't argue with the witness just ask questions?
A I knew it was 25, yes.
THE COURT: Just answer questions.
THE WITNESS: Sorry Your Honor.
Q When this gunman stood up and put the gun to Mr. Davis' face it almost seemed like he was out of it, Mr. Joseph Davis?
A Yes.
Q And, again, you stood in between Mr. Davis and the gunman, right?
A Yes.
Q You wanted to come to Mr. Davis' aid, right?
A Yeah.
Q Mr. Joseph Davis' aid?
A Yes.
Q Were you scared at all at that time?
A No.
Q Did it look like Mr. Norwood Thomas was scared or nervous?
A No.

Cross-Defense-Fitzgerald

Q Were you able to see Mr. Norwood Thomas?
A I seen his face when he was next to me, yes. When he first grabbed the guy, and yeah, I seen him. When he got pushed back, I didn't see him until I -- I met up with him in between the cars again. I seen his face. He was serious.
Q Your testimony is that you saw Mr. Thomas go up to the gunman, correct, and then the next time you saw him after that was when you were in between cars; fair to say?
A Yes.
Q Now, it's fair to say when this gun was pointed at Mr. Davis and then at you, you were focused on this particular person, right?
A Not entirely.
Q Well, you didn't see Mr. Thomas again until after he was in between the cars, correct?
A Because Thomas wasn't in the car. He wasn't in the car.
Q But you didn't see him again until after he was in between the cars, right?
A Yes.
Q How long would you say it took to get from Nostrand, I'm sorry, from Utica to Hoyt Schermerhorn; how much time did it take?
A A pretty long time, to tell you the truth. It felt like it. Especially the whole episode, it wouldn't end.

Cross-Defense-Fitzgerald

Q Did it take ten minutes to get there?
A It seemed like a half an hour, to tell you the truth.
Q Seemed like a half an hour?
A But I also know that the train between the avenues of Nostrand and Hoyt Schermerhorn, it doesn't run that fast and it's a pretty long way and to tell you the truth, the train slowed down, so you could say it stopped but it was going slow.
Q Now, you said that after you got off the train, and you apprehended the guy with the gun, you said that you saw my client, right?
A Yes.
Q And you said that you saw him outside the gate, right?
A Yes, I did?
Q And you then indicated that you saw him going upstairs, is that right?
A I also saw him hop over in between the car too. I saw that too.
Q My question to you is after you had apprehended gun man, you saw him, right?
A Yes, yeah.
MR. FINK: Could we have, I believe it's People's 8 posted?

THE COURT: Yes.

Q Now, if you look at, I believe it's 8-A. You don't have to get up. You indicated that my client would be to the right of the gate that's posted, correct?

A Yes.

Q Now, after you saw them at that point, I believe you testified, correct me if I'm wrong, you saw him running up the stairs, is that correct?

A Yes.

Q Would those stairs be to the left of that photograph or to the right?

A It matters where you're looking at.

THE COURT: As you look at it now.

Q Why don't you go to the diagram?

A It would be to the right, behind me.

Q Excuse me?

A To the right of me and behind me.

Q I'll ask you if you can go and point.

THE COURT: Point on the photograph, the direction that you saw him go.

(Witness Complies.)

Q Where would those stairs be?

A This way and behind.

Q And how far would you say those stairs are?

A Not too far.

Cross-Defense-Fitzgerald

Q Like 10 steps?
A Yeah.
Q You're familiar with the Hoyt Schermerhorn stop?
A No, I'm pretty familiar with the situation. I ain't never been in that situation.
Q You can sit down.
THE COURT: Have a seat.
Q You saw both my client and the other individual who he was with, I believe the person you referred to as the tall guy run up the stairs behind and to the right?
A Yes, I seen them.
Q Getting back to when you were on the train. I believe you testified that at some point Mr. Thomas ended up in between cars, is that correct?
A Yes.
Q Were there, again, looking at 7-B in evidence. Can you see it or perhaps the officer can just hold it up so the witness and jury can see it. Were there a lot of people from where the red dots are to the top of the car where B is?
MS. GOLOWA: At what point?
A Yes.
THE COURT: At what the what point in time?
Q At the point the gunman comes up to you.
A Yes.
Q And people, is it fair to say, a lot of people

started going up towards the top of that car?

A Yes.

Q And how many people would you say, approximately, there were going up towards the top of that car at that particular point when the gunman comes up to you with the gun?

A 25, 30.

Q And the only way for them to get from the car that you were in to another car was to go through one set of doors, is that correct?

A Yes.

Q Now, did you actually hear my client say anything to Mr. Thomas while the gunman was pointing the gun at your face?

A No.

Q And you said that you saw the tall guy punch Mr. Thomas in the face?

A Yes.

Q But you couldn't tell if he was holding anything in his hand, is that correct?

A No.

Q But you actually saw him swing and hit Mr. Thomas in the face with his fist; you saw that with your eyes?

A No. I seen Mr. Thomas' face get hit. I didn't see no motion. I seen his face go like this, and I seen who it

was and that was that.

MR. FINK: Indicating a fist to the face?

THE COURT: Yes.

Q You never actually viewed any lineups with regard to this case; is that fair to say?

A No, I didn't view no lineups.

Q And you made a determination that these three individuals were friends, is that correct; yes or no?

A Yes.

THE COURT: Don't direct the witness how to answer the question.

MR. FINK: Sorry, Judge.

Q Could you just tell us again, I'm sorry, what it was Mr. Thomas was wearing that day?

A I said gray, dark grayish pants, black sneakers and that grayish jacket.

Q And was he wearing a hat on that day?

A I don't know if he had anything on his head. He wasn't really the type to wear hats.

MR. FINK: Just one moment.

THE COURT: Yes take your time.

Q Now, do you recall speaking with Miss Golowa on December 10, 2002?

A Yeah.

Q Yes?

A You said December 10, 2002?

Q December 10, 2002?

A Probably January.

Q Okay.

A I know it was always the beginning of the month she called me.

Q Do you remember describing the person who had the scar to her in her office?

A Yes.

Q And do you remember telling her that this person was holding a knife in his hand?

A No. I never said that.

Q You never said that?

A I said he could have, but I didn't see it. I couldn't see it.

Q If I showed you a document, would that refresh your recollection?

THE COURT: He has a recollection.

MR. FINK: Perhaps his recollection would be different if I show you him a document, Judge.

Can we approach.

THE COURT: No.

Q So it's your testimony as you sit in this courtroom today under oath that you never told Miss Golowa that the person who had the scar was holding a knife in his hand?

A Maybe at that time I was kind of sure of it, but now even if I did know he had one, I'm not sure of it. I can't say, yeah, yeah, he had one; I'm not sure.

Q Are you saying to this jury on December 10, around December 10th of 2002 you were sure that he was holding a knife but now you're not sure?

A Maybe I was in between but now definitely not sure. Time goes by.

Q Now, you recall testifying again in the Grand Jury on December of 2001 in December of 2001, yes?

A Yes.

Q And at that time you were asked questions by a male Assistant District Attorney, is that correct?

A Yes.

Q And again you testified under oath, correct?

A Yes.

Q Do you recall being asked this question and giving this answer back on that date. I'll draw your attention to page 28 line 23.

THE COURT: You have a stipulation that you're using an accurate transcript of the minutes of the Grand Jury proceeding?

MS. GOLOWA: Yes.

THE COURT: It's stipulated. Go ahead.

Q "Question: Okay, when you were on the

platform, did you see those three guys again?

Answer: I seen one of them running up the stairs.

Which one was that?

The one with the red."

Do you recall being asked that question and giving those answers to the Grand Jury back in December of 2001?

A Um-hum.

THE COURT: Is that a yes?

THE WITNESS: Yes.

Q But now it's your testimony that, in fact, you saw all three of the individuals after, correct?

A I saw all three of them when I was already upstairs. They're asking me questions on different times. Now if I was downstairs I only seen one. If I was upstairs, I seen three.

Q Do you recall being asked this question and giving this answer back in December of 2001. I'll draw your attention to page 23, line 18.

"Question: What happened after this guy switched seats with the female?

Answer: He started staring. He started stretching his legs out. The other tall guy was stretching his legs out. The short guy was just looking around, the one with the scar on his face.

Cross-Defense-Fitzgerald

Then what happened.

Question: Then what happened.

Answer: And then all of them started, popped up."

THE COURT: Is that a question? Have you finished it?

MR. FINK: Yes, I'm finished.

Q Do you recall being asked those questions and giving those answers?

MS. GOLOWA: Objection.

THE COURT: Overruled.

MS. GOLOWA: Judge, could we approach?

THE COURT: No.

You recall being asked those questions and giving those answers?

THE WITNESS: Yes.

Q But now it's your testimony that the person with the gun actually moved seats two times, correct?

A Yes.

Q But in the Grand Jury you only indicated that he moved seats one time, right?

A Yes.

THE COURT: Let him finish his answer.

A Yeah, but I only answered what they asked me. If they wanted more, I would have given them more.

Cross-Defense-Fitzgerald

Q You weren't given the opportunity to indicate what happened?

A No. You asked me two different questions. I understand the whole question. Give me the whole scenario. You're popping around asking me different, of course, it's going to be different. That was only at a certain --

THE COURT: That's enough, sir.

Q And just a final other question. Do you recall speaking with a Police Officer Rodriguez after this incident happened?

A When? I spoke to a lot of them.

Q On November 29, 2001 at approximately --

THE COURT: Don't read from something that's not in evidence.

Q On November 29, 2001 at approximately 4:30?

A I spoke to a lot of cops that day. I can't --

Q You don't recall speaking with a Police Officer Rodriguez?

A No.

Q Do you recall indicating to Police Officer Rodriguez that the only person involved in the robbery was the person who you had actually apprehended; do you recall that?

A I wouldn't say -- no. It wasn't that. Hell, no. That's basically saying he didn't do nothing. No, the only

one that had --

Q You don't recall saying that to Police Officer Rodriguez?

A No.

Q If I showed you something, would that perhaps refresh your recollection?

A Probably. But probably, to tell you the truth, I really even wasn't in the right state of mind. I just been through that incident. You asked me a million questions. I sit here, my hands are sweating. I don't know what you trying to do, man.

MR. FINK: Just one moment, Judge.

Judge, I have nothing further.

THE COURT: Redirect?

MS. GOLOWA: Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. GOLOWA:

Q Just briefly. Mr. Fitzgerald, you stated on cross-examination that you got on the train at Utica Avenue?

A Yes.

Q And when you got on at Utica, was that on the local or the express?

MR. FINK: I'll object to the leading. It's redirect examination.

THE COURT: Overruled.

Redirect-People-Fitzgerald

A We got on the local first.
Q And when you say first, was there a second train that you got on?
A Yes.
Q And when did you get on another train?
A We got off the next stop and went back on because Utica, I don't think that's -- two trains was running. We had to get off on Nostrand to be able to catch them, the other train.
Q So the train that you were actually on at the time that this whole incident that you described happened, did you get on at Utica or Nostrand?
A Utica.
Q So you said that you got on Utica and got off at Nostrand-
THE COURT: Next question. Redirect.
A Nah, I don't think we got off.
Q Now, you stated on cross-examination that you spent two minutes with me going over the questions?
A Yeah, about.
Q And when you said that, were you referring to any particular day or all the times that we talked?
A No. Today.
Q And was there another time that we also talked about the questions?

Redirect-People-Fitzgerald

A Yes, we did.

Q And at some other time, did we spend any additional time talking about the questions?

A Yes.

Q Did we spend more or less than two minutes?

A Yes.

Q When you say, "yes," what do you mean?

THE COURT: More or less?

THE WITNESS: More. More. Sorry.

Q Now, you stated that you went, stepped in between Joseph Davis and the gun and then you told the jury on cross-examination that at that time that you weren't scared, is that correct?

A Yes.

Q And could you explain why you weren't scared at that time?

A I -- I don't know why I wasn't. Maybe I watch too much TV.

Q I'm going to ask at this time that the witness be shown People's 4?

THE COURT: Why? Come up and make an offer of prove. It wasn't used on cross.

(Whereupon a bench conference was held off the record.)

THE COURT: Go ahead, question.

Q Mr. Fitzgerald, do you recognize the item in People's 4?

A Yeah.

Q I didn't hear it, I'm sorry.

A Yes.

Q Where do you recognize it from?

A That was in the hand of the gunman.

Q That's the same gun from November 29, 2001?

A It's hard to tell.

MR. FINK: I'm sorry I can't hear.

THE COURT: Louder.

A It's hard to tell. It looks dingy. It looks gray.

THE COURT: Is it the same type of gun that was used that day?

THE WITNESS: Yes.

MS. GOLOWA: Nothing further.

THE COURT: Recross?

MR. FINK: No.

THE COURT: Mr. Fitzgerald, you're excused with the thanks of the Court. You may step down, sir.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you.

(Witness excused.)

THE COURT: You want to come up for a second.

Ladies and gentlemen, that the concludes our

work for today. Now, we have a jury room on this floor. The Court has some other matters to do, rather than have you sit in the room for about an hour and a half to come in, come in at 11 tomorrow, and we will start at 11 and continue with the testimony.

Again, don't discuss the case among yourselves or with anyone else. Don't read anything or listen to anything touching on this case.

Don't attempt to do any investigation about the locations and if anybody tries to talk to you, let me know immediately. See you tomorrow in a new jury room 11 a.m. sharp.

Have a good evening.

(Whereupon the Jury exits the courtroom.)

THE COURT: All of the sworn jurors are outside of the courtroom, anything for the record before we adjourn until 11 a.m. tomorrow morning with the trial.

MS. GOLOWA: I don't have anything other than --

THE COURT: Get your, officer and I'll direct him to appear tomorrow at 11.

(Officer Wengert enters the courtroom.)

THE COURT: Officer, just state your name and your command on the record?

OFFICER WENGERT: Your Honor, I'm officer

Kenneth Wengert, New York City Police Department Transit District 30.

THE COURT: Officer Wengert, your testimony is required at 11 a.m. tomorrow morning. You can tell your commanding officer that you have been directed by Justice Michael Brennan of the New York State Supreme Court to appear tomorrow at 11.

We'll try to have you out of here as soon as we possibly can. See you tomorrow morning.

OFFICER WENGERT: Thank you, Your Honor.

MR. FINK: Can I make a record with regard to an issue?

THE COURT: Go ahead.

MR. FINK: Your Honor, just with regard to Mr. Fitzgerald's cross-examination with regard to conversations that he had with Miss Golowa back on December 10, 2002, I want to make something clear.

I was provided that document by Miss Golowa that he gave a description of my client which the word is written knife. I'm assuming that he, in speaking with her, described my client as having a knife on that day. I think it's -- I have created a foundation for a prior inconsistent statement. My concern, though, is that Miss Golowa is the one who took the statement and technically if it was a detective, I would have asked the detective

on the stand, isn't it a fact that you had a conversation with Mr. Fitzgerald on this date and he said to you that so and so that knife. I raise that issue now.

THE COURT: I'll give you a ruling tomorrow whether I would allow the statement to be put into evidence by you.

MR. FINK: Or some kind of stipulation in fact when he spoke with her, he did indicate that.

THE COURT: I'll give you a ruling tomorrow.

MS. GOLOWA: My concern here --

THE COURT: I haven't seen it.

MS. GOLOWA: There are assumptions being made, something told to me on very cryptic notes, if I take any.

THE COURT: I told you, I'll make a ruling on it. I'll hear arguments in the morning.

MR. FINK: A second thing before I go. The document I put into evidence, Defense Exhibit A that report it's kind of blurry, I don't know if the DA has a clearer copy, can get a clearer copy, but that would be my request.

THE COURT: Can you read it?

MR. FINK: I can read it, but it's a strain, you know.

THE COURT: Then you can read it to the jury.

MR. FINK: Very good, Judge.

THE COURT: 11 a.m. tomorrow.

(The trial is adjourned to May 5, 2003 in Part 23.)

* * *

It is hereby certified that the foregoing is a true and accurate transcript of the proceedings.

Rosanne Terman

ROSANNE TERMAN,
SENIOR COURT REPORTER

# I N D E X P A G E


| PEOPLE'S WITNESSES | PAGE |
|---|---|
| J O S E P H T R E E S E | 98 |
| DIRECT EXAMINATION BY MS. GOLOWA | 98 |
| D E N N I S F I T Z G E R A L D, | 117 |
| DIRECT EXAMINATION BY MS. GOLOWA: | 117 |
| CROSS EXAMINATION BY MR. FINK | 176 |
| REDIRECT EXAMINATION BY MS. GOLOWA | 215 |